**RAZZANO WALSH & TORRES, P.C.**
JOSHUA D. WALSH
SUITE 100, 139 MURRAY BLVD.
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 989-3009
FACSIMILE: (671) 989-8750

*Attorneys for Defendant*
*Evanston Insurance Company*



FILED
DISTRICT COURT OF GUAM

AUG 29 2022

JEANNE G. QUINATA
CLERK OF COURT

### DISTRICT COURT OF GUAM

**22-00021**

| | |
|---|---|
| PACIFIC AMERICAN TITLE & INSURANCE COMPANY and LOURDES P. SAN NICOLAS, | Civil Case No. _____ |
| Plaintiffs. | **NOTICE OF REMOVAL** |
| v. | |
| EVANSTON INSURANCE COMPANY, | |
| Defendant. | |

NOW COMES the Defendant, EVANSTON INSURANCE COMPANY (hereinafter referred to as "Evanston" or "Removing Defendant"), by and through its attorney, Joshua D. Walsh , pursuant to 28 U.S.C. §§1332, 1441, and §1446, and for its Notice of Removal, removes case no. CV0411-22, entitled *Pacific American Title & Insurance Company, et al. v. Evanston Insurance Company,* now pending in the Superior Court of Guam, to the District Court of Guam, and in support thereof states as follows:

### BACKGROUND

1.      As set forth in Evanston's Notice of Removal, this cause of action arises out of an alleged contractual dispute relating to the Professional Liability and Information Security Liability Insurance Policies issued by Evanston to Pacific American Title & Insurance Company ("PATICO"). A copy of the Professional Liability and Information Security Liability Insurance Policies are attached as Ex. 1.

2.      Specifically, Plaintiffs' Complaint alleges that Evanston is in breach of the Professional Liability and Information Security Liability Insurance Policies, and Evanston owes Plaintiffs amounts incurred by Plaintiffs associated with the defense and indemnity of the underlying lawsuit styled *U.L.G., Inc., a Guam corporation, et. al. v. Mary S.N. Leon Guerrero, et al.*, previously filed in the Superior Court of Guam under Case No. CV0776-20 ("ULG Matter").

3.      As more fully set forth below, this case is properly removed to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. This court has jurisdiction of this civil action pursuant to 28 U.S.C. § 1332 (a)(l) because the procedural requirements for removal are satisfied, and this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000, exclusive of interest and costs.

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED

4.      Pursuant to 28 U.S.C. § 1446, "[t]he notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading ...."

5.      The first date upon which Evanston received a copy of the Complaint in the Superior Court of Guam action was August 2, 2022. On August 1, 2022, Plaintiffs served the retail broker which placed the Professional Liability and Information Security Liability Insurance Policies with PATICO, AB Risk Solutions, with the Summons and Complaint. On August 2, 2022, AB Risk Solutions forwarded the Summons and Complaint to CRC Insurance Services, Inc, who then alerted the appropriate Evanston representatives. A copy of the Summons and Complaint, along with all accompanying documents, in the Guam Superior Court action are collectively attached as Ex. 2. A copy of AB Risk Solutions' August 2, 2022, email to CRC Insurances Services, Inc., is attached as Ex. 3.

6.     The instant Notice of Removal is timely because it is filed within 30 days of when Evanston was first made aware of the Summons and Complaint, on August 2, 2022.

7.     Pursuant to 28 U.S.C. § 1446(a), Exhibit 2 consists of all "process, pleadings, and orders" served on Evanston in the Guam Superior Court action.

8.     Evanston is the only Defendant for purposes of consent to removal. 28 U.S.C. § 1446(b).

9.     There have been no substantive proceedings in the Guam Superior Court action since the filing of the Motion to Dismiss.

10.     The United States District Court for the District of Guam embraces the locality in which the territorial court action is now pending, and thus this Court is a proper forum for this action pursuant to 28 U.S.C. §§ 93(a)(l) and 1441(a).

11.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal, which reflects the style of the case exactly as it was styled in the territorial court, is being served on Plaintiffs' counsel and a copy is being filed with the Clerk of Court for the Superior Court of Guam.

12.     The appropriate filing fee has been tendered to the District Court of Guam.

13.     This Notice of Removal is being signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

14.     If any question arises regarding the propriety of the removal of this action, the removing Defendant respectfully requests the opportunity to present a brief and an oral argument in support of the position that this case is removable.

//
//

## REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     For diversity jurisdiction purposes, a corporation is deemed to be citizen of the state in which it is incorporated and the state where it has its principal place of business. 28 U.S.C. 1332(c)(1); *CCC Information Svcs., Inc. v. American Salvage Pool Ass'n.*, 230 F.3d 342, 346 (7th Cir. 2000).

17.     Plaintiff PATICO is a Guam corporation engaged in the escrow and title insurance business. See PATICO's Complaint from the Guam Superior Court attached hereto as Ex. 2. PATICO identifies its primary place of business to be located in Tamuning, Guam. An image of PATICO's website showing the location of PATICO's main office in Tamuning, Guam, and a Westlaw Company Report of PATICO, are collectively attached hereto as Ex. 4. Upon information and belief, PATICO is not incorporated in State of Illinois nor does PATICO conduct business in Illinois.

18.     Upon information and belief, Plaintiff Lourdes P. San Nicolas, is a resident of the Territory of Guam. See PATICO's Complaint from the Guam Superior Court attached hereto as Ex. 2.

19.     Evanston is a surplus lines insurance company organized and existing under the State of Illinois with its principal place of business in Rosemont, Illinois. Evanston was not a citizen of the Territory of Guam at the time of, or immediately prior to, the filing and service of this lawsuit, nor has it been at any time thereafter.

20.     Therefore, complete diversity exists between Plaintiffs and Defendant. *See* 28 U.S.C. §§ 1332(a)(1), (2).

21.     It is apparent from the face of the Summons and Complaint that the amount in controversy in this case substantially exceeds $75,000, exclusive of interest and costs. *Back Doctors Ltd v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011) ("unless recovery of an amount exceeding the jurisdictional minimum is legally impossible, the case belongs in federal court"). Plaintiffs allege that they are entitled to recover to date $59,245.22 from Evanston for attorneys' fees and litigation expenses incurred. Plaintiffs also allege that they are entitled to 12% interest on fees already expended, as well as further attorneys' fees, and expenses as the litigation in the ULG Matter continues on towards a scheduled February 14, 2023 trial date. It is Evanston's information and belief that, Plaintiffs will incur more than $16,000 in litigation expenses between the date of this instant Notice, and trial in the ULG Matter.

22.     The allegations in this Notice of Removal are true and correct and this case is within the jurisdiction of the District Court of Guam.

WHEREFORE, Evanston respectfully requests that Case No. CV0411-22, entitled *Pacific American Title & Insurance Company, et al. v. Evanston Insurance Company,* now pending in the Superior Court of Guam, be removed to the District Court of Guam.

*Respectfully submitted* on this 29th day of August, 2022.

RAZZANO WALSH & TORRES, P.C.

By: _____

JOSHUA D. WALSH
*Attorneys for Defendant*
*Evanston Insurance Company*

## CERTIFICATE OF SERVICE

I, JOSHUA D. WALSH, do hereby certify that on the 29th day of August, 2022,

I will cause to be served, a true and correct copy of the NOTICE OF REMOVAL,

accompanying AFFIDAVIT OF JOSHUA D. WALSH, FEDERAL RULE OF CIVIL

PROCEDURE 7.1 DISCLOSURE STATEMENT OF EVANSTON INSURANCE COMPANY,

and NOTICE OF FILING submitted to the Superior Court of Guam on the following counsel

via hand delivery:

> Bill R. Mann
> **Berman Law Firm**
> Bank of Guam Bldg, Ste 503
> 111 Chalan Santo Papa
> Hagåtña, Guam 96910
> *brmann@pacificlawyers.law*

***Respectfully submitted*** on this 29th day of August, 2022.

RAZZANO WALSH & TORRES, P.C.

By: _____
**JOSHUA D. WALSH**
*Attorneys for Defendant*
*Evanston Insurance Company*

# EXHIBIT 1

# WhiteHaX:
# Cyber readiness for business

**Cyber-readiness verification:** WhiteHaX is a cloud-hosted, automated, cyber-readiness verification (pen-testing) platform. The WhiteHaX cyber insurance version provides a quick (under 15-min) verification of a business' cyber-readiness by simulating several threat scenarios against your business' deployed security infrastructure, including network perimeter defenses and endpoint security and controls. A few examples of these simulated threat scenarios include firewall attacks, user attacks from the internet such as drive-by downloads, email phishing/spoofing/spamming, ransomware, data exfiltration attempts, and others. This provides your business with opportunities to periodically self-assess its cyber readiness against some of the most common, recent, and dangerous cyber threats.

**Verification process:** Using its patent-pending QIVE (Quick, Intelligent Verification Engine), it simulates cyber security breaches, exploits, and attack scenarios to quickly assess the readiness of the deployed security infrastructure solutions and their respective configuration policies against such threats. WhiteHaX utilizes the most recent and commonly used breach scenarios to verify how well your business withstands these threats by detecting and preventing them from compromising your internal assets.

Login details for self-registration for the WhiteHaX cloud-hosted platform are included in this guide. This will enable you to connect from any computer within your company's internal network to the cloud-hosted WhiteHaX platform. Typically, you should either utilize a standard endpoint machine image given to end users or a standard server image used in your infrastructure to connect to the WhiteHaX platform for your cyber readiness verification.



Once the connection is established between your endpoint/server and the WhiteHaX platform, attacks are simulated bi-directionally. These occur either through the browser (which acts as a client) or a downloadable (no install) self-destructing executable file. Once all attack simulations are completed, WhiteHaX generates a comprehensive report for your review. The report includes:

- An executive summary outlining ratings of your overall cyber readiness along with the cyber readiness of your security solutions and controls against simulated attacks;
- A report showing the details of the executed threats and
- A list of further resources to help you
  - Remediate some of these threats;
  - Perform a more detailed risk analysis across entire network, servers, and other assets;
  - Train your IT team and end users on protection/prevention of most the common threats.

**No impact to your computers or infrastructure:** WhiteHaX is designed to provide an internal cyber-readiness verification that is performed inside the firewall of the business and is specifically designed to run without impacting your infrastructure. WhiteHaX verification:

- Does not require any downloads if you use the browser-based quick assessment
  - The self-destructing executable provides deeper verification but requires just-in-time download
- Does not require installation for either the browser-based or self-destructing executable tests
- Does not impact any part of your production infrastructure (you may see security alerts from your deployed security solutions, if they are working correctly)
- Does not leave any footprint behind once it's done running
- Does not capture any proprietary data from your network or computers (not even your IP addresses)

Copyright & Trade-mark Material of IronSDN, Corp. ©Copyright 2019, WhiteHaX™. All rights reserved. Markel® is a registered trademark of Markel Corporation. Coverages and services are offered through one or more Markel Corporation insurance related affiliates licensed or registered in the jurisdiction coverage is desired.

WhiteHaX



**Improve your cyber readiness, gradually:** Traditional pen-tests and vulnerability scanners produce long, monolithic reports listing a large number of issues found. Such reports can potentially overwhelm your IT security team resources. WhiteHaX, on the other hand, provides a comprehensive report with a thorough analysis and identification of weaknesses in your security posture. Additionally, the report offers recommendations on how to address critical threats, such as which security solutions may need to be updated or deployed. These additional services may be purchased directly from WhiteHaX to remedy any gaps identified during the pen-test. This helps your business improve your overall cyber-readiness posture gradually without overwhelming IT resources.

**Test results and insurance providers:** WhiteHaX does not share any details of attack simulation results with your insurance provider. However, cyber insurance providers may be provided with some basic information, such as an overall cyber-readiness score. This information is shared with providers to help them understand where there might be additional resources needed to help customers improve their overall security posture, and for their internal risk assessment analytics.

**Data privacy and security:** WhiteHaX does not collect any proprietary data from computers, networks, or other assets — therefore, there is no risk of data sharing either with WhiteHaX or cyber insurers. The only data collected are cyber-readiness scores, which can help you identify historical trends in your cyber readiness.

**Access details:** WhiteHaX cyber-readiness verification is available to you for periodic verification and is recommended on a quarterly basis. Details to get started with the WhiteHaX service include:

- WhiteHaX URL: https://Markel.WhiteHaX.com/whlite/
- Login: Select the "self-register" option on the site to register. Enter the business name as it appears on your Markel cyber insurance policy and the policy (or account) number
- Password: Once you register, the auto-generated random password will be emailed to you. Upon first login, please change the password to your liking. We recommend using a strong password of at least eight characters including a combination of upper and lower case, numbers, punctuations, and symbols.
- Frequency of Verification: You can use WhiteHaX for quarterly evaluation for as long as your policy is active with Markel.
- Usage: The best usage of the WhiteHaX service is to perform your cyber-readiness verification by connecting from either a standard endpoint machine image given to end users or a standard server image used in your infrastructure.
- Support (Email Only): Please send emails to MarkelSupport@WhiteHaX.com

WhiteHaX Additional Services – Markel provides at no cost to our policyholders the two products WhiteHax Free & Pen-testing Services. Policyholders have the opportunity to purchase additional services directly from WhiteHaX . If you wish to purchase additional services, this will be a relationship between the policyholder and WhiteHaX only.

Copyright & Trade-mark Material of IronSDN, Corp. ©Copyright 2019, WhiteHaX™. All rights reserved. Markel® is a registered trademark of Markel Corporation. Coverages and services are offered through one or more Markel Corporation insurance related affiliates licensed or registered in the jurisdiction coverage is desired.







## EVANSTON INSURANCE COMPANY

10275 West Higgins Road, Suite 750
Rosemont, IL 60018

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

_Kathleen Anne Sturgeon_

_Bryan W. Sales_

| | |
|---|---|
| **Secretary** | **President** |



# EVANSTON INSURANCE COMPANY

## MARKEL'S DESIGNED PROTECTION®
## RISK MANAGEMENT RESOURCES FOR PROFESSIONALS

Welcome to Markel's Designed Protection® leading edge Risk Management Resources.

The following risk management resources are available exclusively to our policyholders at our website www.markelcorp.com/riskmanagement at no additional cost.

**HOW TO QUICKLY ACCESS RISK MANAGEMENT RESOURCES:**

Step 1.  Go onto our website, www.markelcorp.com/riskmanagement.

Step 2.  Select the Designed Protection services that apply to your policy, to get to the Login screen.

Step 3.  Review the disclaimer, enter your current policy number and click on the button below to access. Your policy number is MKLV5PEO000597

**Available Risk Management Resources include:**

### Designed Protection® Risk Management Telephone Hotline for Professional Service Providers

This confidential telephone hotline is staffed by a panel of risk management experts that are available to answer general risk management questions.

### Designed Protection® for Professional Services Firms – Leading Edge Strategies for Effective Risk Management

This Guide provides information about principles of effective risk management including client satisfaction, billing practices and prompt and effective action in the event of an error or omission.

### Top 10 Tips for Liability Loss Avoidance for Professional Services Providers

A concise, bullet point summary of 10 liability risk avoidance strategies.

Please check our website regularly as additional resources are added throughout the year.



# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice

Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| **Why?** | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| **What?** | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>• your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>• your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>• your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>• publicly-available information from government records;<br><br>• de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| **How?** | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 12 of 90

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –**<br><br>such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –**<br>to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –**<br>information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –**<br>information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you<br><br>complete an application or other form for insurance<br><br>perform transactions with Us, Our Affiliates, or others<br><br>file an insurance claim or provide account information<br><br>use your credit or debit card<br><br>We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only<br><br>sharing for Affiliates' everyday business purposes – information about your creditworthiness<br><br>Affiliates from using your information to market to you<br><br>sharing for Nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 13 of 90

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you.<br><br>• Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

### Other Important Information

**For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060.

We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement.

**For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information.

For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy.

**For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision.

**Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc.

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 14 of 90



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# EVANSTON INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS
## CLAIM REPORTING

If you purchased DataBreach coverage as a part of this policy with Markel and are experiencing a data breach or believe you have experienced a data breach, please immediately report a new claim under this policy to:

### MARKEL CYBER SUPPORT HOTLINE

A live operator will connect you with breach response counsel. Markel claims and breach response counsel can deploy services and resources to rapidly address a policy event.

### Phone: 844-462-7535 (844) 4MARKEL

For all other claim reporting that does not require immediate assistance, please report a new claim under this policy to:

### newclaims@markelcorp.com

For general claims inquiries after a claim has been reported, please email:

### markelclaims@markelcorp.com

In order for us to expedite the handling of your claim and quickly refer it to the appropriate party, please have the following information available:
- Claim number (or report as new)
- Your name, contact information and position with the Named Insured
- Date of loss
- Policy number and insured name
- Details of loss

Our address and additional contact information are as follows:
Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
Phone: 800-362-7535 (800) 3MARKEL
Fax: 855-662-7535 (855) 6MARKEL

Markel understands the importance of having knowledgeable claims professionals prepared to answer your questions with personal attention and expertise. With claims professionals located across four times zones, you are sure to find the claims assistance you need -- when you need it.

**PLEASE REFER TO THE POLICY FOR ANY NOTICE AND REPORTING PROVISIONS AND DUTIES IN THE EVENT OF LOSS OR DAMAGE TO COVERED PROPERTY.**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 16 of 90

# EVANSTON INSURANCE COMPANY

**MARKEL®**

## DECLARATIONS

**COVERAGE PARTS CAN BE CLAIMS MADE. PLEASE READ THE COVERAGE PART(S) CAREFULLY. CLAIMS-MADE COVERAGE PARTS REQUIRE THAT A CLAIM BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR DURING THE EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED TO THE COMPANY IN WRITING DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, BUT NO LATER THAN 60 DAYS AFTER THE DATE OF EXPIRATION OF THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE.**

**PLEASE NOTE THAT AMOUNTS INCURRED AS CLAIM EXPENSES WILL REDUCE THE LIMIT OF LIABILITY AVAILABLE AND WILL BE APPLIED AGAINST THE DEDUCTIBLE AMOUNT.**

POLICY NUMBER: MKLV5PEO000597          RENEWAL OF POLICY: EO875895

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)
Pacific American Title Insurance & Escrow Company
888 N Marine Corps Drive
Tamuning, GU 96913

Policy Period: From  05/12/2020   to 05/12/2021        at 12:01 A.M. Standard Time at your mailing address shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| **Producer Number, Name and Mailing Address** |
| --- |
| 210803 |
| CRC Insurance Services, Inc. |
| 515 South Figueroa Street, Suite 600 |
| Los Angeles, CA 90071 |

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 17 of 90

## Insuring Agreement Schedule

This Policy includes only those Insuring Agreements designated below by "X" (☒) as purchased. If Insuring Agreement is not expressly designated as purchased, this Policy does not include such coverage.

