Exhibit "6"



FILED
SUPERIOR COURT
OF GUAM
2022 MAY 31 PM 3:08
CLERK OF COURT
BY:

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| U.L.G., INC., a Guam corporation, et al.,<br><br>Plaintiffs.<br><br>vs.<br><br>MARY S.N. LEON GUERRERO, et al.,<br><br>Defendants. | Civil Case No. CV0776-20<br><br>**DECISION AND ORDER**<br>(Motion for Summary Judgment by Defendants Pacific American Title Insurance & Escrow Company ("PATICO") and Lourdes San Nicolas ("Lourdes") |

## **INTRODUCTION**

This matter came before the Honorable Arthur R. Barcinas on March 3, 2022, for a hearing on Defendants PATICO and Lourdes's Motion for Summary Judgment. Present at the hearing were: Attorney Anita Arriola for Columbus, Attorney Richard Johnson for Defendants Schrage and Lim, Attorney Bill Mann for Defendants PATICO and Lourdes, and Attorney Delia Wolff for Plaintiffs. At the hearing PATICO and Lourdes argued their Motion for Summary Judgment, Plaintiffs argued in opposition, and the Court took the matter under advisement. Having considered the arguments and the applicable law, the Court hereby **DENIES** Defendants PATICO and Lourdes's Motion for Summary Judgment.

# UNDISPUTED FACTS

After reviewing the record, the Court finds the following undisputed facts.

### *Original Ownership of the Properties*

1. Three brothers, Pedro, Francisco, and Agapito Leon Guerrero, each owned a one-third (1/3) interest in Lot. No. 5134-1 and Lot No. 5134-2, Tamuning, Guam. They jointly leased the two lots to Guam Kakuei Company, Ltd., for a term of 99 years. The long-term lease provides for an escalating rent every 10 years. The current rent is $3,000 per month for all the lots. Lot No. 5134-2 was subdivided and is now known as Lot No. 5134-2-1 and Lot No. 5134-2-R1 ("the Property").

2. All three brothers are now deceased and each of their successors-in-interest currently receive $1,000 per month as their one-third share of the monthly rent.

3. Guam Kakuei, as a tenant, assigned all of its interest in Lot 5134-2-1 to Baba Corporation on December 23, 1985, and all its interest in the remaining lots were assigned to American Sotetsu.

4. American Sotetsu assigned all its interest to Grandview Corporation ("Grandview") on September 3, 2003. Grandview is Columbus's sister company, and they share an office in Harmon.

5. Pedro had four children: Rita, Peter, Bernadette, and Gregory. Peter is an adult resident of Washington. Rita is an adult resident of Oklahoma. Bernadette passed away on December 20, 2020, and is now represented by her Estate.

6. Pedro conveyed his one-third (1/3) interest in the Property by Quitclaim Deed to his son Gregory on July 15, 1992.

### *Formation of U.L.G.*

7. Gregory formed U.L.G., a Guam corporation, with his two first cousins Pamela and Anthony Leon Guerrero. The three were then appointed as the first directors of U.L.G. Gregory owned 1,498 shares; Pamela and Anthony each owned one (1) share.

8. On July 15, 1992, Gregory transferred his one-third (1/3) interest in the Property to U.L.G.

9. Gregory died in 2013, and a Decree of Final Distribution in his probate case filed on July 15, 2016, conveyed all of Gregory's 1,498 shares in U.L.G. equally to his wife Mary (749 shares) and his son Collin (749 shares).

## *Mary Transfers U.L.G. Shares to Plaintiffs*

10. After Gregory's death, Mary wanted to "make things right" with Plaintiffs by dividing the U.L.G. shares with them.

11. Sometime in 2014 or 2015, Mary returned to Guam. At that time, she went to the offices of Goodwind, another affiliate of Columbus, to collect the monthly rent payment under the Ground Lease and to introduce herself. There she met with Schrage, the senior vice president of Goodwind, during which time Schrage introduced himself and advised her that if she ever decided that she would like to sell U.L.G.'s interest in the Property, to keep him in mind.