| Professional Liability Insurance | | | | | |
|---|---|---|---|---|---|
| **Insuring Agreement** | **Limits Of Liability** | | **Deductible** | | **Retroactive Date** |
| ☒ Professional Liability: or | $1,000,000 | Each Claim | $10,000 | Each Claim | 05/12/2012 |
| ☐ Information Technology Professionals: | $1,000,000 | Aggregate | $0 | Aggregate | |
| **Additional Payments** | | | | | |
| ☒ TCPA Violation: | $25,000 | | $10,000 | | 05/12/2012 |
| ☒ FCRA Violation: | $25,000 | | $10,000 | | 05/12/2012 |
| ☐ Sexual Injury: | | | | | |
| ☒ Third Party Discrimination: | $25,000 | | $10,000 | | 05/12/2012 |
| **Supplementary Payments** | | | | | |
| ☒ Disciplinary Proceeding: | $25,000 | | | | |
| ☒ Loss Of Earnings And Expense Reimbursement: | $10,000<br>$25,000 | Per Day<br>Maximum | | | |
| ☒ Pre-Claim Assistance Expenses: | $5,000 | | | | |
| ☒ Public Relations Expenses: | $5,000 | | | | |
| ☒ Subpoena And Record Request Assistance: | $5,000 | | | | |
| Coverage Part Aggregate Limit Of Liability: | $1,000,000 | | | | |
| Description of Professional Services: See Title and Escrow Operations Coverage Endorsement | | | | | |

| General Liability Insurance For Professionals | | | |
|---|---|---|---|
| **Coverage** | **Limits Of Liability** | **Deductible** | **Retroactive Date** |
| | | | |
| Each Occurrence: | | Each Occurrence | |
| Damage To Premises: | Any One Premises | | |
| Medical Expense: | Each Person | | |
| Personal & Advertising Injury: | Each Person Or Organization | Each Person Or Organization | |
| General Aggregate: | | | |
| Products/Completed Operations Aggregate: | | | |
| Supplementary Payments<br>☐ Loss Of Earnings And Expense Reimbursement: | Per Day<br>Maximum | | |
| Description of Specified Products, Goods, Operations, or Premises: | | | |

| DataBreach℠ Network And Information Security And Media Injury Liability Insurance | | | | | |
|---|---|---|---|---|---|
| **Insuring Agreement** | **Limits Of Liability** | | **Deductible (Retention)** | | **Retroactive Date** |
| ☒ Network And Information Security Liability: | $100,000<br>$100,000 | Each Claim<br>Aggregate | $5,000 | Each Claim | 05/12/2012 |
| Regulatory Fines: | $100,000<br>$100,000 | Each Claim<br>Aggregate | $5,000 | Each Claim | |
| ☒ Network Security Loss: | $100,000<br><br>$100,000 | Each Unauthorized Access<br>Aggregate | $5,000 | Each Unauthorized Access | 05/12/2012 |
| Network Security Business Interruption Loss: | $100,000<br><br><br><br>$100,000 | Each Business Interruption Event<br>Aggregate | 8 hours | Retention Period For Each Business Interruption Event | |
| ☒ Breach Mitigation Expense: | $100,000<br><br><br>$100,000 | Each Unintentional Data Compromise<br>Aggregate | $5,000 | Each Unintentional Data Compromise | 05/12/2012 |
| ☒ PCI Assessments: | $100,000<br>$100,000 | Each Payment Card Breach<br>Aggregate | $5,000 | Each Payment Card Breach | 05/12/2012 |
| ☒ Social Engineering Loss: | $100,000<br><br>$100,000 | Each Social Engineering Incident<br>Aggregate | $5,000 | Each Social Engineering Incident | 05/12/2012 |
| Supplementary Payments | | | | | |
| ☒ Reward Coverage: | $10,000 | | | | |
| ☒ Loss Of Earnings And Expense Reimbursement: | $5,000<br>$25,000 | Per Day<br>Maximum | | | |
| ☒ Telecommunications Fraud Reimbursement: | $50,000 | | | | |
| Coverage Part Aggregate Limit Of Liability: $100,000 | | | | | |

| Media Injury Liability Insurance For Professionals | | | |
|---|---|---|---|
| **Coverage** | **Limits Of Liability** | **Deductible** | **Retroactive Date** |
| ☐ Media Injury Liability: | Each Claim<br>Aggregate | Each Claim<br>Aggregate | |
| Supplementary Payments<br>☐ Loss Of Earnings And Expense Reimbursement: | Per Day<br>Maximum | | |

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 19 of 90

## Coverage Parts Which Share An Aggregate Limit Of Liability

Coverages designated below by "X" (☒) share the Combined Aggregate Limit Of Liability

- ☒ Professional Liability Insurance
- ☐ General Liability For Professionals
- ☒ DataBreach℠ Network And Information Security And Media Injury Liability Insurance
- ☐ Media Injury Liability Insurance For Professionals
- ☐ NONE

## Combined Aggregate Limit Of Liability

| | |
|---|---|
| $1,000,000 | All Damages, Regulatory Fines, Breach Mitigation Expenses, Loss and Claim Expenses under all purchased Coverage Parts, combined. |

## Premium

| | |
|---|---|
| Professional Liability Insurance: | Included |
| General Liability For Professionals: | Not Covered |
| DataBreach℠ Network And Information Security And Media Injury Liability Insurance: | Included |
| Media Injury Liability Insurance For Professionals: | Not Covered |
| **Total Adjusted Annual Premium:** | $9,980 |

## Extended Reporting Period

| Terms In Months: | Premium Percentage For Extended Reporting Period: |
|---|---|
| 12 | 100% |
| 24 | 150% |
| 36 | 200% |

## Endorsements

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:

**SEE MDIL 1001 ATTACHED**

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____ **05/28/2020** _____ By: _____

| | |
|---|---|
| **DATE** | **AUTHORIZED REPRESENTATIVE** |

MDEO 5000 03 19

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 20 of 90



# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
| --- | --- |
| MPCY 1000 09 19 | WhiteHax - Cyber Readiness For Business |
| MJIL 1000 08 10 | Policy Jacket |
| MPEO 5000 08 18 | Markel's Designed Protection Risk Management Resources For Professionals |
| MPIL 1007 01 20 | Privacy Notice |
| MPIL 1083 04 15 | US Treasury Dept's Office Of Foreign Assets Control ("OFAC") Notice |
| MPIL 1116 02 20 | Notice To Policyholders Claim Reporting |
| MDEO 5000 03 19 | Declarations |
| MDIL 1001 08 11 | Forms Schedule |
| MEEO 5000 03 19 | Professional Liability Insurance Coverage Part |
| MEEO 5004 06 19 | Databreach Network And Information Security And Media Injury Liability Coverage Part |
| MEEO 5700 05 18 | Common Policy Conditions |
| MEDB 5700 12 18 | Markel eRisk Hub |
| MEEO 5237 05 18 | Title And Escrow Operations |
| MEEO 5256 05 18 | Minimum Earned Premium |
| MEEO 5267 05 18 | Certified Acts Of Terrorism |
| MEEO 5309 04 19 | Exclusion - Nuclear Energy Liability (Broad Form) |
| MEEO 5310 05 18 | Exclusion - Claims Brought By or On Behalf Of |
| MEEO 5316 05 18 | Exclusion - Asbestos |
| MEEO 5337 02 20 | Exclusion - Private Information |
| MEEO 5550 03 20 | Deletion of Aggregate Deductible |
| MEIL 1200 02 20 | Service of Suit |
| MEIL 1200-GU 01 10 | Service of Suit - Guam |
| MEIL 1330 08 17 | Exclusion - Unmanned Aircraft |
| MIL 1214 09 17 | Trade Or Economic Sanctions |

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 21 of 90



# EVANSTON INSURANCE COMPANY

## PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

SECTION I – THE INSURED ........................................................................................................................... 2

SECTION II –  INSURING AGREEMENTS ....................................................................................................... 2

SECTION III – DEFINITIONS ......................................................................................................................... 6

SECTION IV – EXCLUSIONS ........................................................................................................................ 9

SECTION V – TERRITORY ............................................................................................................................ 11

SECTION VI – LIMITS OF LIABILITY, DEDUCTIBLES AND INTERRELATED WRONGFUL ACTS ............................ 11

SECTION VII – DEFENSE, SETTLEMENTS AND CLAIM EXPENSES ................................................................. 12

SECTION VIII – CLAIMS REPORTING AND NOTICE ...................................................................................... 13

SECTION IX – EXTENDED REPORTING PERIOD ........................................................................................... 14

SECTION X – CHANGES IN EXPOSURE ....................................................................................................... 14

SECTION XI – OTHER CONDITIONS ............................................................................................................. 15

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 22 of 90

# Professional Liability Insurance Coverage Part

**THIS IS A CLAIMS-MADE AND REPORTED COVERAGE PART. THIS COVERAGE PART REQUIRES THAT A CLAIM BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR DURING THE EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED TO THE COMPANY IN WRITING DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, BUT NO LATER THAN 60 DAYS AFTER THE DATE OF EXPIRATION OF THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE. PLEASE READ THE POLICY CAREFULLY.**

**PLEASE NOTE THAT AMOUNTS INCURRED AS CLAIM EXPENSES WILL REDUCE THE LIMIT OF LIABILITY AVAILABLE AND WILL BE APPLIED AGAINST THE DEDUCTIBLE AMOUNT.**

The Company, relying upon the statements in the **Application**, which is deemed incorporated into this Policy and forms a part hereof, and in consideration of the payment of the premium, agrees with the **Insured** as follows:

## SECTION I – THE INSURED

The word **Insured**, whether in the singular or plural, means:

1. The Named Insured herein defined as the person(s) or organization(s) stated in the Declarations and any **Subsidiary** or **Predecessor Entity** of such organizations as of inception of the **Policy Period**;

2. Any past or current principal, partner, member, manager, officer, director, trustee, shareholder or employee of the Named Insured solely while acting on behalf of the Named Insured and within the scope of their duties as such;

3. The spouse or **Domestic Partner** of each **Insured** in Paragraph **2.** above, but only for each such **Insured's** liability as is otherwise covered herein;

4. The heirs, executors, administrators, assigns and legal representatives of each **Insured** in Paragraphs **1.** through **3.** above in the event of death, incapacity or bankruptcy of each such **Insured** but only for each such **Insured's** liability as is otherwise covered herein; and

5. Any natural person who is an independent contractor of the Named Insured solely while acting within their professional capacity on behalf of the Named Insured.

## SECTION II – INSURING AGREEMENTS

### A. Professional Liability Coverage

The Company shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in the Declarations which the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** incurred as a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claims Reporting Provision of Section **VIII** – Claims Reporting And Notice by reason of a:

1. **Wrongful Act**; or

2. **Personal Injury**;

in the performance of **Professional Services** rendered or that should have been rendered by the **Insured** or by any person for whose **Wrongful Act** or **Personal Injury** the **Insured** is legally responsible, provided:

a. The **Wrongful Act** or **Personal Injury** happens during the **Policy Period** or on or after the applicable **Retroactive Date** and before the end of the **Policy Period**; and

b. Prior to the effective date of the first date of continuous coverage of this Coverage Part with the Company, no **Insured** had any knowledge of such **Wrongful Act** or **Personal Injury**, or any fact, circumstance, situation or incident which would lead a reasonable person in the **Insured's** position to conclude that a **Claim** was likely.

### B. Additional Payments

1. **TCPA Violation**

The Company shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in the Declarations and up to the TCPA Violation Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, which the **Insured** becomes legally obligated to pay as **Damages** and

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 23 of 90

Claim Expenses incurred as a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claims Reporting Provision of Section **VIII** – Claims Reporting And Notice by reason of a violation of the Telephone Consumer Protection Act of 1991 (TCPA) and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation in the performance of **Professional Services** rendered or that should have been rendered by the **Insured**, provided:

    **a.** The TCPA violation happens during the **Policy Period** or on or after the applicable **Retroactive Date** and before the end of the **Policy Period**; and

    **b.** Prior to the effective date of this Coverage Part no **Insured** had any knowledge of such violation, or any fact, circumstance, situation or incident which would lead a reasonable person in the **Insured's** position to conclude that a **Claim** was likely.

No coverage for TCPA Violations is provided by this Policy except as provided by this Paragraph **B.1.** TCPA Violation of Section **II** – Insuring Agreements.

**2. FCRA Violation**

The Company shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in the Declarations and up to the FCRA Violation Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, which the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** incurred as a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claims Reporting Provision of Section **VIII** – Claims Reporting And Notice by reason of a violation of the Fair Credit Reporting Act (FCRA) and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation, including the Fair and Accurate Credit Transactions Act of 2003 (FACTA) in the performance of **Professional Services** rendered or that should have been rendered by the **Insured**, provided:

    **a.** The FCRA violation happens during the **Policy Period** or on or after the applicable **Retroactive Date** and before the end of the **Policy Period**; and

    **b.** Prior to the effective date of this Coverage Part no **Insured** had any knowledge of such violation, or any fact, circumstance, situation or incident which would lead a reasonable person in the **Insured's** position to conclude that a **Claim** was likely.

No coverage for FCRA Violations is provided by this Policy except as provided by this Paragraph **B.2.** FCRA Violation of Section **II** – Insuring Agreements.

**3. Sexual Injury**

The Company shall pay those **Claim Expenses** incurred as a result of a **Claim** for **Sexual Injury** in excess of the Deductible stated in the Declarations and up to the Sexual Injury Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, as a result of all **Sexual Act(s)** perpetrated or alleged to have been perpetrated by any **Insured** or for allegations that the **Insured** was negligent in hiring, training or supervising any **Insured** who perpetrated or is alleged to have perpetrated a **Sexual Act** resulting in **Sexual Injury** provided:

    **a.** Such **Sexual Act** is perpetrated or alleged to have been perpetrated during the Policy Period or on or after the **Retroactive Date** and before the end of the **Policy Period**; and

    **b.** Prior to the effective date of this Policy no **Insured** had any knowledge of such **Sexual Act** or any fact, circumstance, situation or incident involving such **Sexual Act** which would lead a reasonable person in that **Insured's** position to conclude that a **Claim** was likely.

With respect to this Paragraph **B.3.** Sexual Injury of Section **II** – Insuring Agreements, this Coverage Part does not apply to any **Claim** based upon, arising out of, or in any way involving:

    **(1)** Any **Insured** who perpetrates or is alleged to have perpetrated a **Sexual Act** resulting in **Sexual Injury**; however, the Company will defend such **Insured** and pay **Claim Expenses** on their behalf unless it is established in fact that such **Insured** perpetrated such **Sexual Act**;

    **(2)** Any manager, supervisor, partner, officer, director or trustee who gains knowledge of any actual or alleged **Sexual Act** and fails to take reasonable care to prevent a future **Sexual Act**;

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 24 of 90

**(3)** Any **Sexual Act** which is perpetrated or alleged to have been perpetrated by an **Insured** who previously perpetrated or is alleged to have previously perpetrated a **Sexual Act**, and after a manager, supervisor, partner, officer, director or trustee has gained knowledge of the previously perpetrated or previously alleged to have been perpetrated **Sexual Act**; or

**(4)** Any **Sexual Injury** to an **Insured**.

No coverage for **Sexual Injury** is provided by this Policy except as provided by this Paragraph **B.3.** Sexual Injury of Section **II** – Insuring Agreements.

### 4. Third Party Discrimination

The Company shall pay those sums in excess of the Deductible stated in the Declaration which the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** incurred as a result of a **Claim** for **Third Party Discrimination**, up to the Third Party Discrimination Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable; provided:

**a.** The **Third Party Discrimination** happens during the **Policy Period** or on or after the **Retroactive Date** and before the end of the **Policy Period**; and

**b.** Prior to the effective date of this Policy no **Insured** had any knowledge of such **Third Party Discrimination** or any fact, circumstance, situation or incident which would lead a reasonable person in that **Insured's** position to conclude that a **Claim** for **Third Party Discrimination** was likely.

No coverage for **Third Party Discrimination** is provided by this Policy except as provided by this Paragraph **B.4.** Third Party Discrimination of Section **II** – Insuring Agreements.

Payments under this Paragraph **B.** shall be included within the Coverage Part Aggregate Limit Of Liability stated in the Declarations. Once the applicable limit has been paid, the Company's obligation to defend has ended.

### C. Supplementary Payments

#### 1. Disciplinary Proceeding Legal Fee And Legal Expense Reimbursement

**a.** Upon submission to the Company of satisfactory written proof of payment by the Named Insured, the Company shall reimburse the Named Insured up to the Disciplinary Proceeding Legal Fee And Legal Expense Reimbursement Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, for all reasonable and necessary legal fees and legal expenses incurred in response to a **Disciplinary Proceeding** against the Named Insured first initiated during the **Policy Period**, or the Extended Reporting Period, if applicable, provided:

**(1)** The **Wrongful Act** giving rise to the **Disciplinary Proceeding** happens during the **Policy Period** or on or after the **Retroactive Date** and before the end of the **Policy Period**; and

**(2)** Prior to the effective date of this Coverage Part the **Insured** had no knowledge of such **Wrongful Act** or any fact, circumstance, situation or incident which may have led a reasonable person in the **Insured's** position to conclude that a **Disciplinary Proceeding** was likely.

**b.** The **Insured** will give the Company written notice as soon as practicable of any **Disciplinary Proceeding** first initiated against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable. In any event, such **Disciplinary Proceeding** must be reported to the address stated in the Claim Reporting policyholder notice, no later than 60 days after the end of the **Policy Period** or the Extended Reporting Period, if applicable.

**c.** No reimbursement shall be made for the **Insured's** payment of any taxes; criminal or civil fines, penalties or sanctions; registration or licensing fees; or any monetary judgment, award or settlement of any kind.

**d.** Reimbursement to the Named Insured under this Paragraph **1.** shall be in addition to the Limits Of Liability stated in the Declarations and will not be subject to the Deductible.

#### 2. Loss Of Earnings And Expense Reimbursement

**a.** Upon submission to the Company of satisfactory written proof of payment by the Named Insured, the Company shall reimburse the Named Insured as expense reimbursement for all reasonable and necessary expenses incurred by an **Insured** at the Company's written request for attendance at any arbitration, **Mediation**, deposition, hearing or trial in connection with a **Claim** to which this Coverage Part applies. The

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 25 of 90

Named Insured will give the Company written proof of payment of expenses as soon as practicable. In any event, such written proof of payment must be reported to the Company at the address stated in the Claim Reporting policyholder notice attached to this Policy, no later than 60 days after incurring such expenses.

b. The Company shall compensate the Named Insured for loss of earnings of an **Insured** a maximum of the Loss Of Earnings And Expense Reimbursement Per Day Limits Of Liability stated in the Declarations per day for all **Insureds** to attend at the Company's written request any arbitration, **Mediation**, deposition, hearing or trial in connection with a **Claim** to which this Coverage Part applies.

c. The maximum the Company shall pay the Named Insured for all **Insureds** for compensation of all loss of earnings and expense reimbursement for all **Claims** to which this Coverage Part applies and all attendances at the Company's written request is the Loss Of Earnings And Expense Reimbursement Maximum Limit Of Liability stated in the Declarations.

d. Payments to the Named Insured under this Paragraph **2.** shall be in addition to the Limits Of Liability stated in the Declarations and will not be subject to the Deductible.

No coverage for **Loss of Earnings And Expense Reimbursement** is provided by this Policy except as provided by this Paragraph **C.2.** Loss of Earnings And Expense Reimbursement of Section **II** – Insuring Agreements.

**3. Pre-Claim Assistance Expenses**

If, during the Policy Period or the Extended Reporting Period, if applicable, the **Insured** provides the Company with written notice of a **Wrongful Act** or **Personal Injury** as provided in Paragraph **B.** Discovery Of Potential Claims of Section **VIII** – Claims Reporting And Notice that is reasonably expected to result in a **Claim** but as to which no **Claim** has yet been made, the Company may, at the Company's sole option, choose to investigate the **Wrongful Act** or **Personal Injury**. Such an investigation will be at the Company's expense and will not reduce the Limits Of Liability or be subject to the Deductible provisions of this Policy until one of the following occurs:

a. A **Claim** results from the **Wrongful Act** or **Personal Injury** under investigation; or

b. The Company incurs the Pre-Claim Assistance Expenses Limit Of Liability stated in the Declarations in expenses arising from the investigation.

If a **Claim** is made and reported to the Company, or once the Company incurs the Pre-Claim Assistance Expenses Limit Of Liability stated in the Declarations in investigative expense, any further payment will be considered **Claims Expense** and will reduce the applicable Limits of Liability and be subject to the Deductible provisions of this insurance.

No coverage for **Pre-Claim Assistance Expenses** is provided by this Policy except as provided by this Paragraph **C.3.** Pre-Claim Assistance Expenses of Section **II** – Insuring Agreements.

**4. Public Relations Expenses**

The Company shall reimburse **Public Relations Expenses,** that have been approved by the Company prior to being incurred, up to the Public Relations Expenses Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, as the direct result of **Wrongful Acts** or **Personal Injuries** that occur during the **Policy Period.**

No coverage for **Public Relations Expenses** is provided by this Policy except as provided by this Paragraph **C.4.** Public Relations Expenses of Section **II** – Insuring Agreements.

**5. Subpoena And Record Request Assistance**

In the event that during the **Policy Period**:

a. The **Insured** first receives a subpoena or a written request for the **Insured's** records or files or notice of deposition relative to a **Wrongful Act** or **Personal Injury** in the performance of **Professional Services** rendered or that should have been rendered by the **Insured** or by any person or organization for whose **Wrongful Act** or **Personal Injury** the **Insured** is legally responsible; and

b. The **Insured** reports the receipt of such subpoena or request in writing to the Company within 30 days of such receipt and prior to a **Claim** being first made against the **Insured** arising out of such **Wrongful Act** or **Personal Injury**;

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 26 of 90

then the Company shall pay on behalf of the **Insured** up to the Subpoena And Record Request Assistance Limit Of Liability stated in the Declarations per **Policy Period** for reasonable and necessary legal fees and legal expenses incurred for engaging the services of legal counsel selected by the Company to assist the **Insured** in responding to such subpoena or request.

Payments to the Named Insured under this Paragraph 5. shall be in addition to the Coverage Part Aggregate Limit Of Liability stated in the Declarations and not subject to the Deductible.

## SECTION III – DEFINITIONS

A. **Application** means:

1. The application for this Policy and for any policy issued by the Company, or any of its affiliates, of which this Policy is a direct or indirect renewal or replacement;

2. Any attachment to any such application; and

3. Any other materials or applications submitted with or incorporated into any such application.

B. **Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these.

C. **Claim** means the **Insured's** receipt of:

1. A written demand for **Damages** or remedial **Professional Services**, including a written demand that the **Insured** toll or waive a statute of limitations; or

2. The service of suit or institution of arbitration proceedings against the **Insured**;

however, **Claim** shall not include any **Disciplinary Proceeding**.