12. On October 15, 2018, a series of events occurred.
    a. First, Pamela and Anthony each assigned their one (1) share, and Collin assigned his 749 shares in U.L.G. to Mary, so that Mary owned all 1,500 shares in U.L.G.

    b. Second, Mary assigned all her shares to Plaintiffs accordingly: 25% each to Peter, Rita, and Bernadette (375 shares each), and 25% (375 shares) to herself.

    c. Third, the following documents were filed at the Department of Revenue and Taxation ("DRT"):
        i. Assignment of Share Capital Stock by Anthony to Mary and Collin;
        ii. Assignment of Share Capital Stock by Pamela to Mary and Collin;
        iii. Assignment of Share Capital Stock by Collin to Mary;
        iv. Assignment of Share Capital Stock by Mary to Peter, Rita, and Bernadette;
        v. Resolution of U.L.G. Stockholders, (1) consenting to the Assignment of U.L.G. shares; (2) electing Peter, Rita, Bernadette, and Mary as U.L.G.'s four directors; (3) and approving U.L.G.'s First Amended Articles of Incorporation and First Amended Bylaws; and
        vi. Resolution of U.L.G. Directors acknowledging the Assignment of U.L.G. shares, and electing Peter as U.L.G.'s President and Treasurer and Mary as its Secretary.

13. Then, on October 31, 2018, U.L.G. filed its 2018 Annual Report confirming that Mary, Peter, Rita, and Bernadette, each owned 375 U.L.G. shares.

## *Mary's Intent to Sell the Property*

14. In the late summer of 2019, Mary started working with Ramona Siblang ("Ramona"), a real estate affiliate with The Property Shop, to bring about the sale of the Property.

15. In October 2019, Mary and Ramona contacted Rita and Bernadette to inform them that Mary wanted to sell the Property. Rita and Bernadette told Mary she could not sell the Property. Mary became angry, saying "I've had it" and said she would call Peter.

16. When Mary contacted Peter, she told him she wanted to sell the Property for $1.5 million, but he told her not to sell the Property because the price was "too cheap." Mary said, "Never mind. Collin and I will sell it."

17. Sometime in 2019, Schrage was contacted by Phillip Law ("Law"), a real estate broker from The Property Shop. Law advised Schrage that he believed Mary, as president of U.L.G., was interested in selling U.L.G.'s one-third (1/3) undivided interest in the Property.

18. On November 4, 2019, Mary sent an offer to Columbus to sell U.L.G.'s one-third (1/3) interest in the Property for $2.5 million.

19. About a week after sending the offer to Columbus, Mary and Ramona went to DRT and reviewed the U.L.G. corporate file. Mary then discovered that the 2018 Amended Articles and Amended By-Laws had been filed on October 18, 2018, showing that Plaintiffs each owned a one-fourth (1/4) share in U.L.G.

20. Mary became extremely upset, as she believed that Plaintiffs "stole [her] company." Mary then decided she was not going to share the sale of the Property with Plaintiffs.

21. A corporate Resolution, reflecting approval by the U.L.G. board of directors on November 8, 2019, was signed by Mary and Collin. The Resolution authorized Mary, on behalf of U.L.G., to sell the Property to Columbus. The Resolution also indicated Mary's position and title as President/Treasurer, and Collin's position and title as Corporate Secretary.

### *U.L.G.'s one-third (1/3) Interest is sold to Columbus*

22. Columbus is a Guam Corporation established on October 11, 1972, as a property investment entity.

23. Alex Lim ("Lim") is the Treasurer/Corporate Secretary of Columbus.

24. Phillip Schrage ("Schrage") is a representative of Columbus.

25. On November 4, 2019, Columbus received an offer from U.L.G. to purchase a one-third (1/3) interest in the Property for $2.5 million. Columbus's board of directors signed a Resolution approving the purchase of the Property, and authorizing Schrage and Lim to sign any documents relating to the transaction.

26. On November 12 and 13, 2019, Mary and Ramona went to DRT to examine U.L.G.'s filings. Ramona informed Mary that they could not go through with the transaction as things stood. Ramona also informed Lourdes from PATICO that there were "issues with the ownership."