D. **Claim Expenses** means reasonable and necessary amounts incurred by the Company, or by the **Insured** with the prior written consent of the Company, in the defense of that portion of any **Claim** for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; however, **Claim Expenses** shall not include:

1. Salary, wages, overhead, or benefit expenses of or associated with employees or officials of the Named Insured or employees or officials of the Company; or

2. Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or outside counsel for the Named Insured or the Company.

E. **Client** means a natural person or organization:

1. For which services of a professional nature are rendered by the **Insured**; or

2. Using the Named Insured's products or goods for which a fee was paid to the Named Insured.

F. **Content** means advertising, publicity, press release, article, publication, marketing or promotional item or broadcast by any medium.

G. **Damages** means the monetary portion of any judgment, award or settlement, including punitive damages where insurable by law; however, **Damages** shall not include:

1. Multiplied portions of damages in excess of actual damages, including trebling of damages;

2. The cost of any modifications or changes to the **Insured's** security measures, procedures, software or hardware required or agreed to by the **Insured** to satisfy a judgment, award or settlement;

3. Any cost required to repair, build or modify property to comply with any award by a court, administrative order, arbitration award or any similar judgment;

4. Taxes, criminal or civil fines assessed against an **Insured**, or attorneys' fees of a party other than an **Insured** or other penalties imposed by law;

5. Sanctions;

6. Matters which are uninsurable under the law pursuant to which this Coverage Part will be construed;

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 27 of 90

7.  The return, withdrawal, reduction, restitution or payment of any fees, profits, charges or royalties for services or consideration or any expenses paid or payable to the **Insured** for services or goods; or

8.  Any cost to correct, perform or re-perform services of a professional nature when the **Insured** had the capability to correct, perform or re-perform the services of a professional nature with respect to which such costs were incurred.

The insurability of such punitive damages will be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured**, including without limitation the jurisdiction in which the Named Insured, the **Insured**, the Company, this Policy or such **Claim** is located.

H.  **Disciplinary Proceeding** means the **Insured's** receipt of any proceeding by a United States of America domiciled regulatory body, disciplinary board or governmental agency, any of which has the authority to investigate charges of professional misconduct in the performance of **Professional Services**; however, **Disciplinary Proceeding** will not include any criminal proceeding.

I.  **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

J.  **Electronic Communications System** means any wired, wireless, radio, electromagnetic, photo-optical or photo-electronic facility for the transmission of electronic communications; any **Electronic Data** processing system, network or related electronic equipment for the storage of such communications; and any computer.

K.  **Electronic Data** means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or other media which are used with electronically controlled equipment.

L.  **Financial Planner** means an investment professional who helps individuals or entities set and achieve their financial goals through investments, tax planning, asset allocation, risk management, retirement planning and estate planning, assisting in increasing net worth in furtherance of the individual's or entity's financial objectives.

M.  **Interrelated Wrongful Act** means any **Wrongful Acts** that have as a common connection or nexus any fact, circumstance, situation, event, cause, transaction or series of facts, circumstances, situations, events, causes or transactions.

N.  **Media Injury** means injury arising from any of the following offenses:

1.  Libel, slander or defamation or any other form of disparagement;

2.  Invasion or infringement of the right of privacy or the right of publicity;

3.  Infringement of copyright, service mark, service name or trademark, title, trade dress, trade name or slogan and unfair competition alleged in connection therewith;

4.  Plagiarism, piracy or misappropriation of ideas under implied contract; or

5.  Infliction of emotional distress, mental anguish, false arrest or malicious prosecution.

O.  **Mediation** means the voluntary process in which an objective third party who is a qualified professional mediator selected by the parties to the **Claim**, with written agreement of the Company, intervenes between the parties in an attempt to achieve settlement of the **Claim**. However, **Mediation** does not include litigation, arbitration or any court-mandated proceeding.

P.  **Personal Injury** means:

1.  Libel, slander or defamation;

2.  Invasion or infringement of the right of privacy or publicity;

3.  Malicious prosecution, abuse of process, false arrest or false imprisonment; or

4.  Humiliation or infliction of emotional distress;

committed in the performance of **Professional Services**.

Q.  **Policy Period** means the period from the inception date of this Coverage Part to the Coverage Part expiration date stated in the Declarations, or the effective date of any earlier cancellation or termination.

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 28 of 90

**R. Pollutants** means any solid, liquid, gaseous, biological or thermal irritants or contaminants, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals, or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned, or reclaimed.

**S. Pre-Claim Assistance Expenses** means costs, attorneys' fees, experts' fees, charges and expenses incurred by the Company, at our discretion, in connection with the investigation or evaluation of any potential **Claim**.

**T. Predecessor Entity** means any entity engaged in **Professional Services** to whose financial assets and liabilities the Named Insured is the majority successor in interest.

**U. Private Data** means data containing an individual's:

1. Driver license or other state-issued identification number; social security number; unpublished telephone number; savings account, checking account, credit card or debit card number each when in combination with the security code, access code, password or pin for such account or card number;

2. Nonpublic personal information as defined in the Gramm-Leach-Bliley Act of 1999, as amended, and regulations issued pursuant thereto;

3. Protected health information as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto, and medical and healthcare information;

4. Private personal information as defined under a Security Breach Notice Law; and

5. Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information;

not including any lawfully available data accessible by the general public.

**V. Professional Services** means those services stated in the Declarations rendered for others for a fee.

**W. Property Damage** means physical injury to tangible property, including all resulting loss of use of that property or loss of use of tangible property that is not physically injured; however, tangible property shall not include **Electronic Data**.

**X. Public Relations Expenses** means actual, necessary and reasonable expenses approved by the Company in writing and incurred by the **Insured** in retaining a public relations consultant to protect or restore the **Insured's** business reputation or in planning, implementing, executing and managing a public relations campaign under the direction of a public relations consultant to mitigate or minimize any actual or anticipated adverse effects of negative publicity.

**Y. Retroactive Date** means the Retroactive Date stated in the Declarations as applicable to the Professional Liability Insurance Coverage Part.

**Z. Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of the **Insured's Professional Services**.

**AA. Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a **Sexual Act**.

**BB. Subsidiary** means:

1. Any entity, excluding partnerships or joint ventures, of which the **Insured** owns, or has the right to vote, more than 50% of the outstanding voting securities representing the present right to vote for the election of, or designate the appointment of, directors on a board of directors or equivalent management positions including, but not limited to, members of the board of managers of a limited liability company;

2. Any entity that is newly created or acquired during the **Policy Period**, provided that such entity's total consolidated assets as of the date of such creation or acquisition will be no more than 25% of the total consolidated assets of the **Insured** according to the most recently filed audited financial statements. A newly-created or acquired **Subsidiary** will only receive coverage for **Claims** arising from **Wrongful Acts**, **Personal Injuries** or **Interrelated Wrongful Acts** occurring after such date of creation or acquisition and before the end of the **Policy Period** or Extended Reporting Period, if applicable; and

3. Any organization operated as a joint venture in which, on or prior to the inception date stated in the Declarations, the **Insured** owns, directly or through one or more **Subsidiaries**, exactly 50% of the organization's outstanding

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 29 of 90

securities with voting rights, and under a written agreement with the organization's remaining owners, has sole control of the organization's management and operations.

CC. **Third Party Discrimination** means conduct of an **Insured** with respect to any natural person who is not an **Insured** that results in any actual or alleged discrimination on the basis of age, color, disability, familial status, marital status, national origin, pregnancy, race, sex, sexual preference, religion or other protected class or characteristic under applicable federal, state or local statute or ordinance.

DD. **Unauthorized Access** means:

1. A breach of the **Insured's** security measures, systems or procedures, or stated privacy policy, or any intentional violation, interception, or use or misuse of the Named Insured's **Electronic Communications System**, whether or not for profit or gain, by any person, without the permission, knowledge or ratification of the **Insured**;

2. Access to the Named Insured's **Electronic Communications System** that is with the **Insured's** permission where such permission is the result of fraud or deception;

3. Use of the Named Insured's **Electronic Communications System** by a party authorized by the **Insured** to use such system, who does so for an unauthorized purpose;

4. The introduction of programs into the Named Insured's **Electronic Communications System** which contain fraudulent or destructive instructions or code including any inadvertent transmission of such programs to a third party; and

5. A credible threat or an extortion demand received by the Named Insured threatening or portending loss, injury or damage to:

   a. The Named Insured's **Electronic Communications System**, including programs, **Electronic Data** and media which form a part of the Named Insured's **Electronic Communications System**; or

   b. Money, securities, bonds or similar financial instruments, solely to the extent that record of such is maintained in digital or electronic format on the Named Insured's **Electronic Communication System**;

   for the purpose of extorting money or other valuable consideration from the Named Insured.

EE. **Unintentional Data Compromise** means any computer security incident, intrusion, breach, compromise, theft, loss or misuse of **Private Data** of a **Client**.

FF. **Wrongful Act** means a negligent act, error or omission in **Professional Services** rendered or that should have been rendered by the **Insured** or by any person for whose acts, errors or omissions the **Insured** is legally responsible, and includes an **Interrelated Wrongful Act**.

## SECTION IV – EXCLUSIONS

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment or Supplementary Payment:

A. Made against the **Insured**:

1. By any person or organization or its subrogee, assignee, contractor, subcontractor, or parent organization, **Subsidiary**, division or affiliated organization which was or is operated, managed, owned or otherwise controlled, whether directly or indirectly, or in whole or in part, by any **Insured**;

2. By any principal, partner, officer, director, member, manager, employee or shareholder of an **Insured** or any subrogee or assignee of such person; or

3. By or on behalf of any person or organization included in the definition of **Insured**; or

B. Based upon or arising out of:

1. The liability of others assumed by the **Insured** under any contract or agreement; however, this exclusion shall not apply to liability an **Insured** would have in the absence of the contract or agreement by reason of a **Wrongful Act** of the **Insured** in the performance of **Professional Services**;

2. a. Any obligation of the **Insured** under any workers' compensation, unemployment compensation or disability benefits law or under any similar law; or

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 30 of 90

    **b.** The **Insured's** activities as a fiduciary under the Employee Retirement Income Security Act of 1974, as amended, or similar provisions of any federal, state or local statute or common law;

**3.** Wrongful termination or other employment related practices; including, but not limited to, the employment relationship or the nature, terms or conditions of employment or any workplace tort brought by or on behalf of any employee, former employee, prospective employee, independent contractor or consultant of the **Insured**;

**4. a.** Any **Media Injury**;

    **b.** Infringement or inducement of infringement of patent or trade secret or misappropriation of trade secrets or confidential or proprietary information relating to the Named Insured's business operations;

    **c.** Unfair competition based upon infringement of copyright, patent, trademark, service mark, trade name or trade secret;

    **d.** The value of trade secrets, confidential processing methods or other confidential or proprietary information; or

    **e.** Any dispute related to ownership of any intellectual property;

**5.** Any warranties or guarantees, express, implied or otherwise, or any cost estimates;

**6.** Any unlawful discrimination by any **Insured**; however, this exclusion does not apply to:

    **a.** Such unlawful discrimination resulting directly from and in the normal course of the performance of **Professional Services** by the **Insured**; or

    **b.** Coverage provided under Paragraph **B. 4.** Third Party Discrimination of Section **II** – Insuring Agreement;

**7.** Any conversion, misappropriation, commingling of or defalcation of funds or property;

**8.** Any actual or alleged violation of the Securities Act of 1933, Securities Exchange Act of 1934, Investment Company Act of 1940, any state blue sky or securities law or similar state or federal statute or any amendments thereto, or any regulation or order issued pursuant to any of the foregoing statutes or any securities regulatory board;

**9.** Any acts or services as an investment adviser, **Financial Planner**, registered representative or broker/dealer of securities or commodities, mortgage banker or investment banker;

**10.** Any inability or failure of any party to pay or collect monies or to collect or pay federal, state, county or local tax, including, but not limited to, income tax, sales tax or property tax;

**11.** Any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: antitrust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

**12.** The insolvency, receivership, bankruptcy, liquidation or financial inability to pay, of any bank, savings and loan, banking firm, registered representative or broker/dealer of securities or commodities, insurance company, reinsurer, risk retention group or captive (or other self-insurance plan or trust by whatsoever name), real estate developer, or construction organization;

**13.** The insolvency, receivership, bankruptcy, liquidation or financial inability of any **Subsidiary**;

**14.** Any **Wrongful Act** or **Personal Injury** or any fact, circumstance or situation that has been the subject of any notice given prior to the **Policy Period** under any other policy of insurance or to any reinsurer, risk retention group or captive (or any other self-insurance plan or trust by whatsoever name) or insurance representative;

This exclusion will not apply to **Claim Expenses** incurred until an allegation is determined through final and non-appealable adjudication;

**15. a.** Actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of **Pollutants**; or

    **b.** Direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants**, or to pay for or contribute to the costs of undertaking such actions;

**16.** Any actual or alleged **Bodily Injury** or **Property Damage**; however, this exclusion shall not apply to coverage provided under Paragraph **B.3.** Sexual Injury of Section **II** – Insuring Agreement;

**17.** Any acts or services performed by any **Insured** that is not licensed or certified to perform such acts or services if such licensing or certification is required by law;

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 31 of 90

18. **Unauthorized Access** to the Named Insured's **Electronic Communications System**;

19. Any actual or alleged **Unintentional Data Compromise**;

20. Any actual or alleged price discounts, prizes, awards, money, or valuable consideration given in excess of a total contracted or expected amount;

21. Any actual or threatened abuse, molestation or exploitation by anyone; however, this exclusion does not apply to coverage provided under Paragraph B. 3. Sexual Injury of Section II – Insuring Agreement; or

22. Any **Wrongful Act** or **Personal Injury**, or any fact, circumstance, situation, incident, **Claim** or suit referred to in an answer to any question of the **Application(s)** or addendum(s) attached to this Policy; or

C. Based upon, arising out of, or in any way involving:

1. Any conduct of the **Insured** or at the **Insured's** direction that is intentional, willful, dishonest, fraudulent or that constitutes a willful violation of any law, statute or regulation; however, this exclusion will not apply to:

   a. The strictly vicarious liability of any **Insured** for the intentional, willful, dishonest or fraudulent conduct of another **Insured** or for the conduct of another **Insured** that constitutes a willful violation of any statute or regulation; or

   b. **Claim Expenses** incurred until an allegation is determined through final and non-appealable adjudication.

2. The gaining by any **Insured** of any profit, remuneration or advantage to which such **Insured** was not legally entitled, provided, however any fact pertaining to any **Insured** will not be imputed to any other **Insured** under this Coverage Part for the purpose of determining the applicability of this exclusion; or

D. Brought under any other Coverage Part of this Policy.

## SECTION V – TERRITORY

The insurance afforded by this Coverage Part applies worldwide, except for **Claims** made in any country on which the government of the United States of America has imposed trade sanctions, embargoes or any similar regulations that prohibit the transaction of business with or within such country.

## SECTION VI – LIMITS OF LIABILITY, DEDUCTIBLES AND INTERRELATED WRONGFUL ACTS

### A. Limits Of Liability

1. **Each Claim**

   The liability of the Company for the combined total of **Damages** and **Claim Expenses** paid under Section II – Insuring Agreements, A. Professional Liability Coverage for each **Claim** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph A. Claim Reporting Provision of Section VIII – Claims Reporting And Notice, shall not exceed the Each Claim Limit Of Liability stated in the Declarations.

2. **Aggregate**

   Subject to Paragraph 1., the total liability of the Company for the combined total of all **Damages** and **Claim Expenses** paid under Section II – Insuring Agreements, A. Professional Liability Coverage arising out of all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period, if applicable, shall not exceed the Aggregate Limit Of Liability stated in the Declarations.

3. **Coverage Part Aggregate**

   Subject to Paragraph 1. and 2., the total liability of the Company for the combined total of all **Damages** and **Claim Expenses** paid under Section II – Insuring Agreements, A. Professional Liability Coverage and B. Additional Payments arising out of all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period, if applicable, shall not exceed the Coverage Part Aggregate Limit Of Liability stated in the Declarations.

### B. Deductibles

1. **Each Claim Deductible**

   With respect to this Coverage Part, the applicable Deductible stated in the Declarations shall be paid by the Named Insured for each **Claim** and apply to **Damages** and **Claim Expenses**, whether or not any **Damages**

payments are made. Such Deductible amounts will, upon written demand by the Company, be paid by the Named Insured within 10 days. The total payments requested from the Named Insured in respect of each **Claim** will not exceed the Deductible stated in the Declarations. The determination of the Company as to the reasonableness of the **Claim Expenses** shall be conclusive on the Named Insured.

### 2. Aggregate Deductible

Subject to Paragraph 1., the total Deductible payments to be paid by the Named Insured shall not exceed the Aggregate Deductible stated in the Declarations for **Damages** and **Claim Expenses** arising out of all **Claims**, other than any **Disciplinary Proceeding**, first made during the **Policy Period** and the Extended Reporting Period, if applicable.

### 3. Deductible Credits

With respect to this Coverage Part, if a **Claim** is settled without litigation, arbitration, **Mediation** or court mandated proceedings, the Deductible for such **Claim** will be reduced by 75% or $10,000, whichever is less.

If the Named Insured and the Company agree to the use of **Mediation** and a **Claim** is settled at that **Mediation**, the Deductible for such **Claim** will be reduced by 50% or $10,000, whichever is less.

The Deductible credits are not additive or cumulative.

### C. Multiple Insureds, Claims And Claimants

The inclusion herein of more than one **Insured** in any **Claim** or the making of **Claims** by more than one person or organization shall not operate to increase the Limits Of Liability stated in the Declarations. More than one **Claim** arising out of a single **Wrongful Act, Personal Injury** or **Interrelated Wrongful Act** will be treated as a single **Claim**. Such single **Claim** will be deemed first made on the date on which the earliest **Claim** arising out of such **Wrongful Act, Personal Injury** or **Interrelated Wrongful Act** is made or with respect to written notice given to and accepted by the Company pursuant to Paragraph **B.** Discovery Of Potential Claims of Section **VIII** – Claims Reporting And Notice, on the date within the **Policy Period** on which such written notice of potential **Claim** is first received by the Company.

## SECTION VII – DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

### A. Defense And Investigation

With respect to coverage hereunder, the Company will have the right and duty to defend the **Insured** and to investigate any **Claim** and **Disciplinary Proceeding** to which coverage under this Coverage Part applies pursuant to the following provisions:

1. **Claim Expenses** incurred in defending and investigating such **Claim** shall be a part of and not in addition to the applicable Limits Of Liability stated in the Declarations. Such **Claim Expenses** will reduce the applicable Limits of Liability and will be applied against the applicable Deductible. The Company will have no obligation to pay any **Damages** or to defend or continue to defend any **Claim** or to pay **Claim Expenses** after the applicable Limits Of Liability stated in the Declarations have been exhausted by payment(s) of **Damages** or **Claim Expenses**.

2. The Company shall select defense counsel; however, if the law of the state of the Named Insured's domicile, stated in the Declarations, allows the **Insured** to control the selection of defense counsel where a conflict of interest has arisen between the **Insured** and the Company, the Company will provide a list of attorneys or law firms from which the **Insured** may designate defense counsel who will act solely in the interest of the **Insured**, and the **Insured** will direct such defense counsel to cooperate with the Company. Such cooperation shall include:

   a. Providing on a regular basis, but not less frequently than every 3 months, written reports on claimed **Damages**, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the **Claim**;

   b. Providing any other reasonable information requested;

   c. Providing fully itemized billing on a periodic basis; and

   d. Cooperating with the Company and the **Insured** in resolving any disputes, including but not limited to billing disputes.

The fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as set forth above, will be included in **Claim Expenses**. Such **Claim Expenses** shall be a part

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 33 of 90

of and not in addition to the applicable Limits Of Liability stated in the Declarations. Such **Claim Expenses** shall reduce the applicable Limits Of Liability and be applied against the applicable Deductible.

3. Any payments shall be made in U.S. currency from bank or financial institution located in the United States of America. With respect to **Claims** brought in a country other than the United States of America, payment will be made to the Named Insured.

## B. Consent To Settlement

The Company will not settle any **Claim** without the prior written consent of the first Named Insured, but the Company will have, at all times, the right to recommend a settlement of any **Claim**. If the first Named Insured refuses to settle such **Claim** pursuant to the Company's recommendations and acceptable to the claimant, then the Company's liability in regard to such **Claim** will not exceed the sum of:

1. The amount of **Damages** for which the Company could have settled such **Claim**;

2. **Claim Expenses** accrued as of the date such settlement was proposed in writing by the Company to the Named Insured; and

3. 80% of all covered **Damages** and **Claim Expenses** incurred thereafter on account of such **Claim**.

Such amounts are subject to the provisions of Paragraph **A**.