27. Escrow was opened at PATICO for the purchase of the Property on November 15, 2019. Columbus requested for PATICO to assist with the closing of the transaction, and as the agent of Fidelity National Title Insurance Company, to arrange for the issuance at closing of a title insurance policy insuring Columbus against various possible defects in title. In conjunction with the closing and investigations into the state of the title, neither Schrage, Lim, nor any other agent of Columbus, made any investigation of the state of the title. The professionals at PATICO conducted an investigation on title and reviewed the corporate records of U.L.G. provided by Mary.

28. On November 21, 2019, Columbus paid an initial deposit of $25,000, by check.

29. On November 22, 2019, and again on December 5, 2019, PATICO made written requests for U.L.G.'s Articles, Bylaws, Operating Agreements, and any amendments.

30. Mary and Ramona never provided such documents to PATICO or Columbus, nor did they inform PATICO or Columbus about Plaintiffs' ownership of U.L.G. shares prior to closing of the transaction.

31. On November 29, 2019, Mary filed U.L.G.'s Corporate Annual Report for 2019, which stated that she, Collin, Pamela, and Anthony were the shareholders of U.L.G. The Annual Report also indicated that Mary was President and Collin was Secretary of the corporation.

32. On December 6, 2019, Mary signed the Warranty Deed for the transaction.

33. Closing occurred on December 13, 2019.
    a. Columbus paid the purchase price (less escrow, closing, and other fees) in the amount of $2,487,259.74, by a check issued by Goodwind.

    b. Lim and Schrage signed the Warranty Deed for the Property in the presence of Lourdes who also notarized their signatures. This was the first and only day Schrage ever met with Lourdes. During that time, Lourdes did not inform Schrage of Peter, Rita, or Bernadette's claim to the Property or their ownership of U.L.G. shares.

    c. Columbus signed the Warrant Deed; and the Deed was then recorded at the Department of Land Management.

34. Mary did not tell Peter or Rita about the sale of the Property. Instead, Mary instructed PATICO to wire the net sale proceeds in the amount of $2,321,003.74, to her account at Coast360.

35. On December 18, 2019, Mary "approved" a Resolution declaring a dividend of $2,320,858.74 to the shareholders of record of U.L.G. The money was then divided between Mary and Collin. Neither Peter, Rita, nor Bernadette received any of it.

36. Columbus is a one-third (1/3) interest owner in the Property.

### *Columbus Learns of Plaintiffs' Claim to the Property for the Frist Time*

37. In January 2020, Peter, Rita, and their spouses traveled to Guam and visited the Property. At that time they were referred to Columbus's office where they met with Schrage. Peter and Rita then informed Schrage that they were shareholders in U.L.G., and that Mary and Collin had no authority to sell U.L.G.'s interest in the Property. Schrage told them that U.L.G.'s interest in the Property had been sold. This was the first time that Columbus learned of Plaintiffs' claim to the Property.

38. Peter and Rita then went to PATICO and spoke with Lourdes, the escrow officer who had handled the transaction. Lourdes confirmed that U.L.G.'s interest in the Property had been sold. As a result, Peter, Rita, and Bernadette retained counsel and filed the instant suit.

39. Prior to closing, Mary never spoke to anyone from Columbus about the transaction.

40. Prior to closing, Columbus was not aware, nor was it informed that there were Amended Articles of Incorporation or Amended Bylaws for U.L.G.

41. Prior to closing, Columbus had no actual or constructive notice of any claim to the Property by Plaintiffs.

42. Prior to closing, Columbus did not have actual or constructive notice of any family or corporate dispute between Mary and Plaintiffs.

43. Columbus did not have actual or constructive notice of Mary's alleged lack of authority to sell the Property to Columbus.

44. Columbus did not know the ownership of U.L.G. had changed in 2018. Instead, Mary provided a seemingly valid U.L.G. corporate resolution authorizing her to sell the Property to Columbus, prior to closing.

45. Columbus had no actual or constructive knowledge of Mary's alleged breach of fiduciary duty. Nor did Columbus give substantial assistance or encouragement to Mary to breach any fiduciary duty.