## SECTION VIII – CLAIMS REPORTING AND NOTICE

## A. Claim Reporting Provision

1. It is a condition precedent to coverage afforded by this Coverage Part that the **Insured** shall give to the Company written notice as soon as practicable of any **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, but in no event later than:

   a. 60 days after expiration of the **Policy Period**; or

   b. The expiration of the Extended Reporting Period, if applicable.

   Such **Claim** must be reported to the Company at the address stated on the Claim Reporting policyholder notice attached to this Policy.

2. In the event a suit is brought against the **Insured**, the **Insured** will immediately forward to the Company at the address stated on the Claim Reporting policyholder notice, every demand, notice, summons or other process received by the **Insured** or their representatives.

## B. Discovery Of Potential Claims

If during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act** or **Personal Injury** which is reasonably expected to result in a **Claim** within the scope of coverage of this Coverage Part, then the **Insured** may provide written notice to the Company at the address stated on the Claim Reporting policyholder notice containing the information listed below. If such written notice is received by the Company during the **Policy Period**, then any **Claim** subsequently made against the **Insured** arising out of such **Wrongful Act** or **Personal Injury** will be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

It is a condition precedent to the coverage afforded by this Paragraph **B.** that written notice is given to the Company containing the following information:

1. The description of the specific **Wrongful Act** or **Personal Injury**;

2. The date on which such **Wrongful Act** or **Personal Injury** took place;

3. The **Damage** or injury which has or may result from such **Wrongful Act** or **Personal Injury**;

4. The identity of any injured person or organization subject to such injury or **Damage**; and

5. The date and circumstances by which the **Insured** first became aware of such **Wrongful Act** or **Personal Injury**.

The Company, at its sole option, may investigate such circumstance, **Wrongful Act** or **Personal Injury** as stated in Paragraph **C.3.** Pre-Claim Assistance Expenses of Section II – Insuring Agreement.

## C. Supplementary Payments

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 34 of 90

Pursuant to Paragraph **C.** Supplementary Payments of Section **II** – Insuring Agreements, upon the Company's receipt of satisfactory written proof of payment by the Named Insured in no event later than 60 days after the date incurred, the Company will indemnify the Named Insured for such expenses and such loss of earnings within 60 days.

## SECTION IX – EXTENDED REPORTING PERIOD

**A.** The Named Insured's right to exercise the Extended Reporting Period under this Coverage Part will exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements of all Coverage Parts in the policy for which an Extended Reporting Period is available.

**B.** If the Named Insured nonrenews this Policy in its entirety or cancels this Policy in its entirety pursuant to Paragraph **D.** Cancellation of the Common Policy Conditions, or if the Company nonrenews this Policy or cancels this Policy pursuant to Paragraph **D.** Cancellation of the Common Policy Conditions, for reasons other than nonpayment of premium or Deductible or non-compliance with the terms and conditions of this Policy, then the Named Insured will have the right upon payment of an additional premium calculated at the Premium Percentage stated in the Declarations of the annual premium for the **Policy Period** to extend the coverage granted under Section **II** – Insuring Agreements of this Coverage Part for the Additional Period stated in the Declarations, as elected by the Named Insured, to apply to:

    **1. Claims** first made against the **Insured** during the Additional Period stated in the Declarations, and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision of Section **VIII** – Claims Reporting And Notice, following immediately upon the effective date of such cancellation or nonrenewal, for any **Wrongful Act** or **Personal Injury** which happened on or after the applicable **Retroactive Date** and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Coverage Part; and

    **2. Disciplinary Proceedings** first initiated against the **Insured** during the Additional Period stated in the Declarations, and reported to the Company pursuant to Paragraph **C.1.** Disciplinary Proceeding Legal Fee And Legal Expense Reimbursement of Section **II** – Insuring Agreements, following immediately upon the effective date of such cancellation or nonrenewal, for any **Wrongful Act** which happened on or after the applicable **Retroactive Date** and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Coverage Part.

This extended period of coverage as elected by the Named Insured and described herein will be referred to in this Coverage Part as the Extended Reporting Period.

If, however, this Coverage Part is immediately succeeded by similar claims-made insurance coverage on which the applicable **Retroactive Date** is the same as or earlier than that stated in the Declarations, the succeeding insurance will be deemed to be a renewal hereof, and in consequence, the Named Insured will have no right to purchase an Extended Reporting Period applicable to the coverage afforded under this Coverage Part.

The quotation of a different premium or Deductible or Limit Of Liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

**C.** As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid:

    **1.** All Deductibles when due;

    **2.** All premiums due for the **Policy Period**; and

    **3.** All premiums and deductibles due on any other policies issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this Policy is a renewal or replacement.

The right to purchase the Extended Reporting Period will terminate unless a written request of such election for the Extended Reporting Period is received by the Company within 30 days after the effective date of cancellation or nonrenewal together with payment of the additional premium for the Extended Reporting Period. If such written request and premium payment for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

**D.** In the event of the purchase of the Extended Reporting Period the entire premium therefor will be fully earned at its commencement.

**E.** The Extended Reporting Period will not in any way increase the Limits Of Liability stated in the Declarations.

## SECTION X – CHANGES IN EXPOSURE

**A. New Organizations**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 35 of 90

If before or during the **Policy Period,** the Company acquires or creates a new **Subsidiary** or acquires an entity by merger or consolidation, to perform the same **Professional Services** as the Named Insured, coverage under this Policy automatically will apply to the new organization, provided:

1.  Such coverage will apply only with respect to any **Claim** for a **Wrongful Act** or **Personal Injury** taking place after such acquisition or creation; and

2.  There is no other similar insurance available to that organization.

Coverage will be subject to the following:

a.  Coverage is afforded only until 60 days after the Named Insured acquired or formed the organization or the end of the **Policy Period,** whichever is earlier; however, this condition shall not apply if such entity's total consolidated assets as of the date of such creation or acquisition will be no more than 25% of the total consolidated assets of the **Insured** according to the most recently filed audited financial statements;

b.  The **Retroactive Date** applicable to any **Claim** or **Disciplinary Proceeding** against such organization newly acquired or newly formed by the Named Insured for **Wrongful Acts** or **Personal Injuries** by **Insureds** will be the date on which the Named Insured newly acquired or newly formed such organization; and

c.  No person or organization is an **Insured** with respect to the conduct of any current or past partnership, joint venture, or limited liability company that is not stated as a Named Insured in the Declarations.

## B.  Acquisition Of The Insured

If during the **Policy Period** a transaction occurs wherein another organization gains control of the Named Insured through the ownership of more than 50% of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent position, or the Named Insured merges into another organization or consolidates with another organization such that the Named Insured is not the surviving organization, then:

1.  The first Named Insured must give written notice of such transaction to the Company within 60 days after the effective date of such transaction and provide the Company with such information in connection therewith as the Company may deem necessary; and

2.  This Coverage Part will apply only to those **Wrongful Acts** or **Personal Injuries** which happened on or before the effective date of such transaction.

## C.  Cessation Of Subsidiaries

If before or during the **Policy Period** an organization ceases to be a **Subsidiary,** coverage with respect to such **Subsidiary** will continue until the end of the **Policy Period** or the Extended Reporting Period if applicable, provided such coverage will apply only with respect to any **Claim** for a **Wrongful Act** or **Personal Injury** taking place prior to the date such organization ceased to be a **Subsidiary.**

## SECTION XI – OTHER CONDITIONS

### Retractions And Corrections

The **Insured** will take such actions which, in the **Insured's** judgment, are deemed necessary and practicable to prevent or limit the dissemination of **Content** which is false, erroneous or untrue.

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 36 of 90



# EVANSTON INSURANCE COMPANY

## DATABREACH<sup>SM</sup>

## NETWORK AND INFORMATION SECURITY AND MEDIA INJURY LIABILITY COVERAGE PART

| | |
|---|---|
| SECTION I – THE INSURED | 2 |
| SECTION II – INSURING AGREEMENTS | 2 |
| SECTION III – DEFINITIONS | 4 |
| SECTION IV – EXCLUSIONS | 10 |
| SECTION V – TERRITORY | 12 |
| SECTION VI – LIMITS OF LIABILITY, DEDUCTIBLES AND INTERRELATED UNAUTHORIZED ACCESS | 12 |
| SECTION VII – DEFENSE, SETTLEMENT AND CLAIM EXPENSES | 15 |
| SECTION VIII – CLAIMS, LOSS AND EXPENSES | 16 |
| SECTION IX – EXTENDED REPORTING PERIOD | 17 |
| SECTION X – CHANGES IN EXPOSURE | 18 |
| SECTION XI – OTHER CONDITIONS | 19 |

**MEEO 5004 06 19**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 37 of 90

# DATABREACH℠ Network And Information Security And Media Injury Liability Insurance Coverage Part

THIS IS A CLAIMS MADE AND REPORTED COVERAGE PART. THIS COVERAGE PART REQUIRES THAT A CLAIM BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR DURING THE EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED TO THE COMPANY IN WRITING DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, BUT NO LATER THAN 60 DAYS AFTER THE DATE OF EXPIRATION OF THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE. PLEASE READ THE POLICY CAREFULLY.

PLEASE NOTE THAT AMOUNTS INCURRED AS CLAIM EXPENSES WILL REDUCE THE LIMIT OF LIABILITY AVAILABLE AND WILL BE FIRST APPLIED AGAINST THE DEDUCTIBLE OBLIGATION.

The Company, relying upon the representations made in the **Application**, which is deemed incorporated into this Policy and forms a part hereof, and in consideration of the payment of the premium, agrees with the **Insured** as follows:

## SECTION I – THE INSURED

The word **Insured**, either in the singular or plural, means:

1. The Named Insured herein defined as the person(s) or organization(s) stated in the Declarations and any **Subsidiary** or **Predecessor Entity** of such organizations as of inception of the **Policy Period**;

2. Any past or current principal, partner, member, manager, officer, director, trustee or shareholder or **Employee** of the Named Insured stated in the Declarations solely while acting on behalf of the Named Insured and within the scope of their duties as such;

3. The spouse or **Domestic Partner** of each Insured in Paragraph 2. above, but only for each such **Insured's** liability as is otherwise covered herein;

4. The heirs, executors, administrators, assigns and legal representatives of each Insured above in the event of death, incapacity or bankruptcy of such Insured but only for such Insured's liability as is otherwise covered herein; and

5. Any natural person who was or is an independent contractor of the Named Insured solely while acting on behalf of the Named Insured and within the scope of their duties as directed by the Named Insured.

## SECTION II – INSURING AGREEMENTS

Although various Insuring Agreements may be referenced in this Coverage Part, an Insuring Agreement is included within this Coverage Part only if that Insuring Agreement is stated as being purchased in the Declarations. There shall be no coverage under any Insuring Agreement if the corresponding Limit Of Liability is stated in the Declarations to be $0 or Not Purchased.

### A. Network And Information Security Liability

The Company shall pay on behalf of the **Insured**, all sums:

1. In excess of the Deductible stated in the Declarations;

2. Which the **Insured** shall become legally obligated to pay as **Damages** and **Regulatory Fines** both of which are a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable;

3. Reported to the Company pursuant to Paragraph **A.** Reporting Provision of Section **VIII** – Claims, Loss And Expenses; and

4. Which result directly from an **Unauthorized Access**, **Potential Unauthorized Access**, **Unintentional Data Compromise**, or **Regulatory Proceeding**;

provided the **Unauthorized Access**, **Unintentional Data Compromise**, or **Regulatory Proceeding** or the discovery of the **Potential Unauthorized Access**:

a. Happens during the **Policy Period** or on or after the Retroactive Date stated in the Declarations; and

MEEO 5004 06 19

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 38 of 90

**b.** Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Company, no member of the **Control Group** had any knowledge of such **Unauthorized Access**, **Potential Unauthorized Access**, **Unintentional Data Compromise**, or **Regulatory Proceeding**.

## B. Media Injury Liability

The Company shall pay on behalf of the **Insured**, all sums:

1. In excess of the Deductible stated in the Declarations;

2. Which the **Insured** shall become legally obligated to pay as **Damages** which are a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable;

3. Reported to the Company pursuant to Paragraph **A.** Reporting Provision of Section **VIII** – Claims, Loss And Expenses and

4. Which result directly from a **Media Injury**;

provided the **Media Injury**:

**a.** Happens during the **Policy Period** or on or after the Retroactive Date stated in the Declarations; and

**b.** Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Company, no member of the **Control Group** had any knowledge of such **Media Injury**.

## C. Network Security Loss

1. The Company shall indemnify the Named Insured for the amount of **Loss** which:

   **a.** Is in excess of the Deductible stated in the Declarations;

   **b.** Results directly from an **Unauthorized Access** or **Potential Unauthorized Access** which occurs during the Policy Period or on or after the Retroactive Date stated in the Declarations;

   **c.** Is reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses, **A.** Reporting Provision; and

   **d.** Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Company, no member of the **Control Group** had any knowledge of such **Unauthorized Access** or **Potential Unauthorized Access**.

   **Unauthorized Access** includes any continuation, change or resumption of such **Unauthorized Access** after the end of the **Policy Period**; and

2. The Company shall indemnify the Named Insured for the amount of **Business Interruption Loss**:

   **a.** Sustained subsequent to the Retention Period stated in the Declarations;

   **b.** Which results directly from an **Unauthorized Access** or **Potential Unauthorized Access** which occurs during the **Policy Period** or on or after the Retroactive Date stated in the Declarations;

   **c.** Is reported to the Company pursuant to Paragraph **A.** Reporting Provision of Section **VIII** – Claims, Loss And Expenses; and

   **d.** Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Company, no member of the **Control Group** had any knowledge of such **Unauthorized Access** or **Potential Unauthorized Access**.

   **Unauthorized Access** or **Potential Unauthorized Access** includes any continuation, change or resumption of such **Unauthorized Access** or **Potential Unauthorized Access** after the end of the **Policy Period**.

   All **Business Interruption Loss** from multiple **Business Interruption Events** that arise out of the same **Unauthorized Access** or out of **Interrelated Unauthorized Accesses** shall be deemed to be a single **Business Interruption Event**; however, a separate Retention Period, as stated in the Declarations, shall apply to each such **Business Interruption Event**.

## D. Breach Mitigation Expense

1. The Company shall indemnify the Named Insured for the amount of **Loss** incurred with the prior written consent of the Company for **Breach Mitigation Expense** which:

a. Results directly from an **Unintentional Data Compromise** which occurs during the **Policy Period** or on or after the Retroactive Date stated in the Declarations;

b. Is reported to the Company pursuant to Paragraph **A.** Reporting Provision of Section **VIII** – Claims, Loss and Expenses; and

c. Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Company, no member of the **Control Group** had any knowledge of such **Unintentional Data Compromise** .

**2.** With respect to any amount that the Company shall reimburse for costs actually incurred by the Named Insured pursuant to this Insuring Agreement, if such expenses become part of a judgment, award or settlement subject to coverage under Paragraph **A.** Network And Information Security Liability of Section **II** – Insuring Agreements, such expenses shall not also be subject to reimbursement under this Insuring Agreement.

### E. PCI Assessments

The Company shall indemnify the Named Insured for the amount of **PCI Assessments** which:

**1.** Is in excess of the Deductible stated in the Declarations;

**2.** Results directly from a **Payment Card Breach** which occurs during the **Policy Period** or on or after the Retroactive Date stated in the Declarations;

**3.** Is reported to the Company pursuant to Paragraph **A.** Reporting Provision of Section **VIII** – Claims, Loss and Expenses; and

**4.** Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Company, no member of the **Control Group** had any knowledge of such **Payment Card Breach**.

**Payment Card Breach** includes any continuation, change or resumption of such **Payment Card Breach** after the end of the **Policy Period**.

### F. Social Engineering Loss

The Company shall indemnify the Named Insured for the amount of **Social Engineering Loss** which:

**1.** Is in excess of the Deductible stated in the Declarations;

**2.** Results directly from a **Social Engineering Incident** which occurs during the **Policy Period** or on or after the Retroactive Date stated in the Declarations;

**3.** Is reported to the Company pursuant to Paragraph **A.** Reporting Provision of Section **VIII** – Claims, Loss and Expenses; and

**4.** Prior to the effective date of the first continuous coverage of this Insuring Agreement with the Company, no member of the **Control Group** had any knowledge of such **Social Engineering Incident**.

### G. Supplementary Payments

#### 1. Reward Coverage

a. The Company shall reimburse the Named Insured for the actual payment of a reward offered for information leading to the arrest and conviction of persons responsible for crimes committed against an **Insured** and only when the person responsible is convicted of the crime related to an otherwise covered **Policy Event**.

b. Reimbursement will be subject to maximum of 50% of the covered **Claim** or **Loss** up to maximum payment of the Reward Coverage Limit Of Liability stated in the Declarations per Policy Period, or Extended Reporting Period, if applicable.

c. The Named Insured shall give the Company written proof of payment of a reward as soon as practicable, but no later than 60 days after incurring such reward.

#### 2. Loss of Earnings and Expense Reimbursement

a. The Company shall reimburse **Employees** of the Named Insured as expense reimbursement for all reasonable and necessary expenses incurred by an **Insured** at the Company's written request for attendance at any arbitration, mediation, deposition, hearing or trial in connection with a **Claim** to which this Coverage Part applies. The Named Insured shall give the Company written proof of payment of expenses as soon as practicable, but in no event later than 60 days after incurring such expenses.

**b.** The Company shall compensate the Named Insured for loss of earnings of an **Insured** a maximum of the Loss Of Earnings And Expense Reimbursement Per Day Limit Of Liaiblity stated in the Declarations per day for all **Insureds** to attend at the Company's written request any arbitration, mediation, deposition, hearing or trial in connection with a **Claim** to which this Coverage Part applies.

**c.** The maximum the Company shall pay the Named Insured for all **Insureds** for compensation of all loss of earnings and expense reimbursement for all **Claims** to which this Coverage Part applies and all attendances at the Company's written request is the Loss Of Earnings And Expense Reimbursement Maximum Limit Of Liability stated in the Declarations.

**3. Telecommunications Fraud Reimbursement**

**a.** The Company shall pay on behalf of the Named Insured for charges incurred for unauthorized calls resulting from intentional, unauthorized and fraudulent gaining of access to outgoing telephone service through intrusion of the Named Insured's telephone system, which:

**(1)** Occurs during the **Policy Period** or on or after the Retroactive Date stated in the Declarations;

**(2)** Is reported to the Company pursuant to Paragraph **A.** Reporting Provision of Section **VIII** – Claims, Loss And Expenses; and

**(3)** Prior to the effective date of the first continuous coverage of this Supplementary Payment with the Company, no member of the **Control Group** had any knowledge of such unauthorized calls.

However, payments under this Paragraph **3.** shall not include any **Loss**, costs or expenses associated with a **Social Engineering Incident**.

**b.** The Company shall pay on behalf of the Named Insured for all loss resulting under this Supplementary Payment up to the Telecommunications Fraud Limit Of Liability stated in the Declarations.

Any payments made under this Paragraph **G.** Supplementary Payments shall be in addition to the Network And Information Security And Media Injury Liability Limit Of Liability stated in the Declarations and shall not be subject to the Deductible.

## SECTION III – DEFINITIONS

**A. Application** means:

**1.** The application for this Policy and for any policy issued by the Company, or any of its affiliates, of which this Policy is a direct or indirect renewal or replacement;

**2.** Any attachment to any such application; and

**3.** Any other materials or applications submitted with or incorporated into any such application.

**B. Authority** means any agency of:

**1.** A federal, state or local government of the United States of America, its territories or possessions or Puerto Rico;

**2.** A federal, provincial or local government of the United Kingdom, Canada and other commonwealth nations; or

**3.** The government of the European Union (EU) or any member nation;

any of which is charged with the administration or enforcement of laws or regulations relating to the use, transfer or storage of electronic communications or data storage systems.

**C. Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death or emotional distress resulting from any of these; however, **Bodily Injury** shall not include humiliation or the infliction of emotional distress arising solely from **Media Injury**.

**D. Breach Mitigation Expense** means expenses incurred with the prior written consent of the Company for:

**1.** The services of a public relations professional, or other publicity expenses that are recommended by a public relations professional to respond to any actual adverse publicity in the media, that is the result of an **Unauthorized Access, Potential Unauthorized Access**. or **Unintentional Data Compromise**;

**2.** Expenses, including but not limited to notification and related legal fees, that are incurred to comply with a **Security Breach Notice Law** and that are the result of an **Unauthorized Access, Potential Unauthorized Access,** or **Unintentional Data Compromise**;

**MEEO 5004 06 19**

3. Expenses associated with voluntarily providing notifications, credit monitoring services, identity restoration services or credit repair services to individuals affected by an **Unauthorized Access, Potential Unauthorized Access,** or **Unintentional Data Compromise;**

4. Expenses associated with the Named Insured's contractual obligation to indemnify its customer, a merchant bank or a payment card processor for amounts as included in Paragraphs **D.1., D.2.,** and **D.3.** above arising from an **Unintentional Data Compromise,** but only if such obligation was present in a written service agreement effected by the parties prior to the **Unintentional Data Compromise;** or

5. Expenses associated with the services of a data security expert breach coach or consultant that are incurred in response to an **Unauthorized Access, Potential Unauthorized Access, or Unintentional Data Compromise;**

however, **Breach Mitigation Expense** shall not include **PCI Assessments.**

E. **Business Income** means:

1. The net profit or loss before income taxes that the Named Insured would have earned or incurred per hour during a **Business Interruption Event,** based on the average, hourly gross profit or loss the Named Insured has generated in the 12 months prior to inception of the **Business Interruption Loss;** added to

2. The Named Insured's fixed operating expenses, including payroll, incurred per hour during a **Business Interruption Event,** but only to the extent that such operating expenses must necessarily continue during the **Business Interruption Event** and such expenses would have been incurred by the Named Insured had such **Business Interruption Event** not occurred. For manufacturing risks, net income includes the net sales value of production.