46. No one from Columbus ever met with Collin, Pamela or Anthony at any time.

47. Columbus did not conspire with Mary, Collin, PATICO, Lourdes, Pamela, Anthony, or Ramona to deprive U.L.G., and Plaintiffs of their interest in the Property.

48. Columbus did not commit any wrongful acts to any of the other parties in the instant case, nor did it commit any acts resulting in damages to U.L.G., and Plaintiffs.

49. On April 26, 2022, the Court issued its Decision and Order wherein it found Columbus to be a bona fide purchaser and granted Columbus's Motion for Summary Judgment. Then on May 10, 2022, the Court issued its Decision & Order granting Schrage and Lim's Motion for Summary Judgment.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate if the pleadings, deposition, interrogatories and admissions on file together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Guam R. Civ. P. 56(c); *see* also *Gov't of Guam v. Gutierrez*, 2015 Guam 8 ¶¶ 25-26. If, after adequate time for discovery, the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial," then summary judgment is required. *Kim v. Hong*, 1997 Guam 11 ¶ 8.

When deciding a motion for summary judgment, "the court must draw inferences and view the evidence in a light most favorable to the non-moving party." *Gutierrez*, 2015 Guam 8 ¶ 26. If the moving party demonstrates that there are no genuine issues of material fact, the non-movant cannot merely rely on the allegations contained in the pleading and must produce some significant probative evidence to support the pleading. *Bank of Guam v. Flores*, 2004 Guam 25 ¶ 7. The court's "ultimate inquiry is to determine whether the 'specific facts' set by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor on that evidence." *Id.* The Guam Supreme Court has held that a defending moving party may satisfy its moving burden "by showing there is an absence of evidence" to support a claim. *Guam Sanko Transportation, Inc., v. Pacific Modair Corporation*, 2012 Guam 2 ¶ 7. It may also satisfy its burden by "producing evidence negating an essential element" or claim. *Id.* At the summary judgment stage, the court

should not make credibility determinations or weigh the evidence, which are jury functions. *Id.* ¶ 10.

Although the Guam Rules of Civil Procedure allow that "[a] party against whom a claim... is asserted... may, at any time, move with or without supporting affidavits for summary judgment," this does not relieve the movant from separately identifying the disputed and undisputed facts and essential elements of the cause of action for which summary dismissal is sought and applying and analyzing them under the appropriate standard. Guam R. Civ. P. 56(b); *Guam Sanko Trans.*, 2012 Guam 2 ¶ 7.

## II. COUNT III: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

For summary judgment to be proper, PATICO and Lourdes must demonstrate that there is no genuine issue of material fact as to Count III, and that they are entitled to judgment as a matter of law. The elements of the common law tort of aiding and abetting breach of fiduciary duty include: (1) the primary tortfeasor breaches a fiduciary duty which he owes to the victim-plaintiff; (2) the aider-abettor defendant has actual knowledge of the breach; (3) the aider-abettor defendant lends the primary tortfeasor substantial assistance or encouragement in committing the breach; and (4) the victim-plaintiff suffered damages proximately caused by the breach. *Lujan v. Girardi,* No. Civ No. 09-00017, 2009 WL 5216906, at *10 (D. Ct. Guam Dec. 29, 2009); citing *TNN Guam, Inc., dba Nikko Guam v. Jale Management Information Services, Inc., dba Information and Data Systems*, CV0516-07 Decision & Order p. 10 (Jul. 6, 2009) (Super. Ct. Guam 2009); citing *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 144, 144 (Cal. App. 2005).

Page **8** of **15**

Case 1:22-cv-00021   Document 15-6   Filed 10/03/22   Page 9 of 16

### a. Primary Tortfeasors Breach A Duty Which They Owe To Plaintiffs

While the first element of aiding and abetting requires that a primary tortfeasor breach a duty owed to the plaintiff, there are several theories under which this element may be satisfied. The Court addresses each in turn.