F. **Business Interruption Event** means the actual and necessary interruption to or degradation in the availability of the Named Insured's **Electronic Communications System** resulting in a **Business Interruption Loss.**

However, **Business Interruption Event** shall not include any business interruption due to or caused, in whole or in part, by any cause other than an **Unauthorized Access,** including but not limited to:

1. Any cause of loss causing physical damage to real or personal property owned, rented, leased or occupied by, or in the care, custody or control of the Named Insured;

2. Any failure or interruption of service attributable to an Internet service provider, telecommunications provider, utility provider or other infrastructure provider; or

3. Loss of power, heating, cooling or other utilities.

Any **Business Interruption Event** will be deemed to end and the Company's indemnity obligation related to such **Business Interruption Event** will cease at the hour either:

a. The interruption to or degradation in the availability of the Named Insured's **Electronic Communications System** ceases; or

b. The **Business Interruption Loss** ceases;

whichever occurs first.

G. **Business Interruption Loss** means **Business Income** which is reduced by at least 25%; and such reduction in **Business Income:**

1. Lasts in excess of the Retention Period stated in the Declarations, and

2  Is a direct result of an **Unauthorized Access.**

**Business Interruption Loss** shall not include:

a. **Loss** or **Social Engineering Loss;**

b. Reduction in revenue incurred as a result of unfavorable business conditions;

c. Reduction in revenue due to loss of market share or any other consequential loss; or

d. Costs or expenses incurred by the Named Insured to identify and remove software program errors or vulnerabilities.

**MEEO 5004 06 19**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 42 of 90

**H. Claim** means, with regard to Paragraphs **A. Network And Information Security Liability** and **B. Media Injury Liability** of Section **II** – Insuring Agreements only, the **Insured's** receipt of:

1. A written demand for **Damages;**

2. The service of suit or institution of arbitration proceedings against the **Insured;** or

3. A notice of a charge against the **Insured** by any **Authority** or any administrative proceeding initiated by an **Authority** including any official investigation, conciliation meeting or formal hearing;

all as a result of an **Unauthorized Access, Potential Unauthorized Access, Unintentional Data Compromise, Media Injury** or **Regulatory Proceeding.**

**I. Claim Expenses** means reasonable and necessary amounts incurred by the Company, or by the **Insured** with the prior written consent of the Company, in the defense of that portion of any **Claim** or **Regulatory Proceeding** for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; however, **Claim Expenses** shall not include:

1. Salary, wages, overhead, or benefit expenses of or associated with **Employees** or officials of the Named Insured or employees or officials of the Company; or

2. Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or outside counsel for the Named Insured or the Company.

**J. Control Group** means board members, CEO, COO, CIO, CFO, CTO, in-house counsel, Human Resources Director, Risk Manager or the functional equivalents of the Named Insured.

**K. Damages** means the monetary portion of any judgment, award or settlement, including punitive damages where insurable by law; however, **Damages** shall not include:

1. Multiplied portions of damages in excess of actual damages, including trebling of damages;

2. The cost of any modifications or changes to the **Insured's** security measures, procedures, software or hardware required or agreed to by the **Insured** to satisfy a judgment, award or settlement;

3. Any cost required to repair, build or modify property to comply with any award by a court, administrative order, arbitration award or any similar judgment;

4. Taxes, criminal or civil fines, or attorneys' fees of a party other than an **Insured**, other penalties imposed by law;

5. Sanctions;

6. Matters which are uninsurable under the law pursuant to which this Coverage Part shall be construed; or

7. The return, withdrawal, reduction or restitution or payment of any fees, profits or charges for services or consideration or any expenses paid to the **Insured;**

8. **Regulatory Fines;**

9. **PCI Assessments;** or

10. **Social Engineering Loss.**

**L. Electronic Communications System** means any:

1. Wired, wireless, radio, electromagnetic, photo-optical or photo-electronic facility for the transmission of electronic communications;

2. Electronic data processing system, network or related electronic equipment for the storage of such communications; and

3. Computer.

**M. Employee** means any natural person (except a director or trustee who is not also an officer or employee of the Named Insured, if the Named Insured is a corporation or trust) while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service. **Employee** includes any **Leased**

**MEEO 5004 06 19**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 43 of 90

**Worker** and any **Temporary Worker**, but does not include any independent contractor or consultant of the Named Insured.

**N. Extra Expense** means necessary expenses that the Named Insured would not have incurred if there had not been a **Loss** resulting from an **Unauthorized Access**.

**O. Forensic Expense** means reasonable and necessary costs incurred by the Named Insured to engage the services of a third party computer security expert to determine the existence and cause of any **Unauthorized Access**.

**P. Interrelated Unauthorized Access** means one or more **Unauthorized Access(es)** or **Potential Unauthorized Access(es)** that have as a common connection or nexus any fact, incident, circumstance, situation, or any computer security incident, intrusion, breach, compromise, theft, loss or use of the Named Insured's **Electronic Communications System**.

**Q. Leased Worker** means a person leased to the Named Insured by a labor leasing organization, under an agreement between the Named Insured and the labor leasing organization, to perform duties related to the conduct of the Named Insured's business and which are at the Named Insured's direction.

**R. Loss** means:

   1. **Forensic Expense** and reasonable and necessary costs incurred by the Named Insured to restore with due diligence and dispatch the Named Insured's **Electronic Communications System** to the condition that existed prior to an **Unauthorized Access**, including restoration or reinstallation of software applications, electronic data and media which form a part of the Named Insured's **Electronic Communications System**;

   2. **Extra Expense** incurred by the Named Insured in continuing the conduct of the Named Insured's business during the period from the time of the discovery of an **Unauthorized Access** to the time the Named Insured's **Electronic Communications System** is or can be restored with due diligence and dispatch to the condition that existed prior to an **Unauthorized Access**;

   3. Subject to prior approval by the Company, expenses necessarily incurred by the Named Insured to reduce **Loss** under Paragraph **C.** Network Security Loss of Section **II** – Insuring Agreements after an **Unauthorized Access** has happened and to the extent that such expenses do not exceed the value of the **Loss** which such expenses are incurred to reduce;

   4. Loss of money, securities, bonds or similar financial instruments with monetary value which is incurred by the Named Insured and which is proximately caused by the **Unauthorized Access** committed by a person or group of persons, none of whom are an **Insured** or an **Employee** of any **Insured**, having the intent to commit fraud, theft, or other dishonest act; or

   5. Subject to prior written approval by the Company, the Named Insured's payment of an extortion demand.

   However, **Loss** shall not include:

   a. Any cost or charges associated with building, modifying or upgrading the Named Insured's **Electronic Communications System**, or any software, security measures or procedures;

   b. Any cost required to repair, build or modify tangible property to comply with any award or order by a court, an **Authority**, arbitration or any similar proceeding;

   c. Any loss of reputation of the Named Insured or loss of customer confidence in the Named Insured or the value imputed to such loss;

   d. Expenses incurred by the **Insured** in establishing the amount of any **Loss** covered under this Coverage Part; or

   e. **Business Interruption Loss**;

   f. **PCI Assessments**; or

   g. **Social Engineering Loss**.

**S. Media Injury** means injury arising from any of the following:

   1. Libel, slander or defamation or any other form of disparagement;

   2. Invasion or infringement of the right of privacy or the right of publicity;

**MEEO 5004 06 19**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 44 of 90

3. Infringement of copyright, service mark, service name or trademark, title, trade dress, trade name or slogan and unfair competition alleged in connection therewith;

4. Plagiarism, piracy or misappropriation of ideas under implied contract; or

5. Infliction of emotional distress, mental anguish, false arrest or malicious prosecution.

T. **Payment Card Breach** means an actual or suspected unintentional disclosure of payment card data stored or processed by the Named Insured or an **Unauthorized Access**.

U. **PCI Assessments** means amounts assessed against the Named Insured by any payment card company:

1. To recover actual costs incurred by a payment card company, issuing bank or acquiring bank to replace credit cards or debit cards, the numbers of which have been compromised by a **Payment Card Breach**;

2. To refund fraudulent charges which resulted from a **Payment Card Breach** whether incurred by a cardholder, an issuing bank or an acquiring bank or to pay costs assessed by the PCI Security Standards Council as audit costs; or

3. Any fines or penalties or amounts voluntarily agreed to by the Named Insured for an actual or alleged violation of the Payment Card Industry Data Security Standard.

However, **PCI Assessments** shall not include **Breach Mitigation Expense**.

V. **Policy Event** means **Unauthorized Access, Potential Unauthorized Access, Regulatory Proceeding, Media Injury, Unintentional Data Compromise, Payment Card Breach** or **Social Engineering Incident.**

W. **Policy Payment** means **Damages, Regulatory Fines, Claim Expenses, Loss, Business Interruption Loss, Breach Mitigation Expense, PCI Assessments,** or **Social Engineering Loss. Policy Payment** also includes any reimbursements under Paragraph G. Supplementary Payments of Section II – Insuring Agreement.

X. **Policy Period** means the period from the inception date of this Coverage Part to the Coverage Part expiration date stated in the Declarations, or the effective date of any earlier cancellation or termination.

Y. **Pollutants** mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

Z. **Potential Unauthorized Access** means the threat or potential threat of an **Unauthorized Access** to the Named Insured's **Electronic Communications System.**

However, **Potential Unauthorized Access** shall not mean **Social Engineering Incident.**

AA. **Predecessor Entity** means any entity to whose financial assets and liabilities the Named Insured is the majority successor in interest.

BB. **Private Data** means data containing:

1. An individual's driver license or other state-issued identification number; social security number; or unpublished telephone number; savings account, checking account, credit card or debit card number each when in combination with the security code, access code, password or pin for such account or card number;

2. Nonpublic personal information as defined in the Gramm-Leach-Bliley Act of 1999, as amended, and regulations issued pursuant thereto;

3. Protected healthcare information as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto, and medical and healthcare information;

4. Private personal information as defined under a **Security Breach Notice Law;**

5. Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information; or

6. Commercial information subject to provisions of a non-disclosure agreement or a contractual warranty relating to the confidentiality of such information in a written contract in place prior to an **Unintentional Data Compromise;**

not including any lawfully available data accessible by the general public.

MEEO 5004 06 19

CC. **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property or loss of use of tangible property that is not physically injured other than covered **Social Engineering Loss**; however, damage to, corruption of or inability to access data, software and computer networks shall not be considered to be loss of use of tangible property.

DD. **Regulatory Fines** means civil fines and penalties assessed against the **Insured** by an **Authority** as a result of a **Regulatory Proceeding** under Paragraph **A.** Network and Information Security Liability of Section **II** – Insuring Agreements.

EE. **Regulatory Proceeding** means a formal hearing, official investigation, examination, inquiry, legal action or any other similar proceeding initiated by an **Authority** against the Named Insured.

FF. **Security Breach Notice Law** means any law, statute or regulation within the United States of America, its territories or possessions, Puerto Rico or Canada requiring the Named Insured to notify individuals of the compromise or possible compromise of the security of their confidential information in the Named Insured's care, custody or control; the European Union (EU) Data Protection Act of 1995; and the General Data Protection Regulation.

GG. **Social Engineering Incident** means any priming, pre-texting, spoofing, or other fraudulent, manipulative or deceptive communication sent to an **Insured** within the normal course of the Named Insured's business operations resulting in **Social Engineering Loss**. However, **Social Engineering Incident** shall not mean **Unauthorized Access**.

HH. **Social Engineering Loss** means:

1. The loss of money, securities, bonds or similar financial instruments with monetary value which is incurred by the Named Insured;

2. The actual cost of loss of tangible property with pecuniary value which is incurred by the Named Insured;

3. Theft or misdirection of funds held in escrow or trust; or

4. Theft of personal funds of members of the **Control Group**;

which is directly caused by a fraudulent or deceptive communication.

II. **Subsidiary** means:

1. Any entity, excluding partnerships or joint ventures, of which the **Insured** owns more than 50% of the outstanding voting securities or has the right to exercise more than 50% of the voting rights for the election or appointment of the members of the Board of Directors or equivalent management positions including, but not limited to, members of the board of managers of a limited liability company; or

2. Any organization operated as a joint venture in which, on or prior to the inception date stated in the Declarations, the **Insured** owns, directly or through one or more **Subsidiaries**, exactly 50% of the organization's outstanding securities with voting rights, and under a written agreement with the organization's remaining owners, has sole control of the organization's management and operations.

JJ. **Temporary Worker** means any person who is furnished to the Named Insured to substitute for a permanent **Employee** on leave or to meet seasonal or short-term work load requirements.

KK. **Unauthorized Access** means a breach of the Named Insured's **Electronic Communications System**, including:

1. Any intentional violation, interception, or use or misuse of the Named Insured's **Electronic Communications System**, whether or not for profit or gain, by any person, without the permission, knowledge or ratification of the **Insured**;

2. Access to the Named Insured's **Electronic Communications System** that is with the **Insured's** permission where such permission is the result of fraud or deception, including phishing scams;

3. Use of the Named Insured's **Electronic Communications System** by a party, including but not limited to a **Employee**, authorized by the **Insured** to use such system, who does so for an unauthorized purpose;

4. The introduction of viruses, malware, or other programs into the Named Insured's **Electronic Communications System** which contain fraudulent or destructive instructions or code including any inadvertent transmission of such programs to a third party;

5. A credible threat or an extortion demand, including but not limited to a threat or demand by ransomware, received by the Named Insured threatening or portending loss, injury or damage to:

**MEEO 5004 06 19**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 46 of 90

  **a.** The Named Insured's **Electronic Communications System**, including programs, electronic data and media which form a part of the Named Insured's **Electronic Communications System**; or

  **b.** Money, securities, bonds or similar financial instruments, solely to the extent that record of such is maintained in digital or electronic format on the Named Insured's **Electronic Communications System**;

 for the purpose of extorting money or other valuable consideration from the Named Insured; or

**6.** Failure to prevent a denial of service attack on the Named Insured's **Electronic Communications System** or to prevent the use of the Named Insured's **Electronic Communications System** by an unauthorized user or code to launch a denial of service attack on a third party;

**LL. Unintentional Data Compromise** means:

**1.** Any computer security incident, intrusion, breach, compromise, theft, loss or misuse of **Private Data** maintained by the Named Insured, including the theft or loss of any paper records;

**2.** The failure of any third party to prevent the unauthorized viewing, copying or distribution of **Private Data** which the Named Insured has entrusted to such party under a written contract or agreement that specifically requires such party to protect the confidentiality of the **Private Data** so entrusted; or

**3.** Unintentional breach of the Named Insured's written privacy policy.

## SECTION IV – EXCLUSIONS

**A.** With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to **Policy Event** or **Policy Payment**:

**1.** Caused by access to the Named Insured's **Electronic Communications System** which is attributed by the government of the United States of America to any government, governmental agency or sub-agency, or any agents thereof while acting on behalf of such entity;

**2.** Due to riot, civil commotion, war, insurrection or usurped power;

**3.** For **Bodily Injury**; however, this exclusion shall not apply to **Damages** resulting from humiliation or the infliction of emotional distress arising solely from an **Unauthorized Access, Potential Unauthorized Access, Social Engineering Incident** or **Media Injury**;

**4.** For **Property Damage**; however, this exclusion shall not apply to damage to, corruption of or inability to access data, software and computer networks arising solely from an **Unauthorized Access, Potential Unauthorized Access, Social Engineering Incident** or **Media Injury**;

**5.** Based upon or arising out of:

  **a.** Liability of others assumed by the **Insured** under any contract or agreement; however, this exclusion shall not apply to liability an **Insured** would have in the absence of such contract or agreement or to any contractual obligation in a written service agreement entered into by the parties prior to the **Unauthorized Access, Unintentional Data Compromise,** or **Payment Card Breach** assumed by the Named Insured to indemnify its customer, a merchant bank or a payment card processor for **Breach Mitigation Expenses, PCI Assessments,** or **Damages** arising from an **Unauthorized Access, Unintentional Data Compromise,** or **Payment Card Breach;**

  **b.** Any warranties or guarantees, express, implied or otherwise, or any cost estimates; however, this exclusion shall not apply to any liability that the Named Insured would have in the absence of such warranty or guarantee;

  **c.** Any conversion, misappropriation, commingling of or defalcation of funds or property; however, this exclusion shall not apply to **Loss** or **Social Engineering Loss;**

  **d.** Any inability or failure of any party to pay or collect monies; however, this exclusion shall not apply to inability or failure to pay or collect monies resulting directly from **Unauthorized Access** or **Social Engineering Incident;**

  **e.** Infringement or inducement of infringement of patent or trade secret; or

f. An act, error or omission in the performance of professional services rendered or that should have been rendered by the **Insured** or by any person or organization for whose acts, errors or omissions the **Insured** is legally responsible;

6. Based upon, arising out of, or any way involving:

   a. Any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: antitrust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships; however, this exclusion shall not apply to a **Regulatory Proceeding** resulting directly from an **Unauthorized Access, Unintentional Data Compromise,** or **Media Injury;**

   b. Conduct of the **Insured** or at the **Insured's** direction that is intentional, willful, dishonest, fraudulent or that constitutes a willful violation of any statute or regulation; however, this exclusion shall not apply to:

      (1) The strictly vicarious liability of any **Insured** for the intentional, willful, dishonest or fraudulent conduct of another **Insured** or for the conduct of another **Insured** that constitutes a willful violation of any statute or regulation; or

      (2) **Claim Expenses** incurred until an allegation is determined through admission by the **Insured** or final adjudication to be intentional, willful, dishonest or fraudulent or a willful violation of any statute or regulation;

   c. Any:

      (1) Actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of **Pollutants;** or

      (2) Direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize **Pollutants,** or to pay for or contribute to the costs of undertaking such actions; or

   d. The insolvency, receivership, bankruptcy, liquidation of the Named Insured or of any subsidiary;

7. Brought by or on behalf of any **Employee,** former **Employee** or prospective **Employee** based upon, arising out of, or in any way involving the employment relationship or the nature, terms or conditions of employment or any workplace tort;

8. Brought by, in the name of, or on behalf of any **Insured;** however, this exclusion shall not apply to any **Claim** arising out of **Unauthorized Access** or **Potential Unauthorized Access** of the personal information of an **Employee** which is in the care, custody or control of the Named Insured; or

9. Brought under any other Coverage Part of this Policy.

B. Solely with respect to Paragraphs **A.** Network And Information Security Liability and **B.** Media Injury Liability of Section II – Insuring Agreements, this Coverage Part does not apply to any **Claim:**

   1. Made by any person or organization which is operated, managed or owned, in whole or in part, by the Named Insured or any parent organization, subsidiary, division or affiliated organization thereof;

   2. Brought by, in the name of, or on behalf of any performance rights organization, including but not limited to ASCAP, BMI, SESAC, SOCAN or SoundExchange; or

   3. Based upon or arising out of:

      a. Infringement of copyright, title, trade dress, slogan, service mark, service name or trademark, trade name or other intellectual property arising from any tangible goods, service offerings or other products displayed on the Named Insured's web site;

      b. Contractual liability involving the ownership of intellectual property with any vendor, customer, sub-contractor, current or former **Employee;**

      c. Failure of goods, products or services to conform to any statement of quality or performance;

      d. Any description relating to the price of goods, products or services; or

      e. Entries posted on blogs, bulletins boards, chat rooms or other internet forums not directly controlled by the Named Insured with or without the knowledge of the Named Insured.