> *i. Liability in the absence of an aider and abettor's independent duty to Plaintiffs*

Under the first theory, a defendant can be liable for aiding and abetting breach of fiduciary duty in the absence of an independent duty owed to the plaintiff. *American Master Lease LLC v. Idanta Partners, LTD.*, 225 Cal. App, 4th 1451, 1476 (Cal. App. 2014); citing *Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1135 (C.D. Cal. 2003). Under this theory, the aider and abettor does not 'adopt as his or her own' the tort of the primary violator. *Id.*; citing *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1135 (C.D. Cal. 2003). Liability attaches because the aider and abettor behaves in manner that enables the primary violator to commit the under lying tort. *Id.* Therefore, the question becomes whether there is evidence that either sufficiently challenges or proves that PATICO and Lourdes acted in a manner that enabled Mary and Collin to allegedly breach their duty to Plaintiffs.

Here, Lourdes claims that "at no time up to and including closing did Mary or Ramona or anyone else tell [her] or anyone else at PATICO that the Plaintiffs in this case were owners of U.L.G. stock, and [she] was not aware of that." San Nicolas Decl. p. 2 (Dec. 9, 2021). However, Plaintiffs contrast this claim by arguing that Ramona specifically and repeatedly testified that she told Lourdes before the closing that there were "issues with the ownership" of U.L.G. documents filed with DRT. Siblang Depo. pp. 184-185, 188-189 (Nov. 2, 2021); *see* Pls' Opp'n p. 11 (Jan. 10, 2022). Plaintiffs further argue that despite being informed of those

issues, Lourdes knowingly told Ramona just to send what she had, that is, the superseded Articles of Incorporation and Bylaws of U.L.G. that did not show its change of ownership, so that the transaction could be closed anyway. Pls' Opp'n p. 11 (Jan. 10, 2022). The competing arguments and evidence present a question of material fact as to whether PATICO and Lourdes acted in a manner that enabled Mary and Collin the alleged breach of duty owed to Plaintiffs. As such, summary judgment is improper for Count III under this theory.

### ii. Liability when the aider and abettors owe an independent duty

Another theory, similar to conspiracy to breach a fiduciary duty, requires that (1) the aider and abettor owe a fiduciary duty to the victim, and (2) that the aider and abettor provide substantial assistance to the person breaching his or her fiduciary duty. *American Master Lease*, 225 Cal. App. 4th at 1477; citing *Casey*, 127 Cal. App. 4th at 1144. Courts impose liability for concerted action that violates the aider and abettor's fiduciary duty. *Id.* This theory focuses on PATICO and Lourdes's duty owed to Plaintiffs. As such, this begs the question of (1) what duty did PATICO and Lourdes owe to Plaintiffs, and (2) whether Defendants acted in concert to violate PATICO and Lourdes's fiduciary duty to Plaintiffs.

The Court first turns to identify Lourdes's duty as an escrow agent. "The duty of an escrow holder is to comply strictly with the instructions of his principal." *Axley v. Transamerica Title Ins. Co.*, 88 Cal. App. 3d 1, 8 (Cal. App. 1978); citing *Wade v. Lake County Title Co.*, 6 Cal. App. 3d 824, 828 (Cal. App. 1970). It is also the duty of an escrow holder to exercise reasonable skill and ordinary diligence in its employment, and if the escrow holder acts negligently, it is ordinarily liable for any loss occasioned by its breach of duty. *Axley*, 88 Cal. App. 3d at 9. "An escrow holder is a fiduciary like any other fiduciary is under a duty to communicate to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision as to a pending transaction,

particularly where, ... he knows that the principal is looking to him for protection as to those very facts of which he has knowledge." *Id.*; quoting *Contini v. Western Title Ins. Co.*, 40 Cal. App. 3d 536, 547 (Cal. App. 1974).