C. With respect to Paragraph **C.** Network Security Loss of Section II – Insuring Agreements, this Coverage Part does not apply to any **Loss** or **Business Interruption Loss:**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 48 of 90

1. Caused by theft, physical damage, destruction or failure of the Named Insured's **Electronic Communications System** or any part thereof; however, this exclusion shall not apply to theft, physical damage, destruction or failure of programs, electronic data and media caused by an **Unauthorized Access** or **Potential Unauthorized Access;**

2. Based upon or arising out of:

   a. **Media Injury;** or

   b. Theft, or alleged theft, of money, securities, bonds, or similar financial instruments with monetary value caused or contributed to by any fraudulent, dishonest or criminal act committed by any person who is an **Employee** or an **Insured** at the time of the **Unauthorized Access,** whether acting alone or in collusion with others; or

3. Of the value of trade secrets, confidential processing methods or other confidential or proprietary information.

D. With respect to Paragraph **F.** Social Engineering Loss of Section **II** – Insuring Agreements, this Coverage Part does not apply to any **Social Engineering Loss** based upon, arising out of or in any way involving any **Social Engineering Loss** caused by an **Insured** with fraudulent or dishonest intent.

## SECTION V – TERRITORY

The insurance afforded by this Coverage Part applies worldwide, except for **Claims** made in any country on which the government of the United States of America has imposed trade sanctions, embargoes or any similar regulations that prohibit the transaction of business with or within such country.

## SECTION VI – LIMITS OF LIABILITY, DEDUCTIBLES AND INTERRELATED UNAUTHORIZED ACCESS

A. **Network And Information Security Liability**

   1. **Each Claim**

      a. The liability of the Company under Paragraph **A.** Network And Information Security Liability of Section **II** – Insuring Agreements for the combined total of **Damages** and **Claim Expenses** for any **Claim** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, and reported to the Company pursuant to Section **VIII** – Claims, Loss and Expenses for each **Claim** shall not exceed the Network And Information Security Liability Each Claim Limit Of Liability stated in the Declarations.

      b. The liability of the Company under Paragraph **A.** Network And Information Security Liability of Section **II** – Insuring Agreements for the combined total of **Regulatory Fines** for any **Claim** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, and reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses for each **Claim** shall not exceed the Regulatory Fines Each Claim Limit Of Liability stated in the Declarations.

   2. **Network And Information Security Liability Aggregate**

      a. The total liability of the Company under Paragraph **A.** Network And Information Security Liability of Section **II** – Insuring Agreements shall not exceed the Network And Information Security Liability Aggregate Limit Of Liability stated in the Declarations for all **Damages** and **Claim Expenses** arising out of all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period, if applicable.

      b. The total liability of the Company under Paragraph **A.** Network And Information Security Liability of Section **II** – Insuring Agreements shall not exceed the Regulatory Fines Aggregate Limit Of Liability stated in the Declarations for all **Regulatory Fines** arising out of all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period, if applicable.

B. **Media Injury Liability**

   1. **Each Claim**

      The liability of the Company under Paragraph **B.** Media Injury Liability of Section **II** – Insuring Agreements for the combined total of **Damages** and **Claim Expenses** for any **Claim** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, and reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses for each **Claim** shall not exceed the Media Injury Liability Each Claim Limit Of Liability stated in the Declarations.

   2. **Media Injury Liability Aggregate**

**MEEO 5004 06 19**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 49 of 90

The total liability of the Company under Paragraph **B. Media Injury Liability** of Section **II** – Insuring Agreements shall not exceed the Media Injury Liability Aggregate Limit Of Liability stated in the Declarations for all **Damages** and **Claim Expenses** arising out of all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period, if applicable.

## C. Network Security Loss

1. Each Unauthorized Access

   a. The liability of the Company under Paragraph **C. Network Security Loss** of Section **II** – Insuring Agreements for all **Loss** resulting directly from each **Unauthorized Access** reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses shall not exceed the Network Security Loss Each Unauthorized Access Limit Of Liability stated in the Declarations.

   b. The liability of the Company under Paragraph **C. Network Security Loss** of Section **II** – Insuring Agreements for all **Business Interruption Loss** resulting directly from each **Business Interruption Event** reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses shall not exceed the Network Security Business Interruption Loss Each Business Interruption Event Limit Of Liability stated in the Declarations.

2. Network Security Aggregate

   a. The total liability of the Company under Paragraph **C. Network Security Loss** of Section **II** – Insuring Agreements shall not exceed the Network Security Loss Aggregate Limit Of Liability stated in the Declarations for all **Loss** incurred by the Named Insured which results directly from all **Unauthorized Accesses** reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses.

   b. The total liability of the Company under Paragraph **C. Network Security Loss** of Section **II** – Insuring Agreements shall not exceed the Network Security Business Interruption Loss Aggregate Limit Of Liability stated in the Declarations for all **Business Interruption Loss** incurred by the Named Insured which results directly from all **Business Interruption Events** reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses.

## D. Breach Mitigation Expense

1. Each Unintentional Data Compromise

   The liability of the Company under Paragraph **D. Breach Mitigation Expense** of Section **II** – Insuring Agreements for **Breach Mitigation Expense** from each **Unintentional Data Compromise** reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses, shall not exceed the Breach Mitigation Expense Each Unintentional Data Compromise Limit Of Liability stated in the Declarations.

2. Breach Mitigation Aggregate

   The total liability of the Company under Paragraph **D. Breach Mitigation Expense** of Section **II** – Insuring Agreements shall not exceed the Breach Mitigation Expense Aggregate Limit Of Liability stated in the Declarations for all **Breach Mitigation Expense** reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses from all **Unintentional Data Compromise**.

## E. PCI Assessments

1. Each Payment Card Breach

   The liability of the Company under Paragraph **E. PCI Assessments** of Section **II** – Insuring Agreements for all **PCI Assessments** resulting directly from each **Payment Card Breach** which is reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses, shall not exceed the PCI Assessments Each Payment Card Breach Limit Of Liability stated in the Declarations.

2. PCI Assessments Aggregate

   The total liability of the Company under Paragraph **E. PCI Assessments** of Section **II** – Insuring Agreements shall not exceed the PCI Assessments Aggregate Limit Of Liability stated in the Declarations for all **PCI Assessments** incurred by the Named Insured which results directly from **Payment Card Breach** reported pursuant to Section **VIII** – Claims, Loss And Expenses.

## F. Social Engineering Loss

1. Each Social Engineering Incident

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 50 of 90

The liability of the Company under Paragraph **F. Social Engineering Loss** of Section **II** – Insuring Agreements for all **Social Engineering Loss** resulting directly from each **Social Engineering Incident** which is reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses shall not exceed the Social Engineering Loss Each Social Engineering Incident Limit Of Liability stated in the Declarations.

2. Social Engineering Loss Aggregate

The total liability of the Company under Paragraph **F. Social Engineering Loss** of Section **II** – Insuring Agreements shall not exceed the Social Engineering Loss Aggregate Limit Of Liability stated in the Declarations for all **Social Engineering Loss** incurred by the Named Insured which results directly from **Social Engineering Incidents** reported to the Company pursuant to Section **VIII** – Claims, Loss And Expenses.

## G. Combined Coverage Part Aggregate Limit Of Liability

The Combined Network And Information Security And Media Injury Liability Coverage Combined Aggregate Limit Of Liability stated in the Declarations shall be the Company's maximum aggregate liability for the combined total of all **Policy Payments** under all purchased Insuring Agreements, combined.

## H. Deductibles

1. With regard to Paragraph **A. Network And Information Security Liability** of Section **II** – Insuring Agreements:

    a. The Network And Information Security Liability Each Claim Deductible stated in the Declarations shall be paid by the Named Insured and shall be applicable to each **Claim** and shall apply to **Damages** and **Claim Expenses**, whether or not any **Damages** payments are made. Such Deductible amounts shall, upon written demand by the Company, be paid by the Named Insured within 10 days. The determination of the Company as to the reasonableness of the **Claim Expenses** shall be conclusive on the Named Insured.

    b. The Regulatory Fines Each Claim Deductible stated in the Declarations shall be paid by the Named Insured and shall be applicable to each **Claim** and shall apply to **Damages** and **Claim Expenses**, whether or not any **Damages** payments are made. Such Deductible amounts shall, upon written demand by the Company, be paid by the Named Insured within 10 days. The determination of the Company as to the reasonableness of the **Claim Expenses** shall be conclusive on the Named Insured.

2. With regard to Paragraph **B. Media Injury Liability** of Section **II** – Insuring Agreements, the Media Injury Liability Each Claim Deductible stated in the Declarations shall be paid by the Named Insured and shall be applicable to each **Claim** and shall apply to **Damages** and **Claim Expenses**, whether or not any **Damages** payments are made. Such Deductible amounts shall, upon written demand by the Company, be paid by the Named Insured within 10 days. The determination of the Company as to the reasonableness of the **Claim Expenses** shall be conclusive on the Named Insured.

3. With regard to Paragraph **C. Network Security Loss** of Section **II** – Insuring Agreements:

    a. The Network Security Loss Each Unauthorized Access Deductible stated in the Declarations shall be applicable to **Loss** from each **Unauthorized Access** or **Potential Unauthorized Access**. Such Deductible amount will be deducted from the amount of **Loss** for which the Company shall indemnify the Named Insured; and

    b. The Network Security Business Interruption Loss Retention Period For Each Business Interruption Event stated in the Declarations shall be applicable to **Business Interruption Loss** from each **Business Interruption Event**. Such Retention Period shall reduce the number of hours of **Business Interruption Loss** for which the Company shall reimburse the Named Insured.

4. With regard to Paragraph **D. Breach Mitigation Expense** of Section **II** – Insuring Agreements, the Breach Mitigation Expense Each Unintentional Data Compromise Deductible stated in the Declarations shall be applicable to **Breach Mitigation Expense** from each **Unintentional Data Compromise**. Such Deductible amount will be deducted from the amount of **Breach Mitigation Expense** for which the Company shall reimburse the Named Insured. Such Deductible will not apply to amounts incurred for services of a breach coach as set forth in Paragraph **5.** of the definition of **Breach Mitigation Expense**.

5. With regard to Paragraph **E. PCI Assessments** of Section **II** – Insuring Agreements, the PCI Assessments Each Payment Card Breach Deductible stated in the Declarations shall be applicable to **PCI Assessments** from each **Payment Card Breach**. Such Deductible amount will be deducted from the amount of **PCI Assessments** for which the Company shall indemnify the Named Insured.

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 51 of 90

6. With regard to Paragraph **F. Social Engineering Loss** of Section **II** – Insuring Agreements, the Social Engineering Loss Each Social Engineering Incident Deductible stated in the Declarations shall be applicable to **Social Engineering Loss** from each **Social Engineering Incident**. Such Deductible amount will be deducted from the amount of **Social Engineering Loss** for which the Company shall reimburse the Named Insured.

## I. Deductible Credit

If an **Insured** provides written documentation that, prior to a **Policy Event** occurring, the **Insured** used at least one of the services detailed in the Risk Management Services Policyholder Notice attached to this Policy, the Deductible for the **Policy Payment** resulting from that **Policy Event** will be reduced by the lesser of 50% of the applicable deductible or $25,000.

## J. Multiple Insureds, Claims, Losses And Claimants

1. The inclusion herein of more than one **Insured** in any **Claim** or **Policy Event** or the reporting of a **Policy Payment** incurred by, more than one person or organization or under more than one purchased Insuring Agreement of this Coverage Part, shall not operate to increase the Limits Of Liability stated in the Declarations and the Coverage Part.

2. More than one **Policy Payment** arising out of a single **Claim** or **Policy Event** shall be treated as a single **Claim** or **Policy Event** and shall be deemed first made on the date within the **Policy Period** on which such notice of potential **Claim** or **Policy Event** is first received by the Company.

3. It is the intent of the Company that the coverage afforded under the Insuring Agreements be mutually exclusive. If however, it is determined that more than one purchased Insuring Agreement applies to one **Policy Event** ensuing from a common nexus of fact, circumstance, situation, event, transaction, or cause, the smallest of the applicable Deductibles for the purchased Insuring Agreements will apply.

## SECTION VII – DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

### A. Defense And Investigation

With regard to Paragraphs **A.** Network And Information Security Liability and **B.** Media Injury Liability of Section **II** – Insuring Agreements, the Company shall have the right and duty to defend the **Insured** and to investigate any **Claim** to which coverage under this Coverage Part applies pursuant to the following provisions:

1. **Claim Expenses** incurred in defending and investigating such **Claim** shall be a part of and shall not be in addition to the applicable Limits Of Liability stated in the Declarations. Such **Claim Expenses** shall reduce the applicable Limits Of Liability and shall be applied against the applicable Deductible. The Company shall have no obligation to pay any **Damages** or to defend or continue to defend any **Claim** or to pay **Claim Expenses** after the applicable Limits Of Liability stated in the Declarations have been exhausted by payment of **Damages** or **Claim Expenses**.

2. The Company shall select defense counsel; however, if the law of the state of the Named Insured's domicile, stated in the Declarations, allows the **Insured** to control the selection of defense counsel where a conflict of interest has arisen between the **Insured** and the Company, the Company will provide a list of attorneys or law firms from which the **Insured** may designate defense counsel who shall act solely in the interest of the **Insured**, and the **Insured** shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

   a. Providing on a regular basis, but not less frequently than every 3 months, written reports on claimed **Damages**, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the **Claim**;

   b. Providing any other reasonable information requested;

   c. Providing fully itemized billing on a periodic basis; and

   d. Cooperating with the Company and the **Insured** in resolving any discrepancies.

   The fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as set forth above, shall be included in **Claim Expenses**. Such **Claim Expenses** shall be a part of and shall not be in addition to the applicable Limits Of Liability stated in the Declarations. Such **Claim Expenses** shall reduce the applicable Limits Of Liability and shall be applied against the applicable Deductible.

3. The Company may, at its sole discretion, investigate any **Policy Event**. The Company will pay for covered **Policy Payments** incurred by the Named Insured in excess of the Deductible, if applicable. The Company will indemnify

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 52 of 90

the Named Insured within 60 days after receipt of the sworn proof of loss or satisfactory written proof of payment of **Breach Mitigation Expenses**, provided:

    **a.** The Insured has complied with all the terms of this Policy; and

    **b.** The Company and the Named Insured have agreed with the items included within and the amounts documented in the Named Insured's sworn proof of loss and satisfactory written proof of payment of **Breach Mitigation Expenses**.

**B. Consent To Settlement**

The Company shall not settle any **Claim** without the prior written consent of the first Named Insured, but the Company shall have the right to recommend a settlement of any **Claim**. If the first Named Insured refuses to settle such **Claim** pursuant to the Company's recommendations and acceptable to the claimant, then the Company's liability in regard to such **Claim** shall not exceed the sum of:

**1.** The amount of **Damages** for which the Company could have settled such **Claim**;

**2.** **Claim Expenses** incurred as of the date such settlement was proposed in writing by the Company to the Named Insured; and

**3.** 80% of all covered **Damages** and **Claim Expenses** incurred thereafter on account of such **Claim**.

Such amounts are subject to the provisions of Paragraphs **A.** Network And Information Security Liability and **B.** Media Injury Liability of Section **VI** – Limits Of Liability.

## SECTION VIII – CLAIMS, LOSS AND EXPENSES

**A. Reporting Provision**

**1.** It is a condition precedent to coverage afforded by this Coverage Part that the **Insured** shall give to the Company written notice of any **Policy Event**, as soon as practicable and in no event later than 60 days after the end of the **Policy Period** or the **Extended Reporting Period**, if applicable.

**2.** In the event of any **Loss** or **Breach Mitigation Expense**, the **Insured** must:

    **a.** Notify law enforcement in the event of a theft;

    **b.** Give the Company prompt written notice of the **Unauthorized Access**;

    **c.** As soon as practicable, provide a description of how, when and what elements of the Named Insured's **Electronic Communications System** were impacted by the **Unauthorized Access** or **Potential Unauthorized Access**;

    **d.** Take all reasonable steps to protect the Named Insured's **Electronic Communications System** from further **Unauthorized Access** and to reduce **Loss**;

    **e.** As often as may be reasonably required, permit the Company to inspect the Named Insured's **Electronic Communications System** and examine the **Insured's** books and records related to the **Loss** or **Breach Mitigation Expense** incurred;

    **f.** Provide, in no event later than 60 days after the Company's request, a sworn proof of **Loss**, signed by the Named Insured, containing the information the Company requests to investigate the **Loss**; and

    **g.** Submit to the Company satisfactory written proof of payment of any **Breach Mitigation Expenses** within one year after the expiration or cancellation of this Policy.

**3.** In the event a suit is brought against the **Insured** or a charge against the **Insured** is instituted by any **Authority** or any administrative action is initiated by any **Authority**, the **Insured** shall immediately forward to the address shown in the Claim Reporting policyholder notice every demand, notice, summons or other process received by their representatives.

**B. Discovery Clause**

**1.** Under Paragraphs **A.** Network And Information Security Liability and **B.** Media Injury Liability of Section **II** – Insuring Agreements, if during the **Policy Period**, the **Insured** first becomes aware of a specific **Policy Event** which is reasonably expected to result in a **Policy Payment** within the scope of coverage of this Coverage Part then the **Insured** may provide written notice to the Company containing the information listed below. If such written notice is received by the Company during the **Policy Period**, then any **Policy Payment** subsequently

**MEEO 5004 06 19**

made against the **Insured** arising out of such **Policy Event** shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

2. It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

   a. The description of the specific **Policy Event**;

   b. The date on which such **Policy Event** took place;

   c. The injury or damage which has or may result from such **Policy Event**;

   d. The identity of any injured persons or organization subject to such injury or damage; and

   e. The circumstances by which the **Insured** first became aware of such **Policy Event**.

If during the **Policy Period** the **Insured** provides such written notice of a specific **Policy Event** which is reasonably expected to result in a **Policy Payment** within the scope of coverage of this Coverage Part, the Company, at its sole option, may investigate such specific **Policy Event**. Such matter shall be subject to all terms, conditions and provisions in this Coverage Part as applicable to a **Policy Payment**.

### C. Assistance And Cooperation Of The Insured

The **Insured** shall cooperate with the Company and upon the Company's request, the **Insured** shall:

1. Submit to examination and interview by a representative of the Company and while not in the presence of any other **Insured**, under oath if required;

2. Attend hearings, depositions and trials;

3. Assist in effecting settlement, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits; and

4. Give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage or defending any **Claim**, all without cost to the Company. The **Insured** shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the **Insured** may have.

The **Insured** shall not, with respect to any **Claim** covered under this Policy, except at their own cost, make any payment, admit any liability, settle any **Claims**, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur **Claim Expenses** without the Company's prior written consent, such consent not to be unreasonably withheld. Any costs and expenses incurred by the **Insured** prior to the **Insured** giving written notice of the **Claim** to the Company shall be borne by the **Insured** and will not constitute satisfaction of the Deductible.

### D. False Or Fraudulent Claims

If any **Insured** shall commit fraud in proffering any information related to coverage under this Coverage Part, this insurance shall become void as to such **Insured** from the date such fraud was committed.

## SECTION IX – EXTENDED REPORTING PERIOD

A. The Named Insured's right to exercise the Extended Reporting Period under this Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements in the policy for which an Extended Reporting Period is available.

B. If the Named Insured nonrenews or cancels this Policy or if the Company nonrenews or cancels this Policy in its entirety pursuant to the Cancellation provision in the Common Policy Conditions for reasons other than nonpayment of premium or Deductible or non-compliance with the terms and conditions of this Policy, then the Named Insured shall have the right upon payment of an additional premium calculated at the Premium Percentage stated in the Declarations of the annual premium for the **Policy Period** to extend the coverage granted in this Coverage Part for the Additional Period stated in the Declarations, as elected by the Named Insured, to apply to **Claims** first made against the **Insured** or **Policy Payments** incurred during the period of months as elected, and reported to the Company pursuant to Section VIII – Claims, Loss and Expenses, following immediately upon the effective date of such cancellation or nonrenewal, by reason of any **Policy Event**, which happened during the **Policy Period** or on or after the Retroactive Date stated in the Declarations and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Coverage Part.

**MEEO 5004 06 19**

This extended period of coverage as elected by the Named Insured and described in this paragraph shall be referred to in this Policy as the Extended Reporting Period.

If, however, this Coverage Part is immediately succeeded by similar claims made insurance coverage on which the applicable Retroactive Date is the same as or earlier than that stated in the Declarations, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Insured shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium, Deductible or Limit Of Liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

C. As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid:

1. All Deductibles when due;

2. All premiums due for the **Policy Period**; and

3. All premiums, deductibles and coinsurance obligations due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this Policy is a renewal or replacement.

The right to purchase the Extended Reporting Period shall terminate unless a written notice of such election for the Extended Reporting Period is received by the Company within 30 days after the effective date of cancellation or nonrenewal together with payment of the additional premium for the Extended Reporting Period. If such written notice of request and premium payment for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

D. In the event of the purchase of the Extended Reporting Period the entire premium therefor shall be fully earned at its commencement.