Here, Lourdes had a duty to exercise reasonable skill and ordinary diligence in her employment as the escrow agent in the transaction. PATICO and Lourdes fail to argue (1) that Lourdes either owed or did not owe Plaintiffs such a duty, and (2) that she did not otherwise breach that duty. Instead, Lourdes only claims that "at all times up to and including the closing of the transaction, [she] believed that Mary Leon Guerrero and her son Collin Leon Guerrero each owned 749 shares of the stock of U.L.G., Inc., for a total of 1,498 shares out of 1,500 shares, and had authority to sell the subject property on behalf of U.L.G." San Nicolas Decl. p. 2 (Dec. 9, 2021). In contrast, Plaintiffs advance the argument that (1) Ramona informed Lourdes about the issues with the ownership to the Property; (2) Lourdes knowingly told Ramona just to send what she had, that is, the superseded Articles of Incorporation and Bylaws of U.L.G. that did not show its change of ownership, so that the transaction could be closed anyway; and (3) the documents that Ramona sent Lourdes show, on their face, that the sale was not properly authorized. Pls' Opp'n pp. 11-12 (Jan. 10, 2022). Mary signed the warranty deed for the transaction on December 6, 2019, and closing took place on December 6, 2019. The conflicting evidence creates a question of material fact as to whether (1) Lourdes breached her duty as an escrow agent in the transaction; and (2) whether Ramona and Defendants Mary and Lourdes acted in concert to breach Lourdes's duty as an escrow agent. Summary judgment for Count III under this theory is also improper.

       *iii. Liability when the aider and abettor commit an independent tort.*

The last theory for imposing liability for aiding and abetting breach of fiduciary duty arises when the aider and abettor commits an independent tort. *American Master Lease*, 225

Cal. App. 4th at 1477; see *Casey*, 127 Cal. App. 4th at 1144. This occurs when the aider and abettor makes "a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Id.*; citing *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 823, fn.10 (Cal. App. 2005). Nothing on the record reflects that PATICO and Lourdes committed an independent tort, nor does it speak to what that tort may be. The answers to these questions also turn on the competing arguments discussed above.

The evidence before the Court reveals a question of material fact as to Count III: Aiding and Abetting Breach of Fiduciary Duty. As such, PATICO and Lourdes's Motion for Summary Judgment as to Count III is **DENIED**.

### III. COUNT IV: CIVIL CONSPIRACY

#### a. Civil Conspiracy As Alleged Between Lourdes and PATICO

Under the intracorporate conspiracy doctrine, members of a corporation cannot conspire amongst themselves in their capacity as agents of the corporation. *Moylan*, 2015 Guam 16 ¶ 74; *see L.L. Nelson Enters., Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 812 (8th Cir. 2012)("[A] corporation and its agents are a single person in the eyes of the law, and a corporation cannot conspire with itself."). Here, Lourdes is the agent acting on behalf of PATICO. As such, it cannot be said that Lourdes conspired with PATICO in carrying out the transaction.

#### b. Civil Conspiracy As Alleged Between Lourdes, Mary, and Collin

The elements of civil conspiracy are "(1) the formation and operation of the conspiracy, (2) the wrongful act or acts pursuant thereto, and (3) the damage resulting from such act and acts." *Moylan v. Citizens Sec. Bank*, 2015 Guam 36 ¶ 72; *see* also *Prakashpalan v. Engstrom, Lipscomb and Lack*, 223 Cal. App. 4th 1105, 1136 (Cal. App. 2014). There is no separate tort

of civil conspiracy and no action for conspiracy to commit a tort unless the underlying tort is committed and damage results therefrom. *Prakashpalan*, 223 Cal. App. 4th at 1136. In other words, civil conspiracy requires an agreement to participate in an unlawful activity and an overt act that causes injury, so it does not set forth an independent cause of action but rather is sustainable only after an underlying tort claim has been established. *American Master Lease*, 225 Cal. App. 4th at 1474.

On April 26, 2022, the Court issued its Decision and Order finding that Plaintiffs failed to satisfy the elements for civil conspiracy as it relates to Columbus. *See* Decision & Order p. 16 (April 26, 2022). Then on May 10, 2022, the Court issued its Decision and Order finding that Plaintiffs failed to satisfy the same as it relates to Schrage and Lim. *See* Decision and Order p. 13 (May 10, 2022). Therefore, the Court's analysis here concerns the question of whether there is evidence of civil conspiracy between the remaining Defendants: Lourdes, Mary, and Collin.