E. The Extended Reporting Period shall not in any way increase the Limits Of Liability stated in the Declarations.

## SECTION X – CHANGES IN EXPOSURE

### A. New Organizations

If before or during the **Policy Period** the Company acquires or creates a new **Subsidiary** or acquires an entity by merger or consolidation, to perform the same operations as the Named Insured, coverage under this Coverage Part automatically will apply to the new organization, provided:

1. Such coverage will apply only with respect to any **Claim** taking place after such acquisition or creation; and

2. There is no other similar insurance available to that organization.

Coverage will be subject to the following:

a. Coverage is afforded only until 60 days after the Named Insured acquired or formed the organization or the end of the **Policy Period**, whichever is earlier;

b. The Retroactive Date applicable to any **Policy Event** or **Claim** against such organization newly acquired or newly formed by the Named Insured will be the date on which the Named Insured newly acquired or newly formed such organization; and

c. No person or organization is an **Insured** with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not stated as a Named Insured in the Declarations or included in the definition of **Subsidiary**.

### B. Acquisition Of The Insured

If during the **Policy Period** a transaction occurs wherein another organization gains control of the Named Insured through the ownership of more than 50% of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent position, or the Named Insured merges into another organization or consolidates with another organization such that the Named Insured is not the surviving organization, then:

1. The first Named Insured must give written notice of such transaction to the Company within 60 days after the effective date of such transaction and provide the Company with such information in connection therewith as the Company may deem necessary; and

MEEO 5004 06 19

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 55 of 90

**2.** This Coverage Part will apply only to those **Policy Events** which happened on or before the effective date of such transaction.

## C. Cessation Of Subsidiaries

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** will continue until the end of the **Policy Period** or the Extended Reporting Period if applicable, provided such coverage will apply only with respect to any **Claim** for a **Policy Event** taking place prior to the date such organization ceased to be a **Subsidiary**.

## SECTION XI – OTHER CONDITIONS

### Mitigation

It is a condition precedent to coverage that the **Insured** shall not willfully fail to comply with any **Security Breach Notice Law** that the Named Insured may be subject to by reason of an **Unauthorized Access** or **Potential Unauthorized Access**.



# EVANSTON INSURANCE COMPANY

## COMMON POLICY CONDITIONS

All Coverage Parts included in this Policy are subject to the following conditions.

Throughout this Policy, the term Company refers to the insurance company providing this insurance.

### A. Terms And Conditions

This Policy is comprised of these Common Policy Conditions, the Declarations, various Coverage Parts and endorsements, if applicable, and the **Application**. Although various Coverage Parts may be referenced in this Policy, a Coverage Part is included within this Policy only if that Coverage Part is stated as being purchased in the Coverage Schedule of the Declarations.

Except for these Common Policy Conditions or unless stated to the contrary in any Coverage Part or endorsement, the terms and conditions of each Coverage Part of this Policy apply only to that Coverage Part and shall not apply to any other Coverage Part of this Policy. Any defined term referenced in the Common Policy Conditions but defined in a Coverage Part shall, for purposes of coverage under that Coverage Part, have the meaning set forth in that Coverage Part. If any provision in the Common Policy Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

### B. Policy Aggregate Limit Of Liability

**1.** Coverage Parts Which Share An Aggregate Limit Of Liability

Notwithstanding the Limits Of Liability of any single purchased Coverage Part, the Company's maximum aggregate Limit Of Liability for all **Damages, Regulatory Fines, Breach Mitigation Expenses, Loss** and **Claim Expenses** covered under all purchased Coverage Parts which share the Aggregate Limit Of Liability stated in the Declarations, shall be the Aggregate Limit Of Liability for such Coverage Parts stated in the Declarations. Such shared Aggregate Limit Of Liability shall be part of and not in addition to the Combined Aggregate Limit Of Liability stated in the Declarations. This paragraph further limits the Company's maximum liability under each such Coverage Part and does not increase the respective separate Limit Of Liability for each Coverage Part.

**2.** Combined Aggregate Limit Of Liability

The Combined Aggregate Limit Of Liability stated in the Declarations shall be the Company's maximum aggregate liability for the combined total of all **Damages, Regulatory Fines, Breach Mitigation Expenses, Loss** and **Claim Expenses** covered under all purchased Coverage Parts, combined.

### C. Single Limit And Deductible

The inclusion herein of more than one **Insured** in any **Claim** or the making of **Claims** by, or reporting of **Loss** incurred by more than one person or organization or under more than one purchased Coverage Part of this Policy, shall not operate to increase the Limits Of Liability stated in the Declarations.

It is the intent of the Company that the coverage afforded under the Coverage Parts be mutually exclusive. If however, it is determined that more than one purchased Coverage Part applies to one **Claim** or **Loss**, then the Limit Of Liability with respect to such **Claim** or **Loss** shall be the larger(est) Limit Of Liability available under the applicable purchased Coverage Parts and not the sum of the limits available under the applicable purchased Coverage Parts. In such event, the smaller(est) of the applicable deductibles for the applicable purchased Coverage Parts will apply and not the sum of such deductibles.

### D. Cancellation

This Policy may be cancelled by the Named Insured on behalf of all **Insureds** by mailing to the Company written notice stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, the Company shall retain the customary short rate proportion of the premium. Payment or tender of unearned premium shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

**MEEO 5700 05 18**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 57 of 90

This Policy may be cancelled by the Company, by mailing to the Named Insured, at the address stated in the Declarations, written notice stating when, not less than 30 days thereafter, such cancellation shall be effective. However, if the Company cancels the Policy because the Named Insured has failed to pay a premium or Deductible when due, including premium, deductible(s) or co-insurance obligations(s) due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies for which this Policy is a renewal or replacement, this Policy may be cancelled by the Company, by mailing a written notice of cancellation to the Named Insured stating when, not less than 10 days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Such notice shall be conclusive on all **Insureds**. Delivery of such written notice by the Named Insured or the Company shall be equivalent to mailing. If cancelled by the Company earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

### E. Representations

By acceptance of this Policy, the **Insureds** agree as follows that the information and statements contained in the **Application(s)** are:

1. The basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy;

2. Their representations;

3. Deemed material to the acceptance of the risk or hazard assumed by the Company under this Policy; and

4. That this Policy is issued in reliance upon the truth of such representations.

### F. Entire Agreement

The Declarations, Common Policy Conditions, Coverage Part(s), any written endorsements and any **Application(s)** shall be deemed to be a single unitary contract.

### G. Other Insurance

This insurance shall be in excess of the applicable Deductible stated in the Declarations and any other valid and collectible insurance available to the **Insured** whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits Of Liability provided in this Policy.

If any **Claim** under this Policy is also covered by one or more policies issued by the Company or any of its affiliated companies affording coverage to the Named Insured or to any organization or person who controls, is controlled by, or is affiliated by common control with the Named Insured unless such other insurance is written only as specific excess insurance or umbrella insurance over the Limits Of Liability provided in this Policy, then with respect to such **Claim**:

1. The Limit Of Liability available under this Policy will be equal to the percentage that this Policy's available Limit Of Liability bears to the total combined Limits Of Liability available under all applicable policies; and

2. The total Limit Of Liability available for such **Claim** shall not exceed the greater(est) available Limit Of Liability remaining on all such policies and its payment shall extinguish the Company's and its affiliated companies' liability on all such policies for such **Claim**.

### H. Changes

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of this Policy and shall not estop the Company from asserting any right under the terms of the Policy. The terms of this Policy shall not be waived or changed, except by written endorsement issued to form a part of this Policy, and this Policy embodies all agreements existing between the **Insureds** and the Company or any of its agents relating to this insurance.

### I. Assignment Of Interest

Assignment of interest under this Policy shall not bind the Company unless its consent is endorsed hereon.

### J. Subrogation

In the event of any payment under this Policy, the Company shall be subrogated to the right of recovery of all **Insureds** to the extent of such payment. The **Insured** shall execute and deliver instruments and papers and do

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 58 of 90

whatever else is necessary to secure such rights. The **Insured** shall do nothing after the **Claim** to prejudice such rights.

The Company shall not exercise any such rights against any person or organization included in the definition of **Insured**. Notwithstanding the foregoing, however, the Company reserves the right to exercise any rights of subrogation against an **Insured** in respect of any **Claim** brought about or contributed to by an intentional, willful, dishonest, fraudulent act or omission of such **Insured** or by an act or omission of such **Insured** that constitutes a willful violation of any statute or regulation.

Any amount so recovered, whether effected by the Company or by the **Insured**, shall first be used for the repayment of expenses incurred toward subrogation; second, for any **Damages**, **Regulatory Fines**, **Breach Mitigation Expenses**, **Loss** and **Claim Expenses** payment by the **Insured** which is in excess of the amount of the Limit Of Liability under this Policy and which is excess of any amount paid by any insurer under any other policy; third, for any damages, regulatory fines, breach mitigation expenses, loss and claims expenses payment by any excess carrier on behalf of the **Insured**; fourth, for any damages, regulatory fines, breach mitigation expenses, loss and claim expenses payment by any primary carrier on behalf of the **Insured**; and, last, for repayment of the **Insured's** Deductible.

### K. Assistance And Cooperation Of The Insured

The **Insured** shall cooperate with the Company and upon the Company's request, the **Insured** shall:

1. Submit to examination and interview by a representative of the Company and while not in the presence of any other **Insured**, under oath if required;

2. Attend hearings, depositions and trials;

3. Assist in effecting settlement, securing and giving evidence, and obtaining the attendance of witnesses in the conduct of suits;

4. Give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and investigating or defending any **Claim**; and

5. Provide any information required to comply with federal or state reporting regulations;

all without cost to the Company, other than coverage provided under Loss Of Earnings And Expense Reimbursement in Section II – Insuring Agreements. The **Insured** shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the **Insured** may have.

The **Insured** shall not, except at their own cost, make any payment, admit any liability, settle any **Claims**, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur any expense without the prior written consent of the Company, such consent not to be unreasonably withheld. Any costs and expenses incurred by the **Insured** prior to the **Insured** giving written notice of a **Claim** to the Company shall be borne by the **Insured** and will not constitute satisfaction of the Deductible.

### L. False Or Fraudulent Claims

If any **Insured** shall commit fraud in proffering any **Claim**, this insurance shall become void from the date such fraudulent **Claim** is proffered.

### M. Inspection

Any of the Company's authorized representatives will have the right and opportunity, whenever the Company so desires, to inspect at any reasonable time the **Insured's** products, goods, operations or premises, but the Company assumes no responsibility or duty by reason of such inspection or the omission thereof. The **Insured** agrees to provide appropriate personnel to assist the Company's representatives during such inspection without cost to the Company.

### N. Action Against The Company

No action shall lie against the Company unless, as a condition precedent thereto, the **Insured** shall have fully complied with all of the terms and conditions of this Policy, nor until the amount of the **Insured's** obligation to pay shall have been fully and finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the Company.

Nothing contained in this Policy shall give any person or organization any right to join the Company as a co-defendant in any action against the **Insured** to determine the **Insured's** liability. Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

## O. Authorization

By acceptance of this Policy, the first Named Insured stated in the Declarations shall act on behalf of all **Insureds** with respect to the:

1. Giving and receiving of all notices to and from the Company as provided herein;
2. Exercising of the Extended Reporting Period, if available;
3. Cancellation of this Policy in whole or part;
4. Payment of premiums and Deductibles when due;
5. Receiving of any return premiums that may become due under this Policy; and

the **Insureds** agree that such person or organization shall act on their behalf.

With respect to any coverage which provides for the reimbursement or indemnification of the Named Insured, the first Named Insured stated in the Declarations shall act on behalf of all Named Insureds with regard to the receiving of such reimbursement or indemnification as provided, and the Named Insureds agree that such person or organization shall act on their behalf.

## P. Policy Extended Reporting Period – All Claims Made Coverages

The Named Insured's right to exercise the Extended Reporting Period under any Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Coverage Parts that provide coverage on a claims made basis.

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 60 of 90

 # Markel eRisk Hub

## Welcome to the Markel eRisk Hub!

## Our risk management portal addressing your data privacy and security concerns

We recognize that your data is one of your most valuable assets and protecting that asset requires on-going effort. To assist you in managing your data security, we are pleased to provide you with free access to our eRisk Hub. This online portal provides quick and easy access to a wealth of resources for understanding security as well as combating, defending and recovering from a data breach incident.

This service is provided free of charge with the purchase of your Markel DataBreach$_M$ policy. We inviteyou to explore the site and take advantage of the wealth of information it offers. Key

features of our eRisk Hub portal include:

   News Center – cyber risk stories, security and compliance blogs, security news, risk management events, and helpful industry links
   Learning Center – best-practices articles, white papers, and webinars from leading technical and legal practitioners
   Risk Manager Tools – assists you in managing your cyber risk, including research tools, what-if calculators, and state breach notification laws
   Incident Roadmap – includes suggested steps to take following a network or data breach incident and free consultation with a Breach Coach®
   eRisk Resources – a directory to quickly find external resources with expertise in pre- and post-breach disciplines

## Register for your free access today:
1. Go to https://www.eriskhub.com/markel.php
2. Complete the registration form in the center of the page. Your Access Code is 12689.
3. Once you've completed registration, you can log-in immediately with the User ID and password you created during registration.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TITLE AND ESCROW OPERATIONS

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that:

A. Paragraph 5. of Section I – The Insured is deleted.

B. Paragraph V. of Section III – Definitions is amended to include the following:

   **Professional Services** also means:

   1. Those services rendered for others for a fee as title abstracter/searcher, title insurance agent, closing agent, and notary public;

   2. Rendered opinions of title based upon abstracts prepared by the **Insured**;

   3. Services rendered as escrow agent pursuant to written escrow instructions accepted in writing by the **Insured**.

C. Section IV – Exclusions is amended as follows:

   1. Paragraphs B.7., B.9., and B.12. are replaced with the following:

      With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment or Supplementary Payment:

      B. Based upon or arising out of:

         7. Any conversion, misappropriation, commingling, defalcation, theft, disappearance, or insufficiency in the amount of escrow funds, monies, monetary proceeds, funds or property, or any other assets, securities, negotiable instruments or any other thing of value. This exclusion shall apply irrespective of which individual, party, or organization actually or allegedly committed or caused in whole or part the conversion, misappropriation, commingling, defalcation, theft, disappearance, or insufficiency in amount;

         9. Any acts or services as an insurance agent or insurance broker for other than title insurance, investment adviser, **Financial Planner**, lawyer, accountant, registered representative or broker/dealer of securities or commodities, mortgage banker, mortgage broker, investment banker, construction adviser, architect, property developer, or real estate agent or broker;

         12. The insolvency, receivership, bankruptcy, liquidation or financial inability to pay, of any bank, savings and loan, banking firm, financial institution, lender, mortgage company, registered representative or broker/dealer of securities or commodities, insurance company, reinsurer, risk retention group or captive (or any other self-insurance plan or trust by whatsoever name), real estate developer, real estate company, or construction organization;

   2. The following exclusions are added to Paragraph B.:

      With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment or Supplementary Payment:

      B. Based upon or arising out of:

**MEEO 5237 05 18**

**Page 1 of 2**

Disbursement of construction funds or any escrow open for a period of over 6 months;

Any transaction involving a loan funded in whole or in part with the **Insured's** own funds or the funds of any organization controlled by, owned by, or commonly owned or affiliated with the **Insured**; or any servicing of loans by the **Insured**;

Notarized certification or acknowledgment of a signature without the physical appearance at the time of said notarization before such notary public as insured hereunder, of the person who is or claims to be the person signing said instrument; or

The Real Estate Settlement Procedures Act (RESPA) or any similar state or local legislation.

All other terms and conditions remain unchanged.

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 63 of 90



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

DATABREACH[SM] NETWORK AND INFORMATION SECURITY AND MEDIA INJURY LIABILITY COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
MEDIA INJURY LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

### SCHEDULE

| Percentage: | 25% |
|---|---|

In consideration of the premium paid, it is hereby understood and agreed that:

The following is added to the Other Conditions section:

**Minimum Earned Premium**

In the event that this Policy is cancelled by the first Named Insured, the Policy premium is subject to a minimum earned premium of the Percentage shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

**MEEO 5256 05 18**                                                                 **Page 1 of 1**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 64 of 90



# EVANSTON INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DATABREACH<sup>SM</sup> NETWORK AND INFORMATION SECURITY AND MEDIA INJURY LIABILITY COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)

In consideration of the premium paid, it is hereby understood and agreed that, with respect to any **Claim, Loss,** Additional Payment or Supplementary Payment otherwise covered hereunder, this Policy shall not exclude any **Policy Payments, Claim, Loss,** Additional Payment, or Supplementary Payment based upon, arising out of, or in any way involving any **Certified Act Of Terrorism.**

**Certified Act Of Terrorism** means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The federal Terrorism Risk Insurance Act sets forth the following criteria for a Certified Act of Terrorism:

1.  The act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Calendar Year and the Company has met the Company's deductible under the Terrorism Risk Insurance Act, the Company shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such cases insured losses up to that amount are subject to pro rata allocation in accordance with the procedures established by the Secretary of the Treasury.

All other terms and conditions remain unchanged.

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 65 of 90



# EVANSTON INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – NUCLEAR ENERGY LIABILITY (BROAD FORM)

This endorsement modifies insurance provided under the following:

DATABREACH℠ NETWORK AND INFORMATION SECURITY AND MEDIA INJURY LIABILITY COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
MEDIA INJURY LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

**NUCLEAR ENERGY LIABILITY EXCLUSION (Broad Form)**

The insurance does not apply:

1.  Under any Liability Coverage, to **Bodily Injury** or **Property Damage**:

    a.  With respect to which an **Insured** under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    b.  Resulting from the **Hazardous Properties** of **Nuclear Material** and with respect to which:

        (1) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

        (2) The **Insured** is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.  Under any Medical Payments coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to **Bodily Injury** resulting from the **Hazardous Properties** of **Nuclear Material** and arising out of the operation of a **Nuclear Facility** by any person or organization.

3.  Under any Liability Coverage, to **Bodily Injury** or **Property Damage** resulting from **Hazardous Properties** of **Nuclear Material**, if:

    a.  **The Nuclear Material**:

        (1) Is at any **Nuclear Facility** owned by, or operated by or on behalf of, an **Insured**; or

        (2) has been discharged or dispersed therefrom;

    b.  The **Nuclear Material** is contained in **Spent Fuel** or **Waste** at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an **Insured**; or

    c.  The **Bodily Injury** or **Property Damage** arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**,

**MEEO 5309 04 19**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 66 of 90

but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to **Property Damage** to such **Nuclear Facility** and any property threat.

4. As used in this exclusion:

   a. **Hazardous Properties** includes radioactive, toxic or explosive properties.

   b. **Nuclear Material** means **Source Material, Special Nuclear Material** or **By-Product Material**.

   c. **Source Material, Special Nuclear Material,** and **By-Product Material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   d. **Spent Fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **Nuclear Reactor.**

   e. **Waste** means any waste material:

      (1) Containing **By-Product Material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **Source Material** content; and

      (2) Resulting from the operation by any person or organization of any **Nuclear Facility** included under the first two paragraphs of the definition of **Nuclear Facility.**

   f. **Nuclear Facility** means:

      (1) Any **Nuclear Reactor;**

      (2) Any equipment or device designed or used for:

         (a) Separating the isotopes of uranium or plutonium; \

         (b) Processing or utilizing **Spent Fuel;** or

         (c) Handling, processing or packaging **Waste;**

      (3) Any equipment or device used for the processing, fabricating or alloying of **Special Nuclear Material** if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

      (4) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **Waste;** and

      (5) The site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

   g. **Nuclear Reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

   h. **Property Damage** includes all forms of radioactive contamination of property.

All other terms and conditions remain unchanged.

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 67 of 90



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CLAIMS BROUGHT BY OR ON BEHALF OF

This endorsement modifies insurance provided under the following:

DATABREACH℠ NETWORK AND INFORMATION SECURITY AND MEDIA INJURY LIABILITY COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
MEDIA INJURY LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

**SCHEDULE**

| | |
|---|---|
| Person Or Entity: | Berman, O'Connor & Mann |

In consideration of the premium paid, it is hereby understood and agreed that Paragraph **C.** of Section **IV – Exclusions** is amended to include the following exclusion:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment or Supplementary Payment:

**C.** Based upon, arising out of, or in any way involving:

Any **Claim** brought by or on behalf of any Person Or Entity shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

**MEEO 5310 05 18**                                                                                          **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is hereby understood and agreed that the following is added to Paragraph **C.** of Section **IV** – Exclusions:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment or Supplementary Payment:

**C.** Based upon, arising out of, or in any way involving:

Asbestos, asbestos fibers or any product or material containing asbestos in any form, under any theory of liability whatsoever.

It is further agreed that the Company shall have no duty to defend or to pay or reimburse for any fees, costs or expenses in the investigation or defense of any **Claim** excluded herein.

All other terms and conditions remain unchanged.

**MEEO 5316 05 18**

**Page 1 of 1**



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – PRIVATE INFORMATION

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is understood and agreed that:

**A.** The following definitions are added to Section **III** – Definitions:

**Consumer** means any natural person, and any person, group, or regulatory agency that purports to have standing to bring a **Claim**.