Here, PATICO and Lourdes make a four part argument as to why they believe summary judgment is proper for Count IV. First, PATICO and Lourdes rely on Plaintiff Peter Leon Guerrero's deposition. Peter was asked "How did Lou[rdes] San Nicolas conspire with Columbus to transfer the Tumon Properties to Columbus?" Peter responded "I have no idea." Peter Depo. p. 153 (Aug. 9, 2021); *see* Defs' Mot. Summ J. p. 6 (Dec. 9, 2021). This evidence does not support summary judgment, as it does not prove nor disprove the elements of civil conspiracy, specifically, that Lourdes (1) formed or operated any alleged conspiracy, (2) engaged in wrongful acts, and (3) that damage resulted from such acts. All this evidence does is reflect that Plaintiff Peter was unaware that any alleged conspiracy was occurring. Further, this evidence concerns Lourdes and Columbus. As mentioned above, the Court has already

found that Columbus did not engage in a civil conspiracy. *See* Decision & Order p. 16 (April 26, 2022).

PATICO and Lourdes next argue that Plaintiff Rita Toves was likewise not aware of any evidence to support the conspiracy claim. During depositions, Rita was asked "are you aware of any conversation between Lou[rdes] San Nicolas and Columbus where they conspired to transfer title of the Tumon Properties to Columbus?" Rita responded, "I don't know." Rita Depo. pp. 100-101 (Aug. 10, 2021); *see* Defs' Mot. Summ. J. p. 6 (Dec. 9, 2021). The Court yields to the same conclusion as that above. This evidence does nothing to prove or disprove the alleged civil conspiracy between the remaining Defendants. All this evidence does is reflect that Plaintiff Rita was unaware that any alleged conspiracy was occurring.

Third, PATICO and Lourdes argue that Mary did not have any knowledge of any conspiracy between (1) Lourdes and Columbus, (2) Ramona and Columbus, and (3) Ramona and Mary. *See* M. Leon Guerrero Dept. p. 124 (Aug. 6, 2021). PATICO and Lourdes further argue that Mary did not conspire with Phil Schrage, Alex Lim, or Columbus to attempt to obtain title of Tumon Properties. *See* M. Leon Guerrero Dept. p. 123 (Aug. 6, 2021). This evidence misses the mark. The inquiry here is whether there is evidence that either proves or disproves a civil conspiracy between PATICO/Lourdes, Mary, and Collin—not between Mary, Collin, Columbus, and Columbus's agents. Therefore, it is insufficient to satisfy summary judgment.

Fourth, PATICO and Lourdes argue that Lourdes, herself, testified that PATICO did not conspire with Columbus to deprive the Plaintiffs of the Property. Defs' Mot. Summ. J. p. 7 (Dec. 9, 2021). The weight of this general denial is a question for the jury.

Finally, there is no action for conspiracy to commit a tort unless the underlying tort is committed and damages result therefrom. *See Prakashplan*, 233 Cal. App. 4th at 1136. This

requires the Court to first determine that a tort was committed, which is a premature inquiry at this stage of the instant case. As such, a question of material fact as to Count IV remains and summary judgment is improper. PATICO and Lourdes's Motion for Summary Judgment as to Count IV is **DENIED**.

## CONCLUSION

For the reasons set forth above, the Court hereby **DENIES** Defendants PATICO and Lourdes's Motion for Summary Judgment.

IT IS SO ORDERED MAY 3 1 2022.

**HONORABLE ARTHUR R. BARCINAS**
Judge, Superior Court of Guam

SERVICE VIA E-MAIL
I acknowledge that an electronic copy of the original was e-mailed to:
LUAN MCDONALD
Benavan, Arriola
Date:_____ Time: 5/31/22
**Joseph Bamba, Jr.**
Deputy Clerk, Superior Court of Guam

SERVICE VIA E-MAIL
I acknowledge that an electronic copy of the original was e-mailed to:
Blair, Bronze
D Moylan
Date:_____ Time: 5/31/22
**Joseph Bamba, Jr.**
Deputy Clerk, Superior Court of Guam