**Consumer Data** means information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular **Consumer** or household including:

1. Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, password, account name, social security number, driver's license or state identification card number, passport number, telephone number, insurance policy number, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information, or other similar identifiers, characteristics, or description;

2. Characteristics of protected classifications under state or federal **Consumer** protection statutes or laws;

3. Commercial information, including records of personal property, products, or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies;

4. Biometric data or information (such as a fingerprint, voice print, retina, or iris image, or other unique physical representation or digital representation of biometric data);

5. Internet or other electronic network activity information, including but not limited to, browsing history, search history, and information regarding a **Consumer's** interaction with an internet website, application, or advertisement;

6. Geolocation data;

7. Audio, electronic, visual, thermal, olfactory, or similar information;

8. Professional or employment-related information;

9. Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. section 1232g; 34 C.F.R. Part 99); or

10. Inferences drawn from any of the information shown in Paragraphs 1. through 9. above to create a profile about a **Consumer** reflecting the **Consumer's** preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, or aptitudes.

**B.** The following exclusions are added to Paragraph **C.** of Section **IV** – Exclusions:

**MEEO 5337 02 20**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 70 of 90

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment or Supplementary Payment:

**C.** Based upon, arising out of, or in any way involving:

Any **Wrongful Act** or **Personal Injury** associated with any alleged or actual violation of any federal, state, or local statute, law, rule, ordinance, or regulation, other than TCPA or FCRA and their amendments and additions, that addresses, prohibits, regulates, or limits the printing, interception, dissemination, disposal, collecting, recording, sending, transmitting, communicating, distribution, retaining, or receiving of **Consumer Data**, including but not limited to:

1. The Biometric Information Privacy Act (BIPA);
2. The California Consumer Privacy Act (CCPA);
3. The California Invasion Of Privacy Act (CIPA);
4. The Stop Hacks and Improve Electronic Data Security Act (SHIELD Act); or
5. The European Union General Data Protection Regulation (GDPR); and

any amendment thereto or any similar or related federal or state statute, law, rule, ordinance, or regulation.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DELETION OF AGGREGATE DEDUCTIBLE

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is hereby understood and agreed that Paragraph **B.2.** Aggregate Deductible under Section **VI** – Limits Of Liability, Deductibles And Interrelated Wrongful Acts is deleted in its entirety.

All other terms and conditions remain unchanged.

**MEEO 5550 03 20**

**Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, 10275 West Higgins Road, Suite 750, Rosemont, Illinois 60018, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**MEIL 1200 02 20**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 73 of 90



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT - GUAM

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon the following:

CRC Insurance Services, Inc.
515 South Figueroa Street, Suite 600
Suite 600Los Angeles, CA, 90071

and a copy of such process is sent within ten (10) days thereafter by registered mail by the plaintiff's attorney to the defendant at the last know principal place of business of the defendant, and the defendant's receipt, or the receipt issued by the post office with which the letter is registered, showing the name of the sender of the letter and the name and address of the person to whom the letter is addressed, and the affidavit of the plaintiff's attorney showing a compliance herewith, are filed with the clerk of the court in which such action is pending on or before the date the defendant is required to appear, or with such further time as the court may allow; and that in any suit instituted against the Company upon this contract, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named as to whom the said officer is authorized to mail such process or a true copy thereof.

**MEIL 1200-GU 01 10**                                                                                     **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

**A.** The PROFESSIONAL LIABILITY INSURANCE COVERAGE PART and PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS are amended as follows:

    **1.** The following is added to Section III – Definitions:

    **Unmanned Aircraft** means an aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

    **2.** The following is added to Paragraph **C.** of Section **IV** – Exclusions:

    With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment or Supplementary Payment:

    **C.** Based upon, arising out of or in any way involving:

    The ownership, maintenance, use or entrustment to others of any aircraft that is an **Unmanned Aircraft**. Solely for purposes of this exclusion, "use" includes operation of or exercise of any control over an **Unmanned Aircraft**; and the **Insured's** authorization, direction or acquiescence in the operation or control of **Unmanned Aircraft** by any person or entity; and loading or unloading of any such **Unmanned Aircraft**. This exclusion applies even if any such **Claim** alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the **Insured**, involving the ownership, maintenance, use or entrustment to others of any aircraft that is an **Unmanned Aircraft**.

**B.** The GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART and the GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE) are amended as follows:

    **1.** Paragraph **B.** of Section III – Definitions is replaced by the following:

    **B. Aircraft Products** means any aircraft whether or not heavier than air, including manned and **Unmanned Aircraft**, spacecraft and missiles, and any ground support, guidance, control or communications equipment used in connection therewith, and also includes parts, supplies, or equipment installed in or on or used in connection with aircraft, including tools, training aids, instructions, manuals, blueprints and other data, engineering and other advice, services and labor used in the operation, maintenance or manufacture of **Aircraft Products**.

    **2.** The following is added to Section III – Definitions:

    **Unmanned Aircraft** means an aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

    **3.** The following is added to Paragraph **A.2.** of Section **IV** – Exclusions:

    **A.** With respect to all Coverages, this Coverage Part does not apply to any **Claim** or Supplementary Payment:

    **2.** Based upon, arising out of or in any way involving:

Case 1:22-cv-00021 Document 1 Filed 08/29/22 Page 75 of 90

**Bodily Injury, Property Damage** or **Personal And Advertising Injury** arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an **Unmanned Aircraft**. Solely for purposes of this exclusion, "use" includes operation of or exercise of any control over an **Unmanned Aircraft**; and the **Insured's** authorization, direction or acquiescence in the operation or control of **Unmanned Aircraft** by any person or entity; and loading or unloading of any such **Unmanned Aircraft**. This exclusion applies even if any such **Claim** alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the **Insured**, if the **Occurrence** which caused the **Bodily Injury** or **Property Damage** or the offense which caused the **Personal And Advertising Injury** involved the ownership, maintenance, use or entrustment to others of any aircraft that is an Unmanned Aircraft.

4. Paragraph **B.1.f.** of Section **IV** – Exclusions is replaced by the following:

   B. With respect to Paragraph **A.** Bodily Injury And Property Damage Liability of Section **II** – Insuring Agreements, this Coverage Part does not apply to any **Claim**:

      1. Based upon or arising out of:

         f. **Bodily Injury** or **Property Damage** arising out of ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

            (1) Any **Automobile**, aircraft other than an **Unmanned Aircraft** or watercraft owned or operated by or rented or loaned to any **Insured**; or

            (2) Any other **Automobile**, aircraft other than an **Unmanned Aircraft** or watercraft operated by any person in the course of employment by the Named Insured;

         This exclusion applies even if any such **Claim** alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the **Insured**, if the **Occurrence** which caused the **Bodily Injury** or **Property Damage** involved the ownership, maintenance, use or entrustment to others of any aircraft other than **Unmanned Aircraft, Automobile** or watercraft that is owned or operated by or rented or loaned to any **Insured**;

         however, this exclusion shall not apply to:

            (1) The parking of an **Automobile** on premises owned by, rented to or controlled by the Named Insured or on ways next to such premises, if such **Automobile** is not owned by or rented or loaned to any **Insured**;

            (2) A watercraft while ashore on premises owned by, rented to or controlled by the Named Insured; or

            (3) A watercraft that is less than 26 feet in length, that is not owned by the Named Insured and that is not being used to carry persons or property for a charge;

All other terms and conditions remain unchanged.

**MEIL 1330 08 17**     Includes copyrighted material of Insurance Services Office, Inc. with its permission.     **Page 2 of 2**

Case 1:22-cv-00021   Document 1   Filed 08/29/22   Page 76 of 90



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

MIL 1214 09 17

# EXHIBIT 2

DAVID SABLAN
671-489-7708

RECEIVED
ADV. 8/2/22

FILED
SUPERIOR COURT
OF GUAM

2022 JUL 28 PM 2:53

CLERK OF COURT

By: _____

1  BERMAN LAW FIRM
2  Suite 503, Bank of Guam Building
   111 Chalan Santo Papa
3  Hagåtña, Guam 96910
   Telephone: (671) 477-2778
4  Facsimile: (671) 477-4366
5  Email: guam@pacificlawyers.law

6  Attorneys for Plaintiffs:
   *PACIFIC AMERICAN TITLE INSURANCE*
7  *& ESCROW COMPANY and LOURDES P. SAN NICOLAS*

8

9              IN THE SUPERIOR COURT OF GUAM

10  PACIFIC AMERICAN TITLE & INSURANCE          CIVIL CASE NO. __CV__ 0411-22
    COMPANY and LOURDES P. SAN NICOLAS,
11

12                      Plaintiffs,
                v.                              **S U M M O N S**
13
    EVANSTON INSURANCE COMPANY,
14
                     Defendant.
15

16  **TO THE WITHIN NAMED DEFENDANT: EVANSTON INSURANCE COMPANY**

17      You are hereby summoned and required to serve upon Plaintiffs' attorney:

18                        Bill R. Mann, Esq.
                        BERMAN LAW FIRM
19                  Suite 503, Bank of Guam Building
                       111 Chalan Santo Papa
20                      Hagåtña, Guam 96910

21  an Answer to the Complaint for Declaratory Judgment which is herewith served upon

22  you within twenty (20) days after service of this Summons upon you, exclusive of the

23  day of service. If you fail to do so, judgment by default will be taken against you for the

24  relief demanded in the Complaint.

25                                      **DANIELLE T. ROSETE**
                                        Clerk of Court
26            JUL 2 9 2022
27  Dated:_____        By:    _____
                                        Ervin V. Segovia
28                                      Deputy Clerk

\\SHARESERVER\share\wpdocs2\BRM\PATICO v Evanston Ins\PLDS\2022 07 Jul\Summons.doc

FILED
SUPERIOR COURT
OF GUAM

2022 JUL 28 PM 2: 53

CLERK OF COURT

By:

1   BERMAN LAW FIRM
2   Suite 503, Bank of Guam Building
    111 Chalan Santo Papa
3   Hagåtña, Guam 96910
    Telephone: (671) 477-2778
4   Facsimile: (671) 477-4366
5   Email: guam@pacificlawyers.law

6   Attorneys for Plaintiffs:
    *PACIFIC AMERICAN TITLE INSURANCE*
7   *& ESCROW COMPANY and LOURDES P. SAN NICOLAS*

8

9              IN THE SUPERIOR COURT OF GUAM

                                                CV  0411-22

10  PACIFIC AMERICAN TITLE & INSURANCE      | CIVIL CASE NO. _____
    COMPANY and LOURDES P. SAN NICOLAS,     |
11                                          |
12                      Plaintiffs,         |
              v.                            | **COMPLAINT FOR**
13                                          | **DECLARATORY JUDGMENT**
    EVANSTON INSURANCE COMPANY,             |
14                                          |
                      Defendant.            |
15

16

17          For their Complaint, the Plaintiffs allege as follows:

18          1.      The Plaintiff Pacific American Title Insurance & Escrow Company

19  ("PATICO") is a Guam corporation engaged in the escrow and title insurance business.

20          2.      The Plaintiff Lourdes P. San Nicolas ("San Nicolas") is and was at all

21  relevant times an employee of PATICO.

22          3.      The Defendant Evanston Insurance Company ("Evanston") is an Illinois

23  corporation and is authorized to engage in the general insurance business on Guam.

24          4.      An actual controversy of a justiciable nature exists between Plaintiffs and

25  Evanston under a policy of professional liability insurance entered into between them,

26  and dependent on the construction of said policy.

27          5.      This Court has jurisdiction pursuant to 7 G.C.A. § 26801 and G.R.C.P. 57.

28

1    6.    On May 12, 2020, Evanston issued its renewal of a policy of professional
2    liability insurance No. MKLV5PE0000597 to PATICO, wherein Evanston insured
3    PATICO against liability, by agreeing to pay on behalf of PATICO all sums which
4    PATICO should become legally obligated to pay as damages and claim expenses
5    because of injury resulting from negligence, error, or omission in the provision of
6    professional services, and further in which Evanston agreed to defend any suit for
7    damages against PATICO as a result of a claim made against the PATICO during the
8    policy period, even if such suit be groundless, false or fraudulent.

9    7.    The policy also provided coverage for employees of PATICO while acting
10   within the scope of their duties. The Plaintiff San Nicolas was acting within the scope
11   of her duties at all times relevant to this case, and is therefore an insured under the
12   policy.

13   8.    In November and December 2019, PATICO served as escrow agent for a
14   real estate transaction involving the sale and purchase of certain real property in
15   Tumon, Guam.   The purchase price was $2,500,000.00.   The transaction closed on
16   December 13, 2019. San Nicolas was the PATICO employee that handled the escrow.

17   9.    On or about February 3, 2021, PATICO and San Nicolas were served with
18   a Complaint in the Superior Court of Guam entitled *U.L.G., Inc., a Guam corporation,*
19   *Peter U. Leon Guerrero, Rita L.G. Toves and Bernadette L.G. Vandergrift v. Mary S.N. Leon*
20   *Guerrero, Collin Leon Guerrero, Columbus Development Corporation, Philip Schrage, Alex*
21   *D.B. Lim, Pacific American Title Insurance & Escrow Company, Lourdes P. San Nicolas,*
22   *Pamela M. Leon Guerrero, now known as Pamela L.G. Sahagun, Anthony J. Leon Guerrero, and*
23   *Doe Insurance Company,* Case No. CV0776-20 (hereafter the "U.L.G. litigation").

24   10.   As regards PATICO and San Nicolas, the Complaint alleged that they
25   knew that the Defendant Mary S.N. Leon Guerrero did not have authority on behalf of
26   the seller, U.L.G., Inc., to sell the subject property on U.L.G.'s behalf but nevertheless
27   aided and abetted Mary S.N. Leon Guerrero to breach her fiduciary duties to U.L.G.

28
-2-

1   The Complaint further alleged that PATICO and San Nicolas conspired with the other
2   Defendants to arrange and accomplish the improper transfer of the title to said property
3   to the Defendant Columbus Development Corporation.

4       11.     PATICO promptly gave notice to Evanston of the Complaint and
5   furnished a copy to Evanston on or about February 6, 2021.

6       12.     By letter dated February 9, 2021, PATICO and San Nicolas made demand
7   on Evanston to accept coverage and provide a defense to them.

8       13.     By letter dated February 25, 2021, Evanston wrongfully refused to accept
9   coverage of said claim against PATICO and San Nicolas, or to provide a defense for
10  them in the pending litigation, all in violation of the terms of the policy.

11      14.     Thereafter PATICO and San Nicolas filed a Motion for Summary
12  Judgment in the U.L.G. litigation on the grounds that the Plaintiffs therein had failed to
13  present evidence that PATICO and San Nicolas had actual knowledge that Mary S.N.
14  Leon Guerrero did not have U.L.G.'s authority to sell the subject property.

15      15.     The Superior Court denied said Motion for Summary Judgment by
16  Decision and Order dated May 31, 2022. In the Decision and Order, the Superior Court
17  concluded, *inter alia,* that the liability of PATICO and San Nicolas could be based on
18  ordinary negligence.

19      16.     PATICO and San Nicolas promptly notified Evanston of said Decision and
20  Order by letter dated June 2, 2022, and the Court's ruling that the liability of PATICO
21  and San Nicolas could be based on ordinary negligence.

22      17.     Nevertheless, by letter dated June 16, 2022, Evanston again wrongfully
23  refused to provide a defense to PATICO and San Nicolas against the pending litigation.

24      18.     As a result of the refusal of Evanston to defend PATICO and San Nicolas,
25  they have been required to retain the services of attorneys to undertake their defense,
26  and have expended $59,245.22 to date in attorneys' fees and litigation expenses. Those
27  fees and litigation expenses will continue to accrue as the U.L.G. litigation continues.

28

-3-

1    19.    Evanston was obligated by the policy to pay the attorneys' fees and
2  litigation expenses of PATICO and San Nicolas as said fees and expenses were incurred,
3  and Evanston's failure to do so subject it to an additional payment of 12% of all
4  incurred fees and expenses, plus a reasonable amount of attorneys' fees for the
5  prosecution of this action, pursuant to 22 G.C.A. § 18608.

6    20.    PATICO and San Nicolas are entitled to a declaration by this Court fixing
7  the rights and obligations of themselves and Evanston under the terms of the above-
8  described policy of insurance.

9    21.    Trial in the U.L.G. litigation has been set to commence on February 14,
10  2023. PATICO and San Nicolas request that this Court order a speedy hearing of this
11  action and advance it on the calendar as permitted by G.R.C.P. 57.

12    WHEREFORE, PATICO and San Nicolas request that:

13    1.    This Court enter a declaratory judgment construing the provisions of the
14  policy of insurance and determining the respective rights and liabilities of the parties
15  thereunder;

16    2.    This Court order Evanston to defend PATICO and San Nicolas against the
17  Complaint filed by the Plaintiffs in the U.L.G. litigation, Case No. CV0776-20 of the
18  Superior Court of Guam, and to pay any judgment that may be rendered against
19  PATICO and San Nicolas in that action;

20    3.    This Court order Evanston to reimburse PATICO and San Nicolas all
21  monies expended for attorneys' fees and litigation expenses of defending themselves
22  against the U.L.G. action up to the time of the entry of the order of this Court in this
23  action, plus an additional 12% of the amount owing;

24    4.    This Court order Defendant to reimburse PATICO and San Nicolas for
25  their reasonable attorneys' fees, court costs and litigation expenses in connection with
26  filing of this action for Declaratory Judgment; and

27    5.    Enter such other and further relief as the Court may deem just.

28

- 4 -

\\SHARESERVER\share\wpdocs2\BRM\PATICO v Evanston Ins\PLDS\2022 07 Jul\Complaint for Declaratory Judgment final.doc

1    DATED this _28th_ day of July, 2022.

2                                    **BERMAN LAW FIRM**
3                                    Attorneys for Plaintiffs
                                     *PACIFIC AMERICAN TITLE INSURANCE*
4                                    *& ESCROW COMPANY and*
                                     *LOURDES P. SAN NICOLAS*
5

6                            By: _____
                                     **BILL R. MANN**
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    - 5 -

# EXHIBIT 3

| **From:** | Dan R. Formeller |
| **Sent:** | Wednesday, August 24, 2022 10:20 AM |
| **To:** | Jihoon Kim |
| **Subject:** | Further proof of service on August 1 on Guam |

**From:** Dave Silva <dave.silva@abriskmicronesia.com>
**Sent:** Tuesday, August 2, 2022 6:54 PM
**To:** Jay Horoshak <jhoroshak@CRCGroup.com>; Jonathan Sloan <jsloan@CRCGroup.com>
**Cc:** Percival Acejo <percival.acejo@abriskmicronesia.com>; Margaret Cruz <margaret.cruz@abriskmicronesia.com>;
Christopher Lubi <christopher.lubi@abriskmicronesia.com>
**Subject:** Urgent/Confidential (Time Sensitive) +++ Summons Patico vs Evanston PL
**Importance:** High

**[* This email contains attachments or links from an unverified sender. DO NOT open attachments or click links without verifying the sender. *]**

Guys – We place Pacific American Title Co with Evanston via CRC. Because we are named Service of Suit for the Surplus Lines Placement (for claims purposes) , we are somehow identified as Evanston's agent in Guam. We are served a Summons yesterday on a Complaint from Pacific American Title against Evanston Ins Co.

I've no contact with Evanston other than through CRC. Please urgently pass this complaint & summons to the appropriate party at Evanston.

**Daniel R. Formeller** | Partner | Tressler LLP
dformeller@tresslerllp.com
O: (312) 627-4007
C: (312) 502-2940
F: (312) 627-1717
233 South Wacker Drive, 61ˢᵗ Floor, Chicago, IL 60606
www.tresslerllp.com/daniel-formeller

  

CALIFORNIA | ILLINOIS | NEW JERSEY | NEW YORK | PENNSYLVANIA

# EXHIBIT 4



- Home
- Offices
- Resources
- Useful Links
- Meet Our Staff
- Order Center
- Site Map

- Mortgage Calculator
- Home Selling
- Home Buying
- API 1031 Exchanges

# Title Insurance in Guam

Offices for Pacific American Title

Guam - Main Office
888 North Marine Corps Drive, Suite 200
Tamuning, Guam 96913
Telephone: 671-648-7777
Facsimile: 671-648-7213
Email: patico@pamericantitle.com

Guam - Office of Manu Melwani & Anita Melwani
888 North Marine Corps Drive, Suite 210
Tamuning, Guam 96913
Telephone: 671-648-8892

Saipan
6th Floor Marianas Business Plaza
PMB211, P.O. Box 10000
Saipan, MP 96950
Telephone: 670-235-5787
Facsimile: 670-235-6787
E-mail: paticocnmi@pamericantitle.com



COPYRIGHT © 2022  Pacific American Title
ALL RIGHTS RESERVED.