# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| PACIFIC AMERICAN TITLE INSURANCE AND ESCROW COMPANY and LOURDES P. SAN NICOLAS,<br><br>    Plaintiffs,<br><br>    v.<br><br>EVANSTON INSURANCE COMPANY,<br><br>    Defendant. | Case No. 1:22-cv-00021<br><br>**DECISION AND ORDER:**<br><br>**DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND**<br><br>**GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

   This insurance coverage dispute case arises from the escrow officer's conduct in a land transaction involving disputed ownership. Before the Court are the insured and insurers' cross-motions for summary judgment in this declaratory judgment action.[1] Plaintiffs Pacific American Title Insurance and Escrow Co. ("PATICO") and Lourdes P. San Nicolas ("San Nicolas") (collectively "Plaintiffs") are the insured and move the Court for summary judgment to find that their insurer, Defendant Evanston Insurance Co. ("Evanston"), has a duty to defend plaintiffs PATICO and San Nicolas in a Superior Court of Guam action brought against them (U.L.G. Compl., ECF No. 15-1) ("Underlying Lawsuit") pursuant to PATICO's Professional Liability Insurance Policy (Policy, ECF No. 20).[2] At the time the Underlying Lawsuit was filed against

---

[1] (ECF Nos. 11 (Pls.' Notice of Mot. for Partial Summ. J.); 12 (Pls.' Mem. P. & A. ("MSJ")); 44 (Def.'s Cross-Mot. for Summ. J., or Alternatively, Partial Summ. J. ("Cross-MSJ")).

[2] The supporting documents include Plaintiffs' Statement of Material Facts (ECF No. 13); Declaration of San Nicolas (ECF No. 14); Declaration of Bill Mann (ECF Nos. 15, 25); the U.L.G. Complaint (ECF No. 15-1); Declarations of Service (ECF Nos. 15-3 and 4); Correspondence (ECF Nos. 15-4, 15-5, 15-7, 15-8); a decision on Plaintiffs' Motion for Summary Judgment in the Underlying Action (ECF No. 15-6), and Reply to Defendants' Opposition (ECF No. 24). Defendant Evanston also filed an Opposition (ECF No. 19), declarations (ECF Nos. 20, 21), and a Concise Statement of Material Facts (ECF No. 22). Plaintiffs' Statement of Concise Facts were accepted

- 1 -

PATICO and its escrow officer San Nicolas, PATICO was insured under the Policy through Defendant Evanston. After briefing completed, a hearing was held on Plaintiffs' motion, at which point the Court took the matter under submission. (Mins., ECF No. 40.)

While Plaintiffs' motion was pending, Defendant Evanston filed its own cross-motion for summary judgment, or alternatively, partial summary judgment, asserting that there is no duty to defend PATICO and San Nicolas under the Policy because there are no facts in the underlying complaint that allege negligent conduct, and even if there were, the duty is extinguished by way of an exclusionary clause. (Cross-MSJ 9, 17, 22.) In addition, Evanston seeks a declaration that it has no duty to indemnify PATICO based on the vicarious liability exception because there is no coverage in the first instance. Evanston's Cross-MSJ has been fully briefed.[3] A hearing on this matter was held and the motion was also taken under submission.

As an initial matter, Evanston's request for judicial notice (ECF No. 45 at 18-20) is GRANTED. Based on the controlling law, the parties' written and oral arguments, and the record in this case, the Court now issues this Decision and Order DENYING Plaintiffs' motion and GRANTING Evanston's cross-motion for summary judgment.

## I.    BACKGROUND

### A.  Judicial Notice

Defendant Evanston requests this Court take judicial notice of three documents: (1) the U.L.G., Inc. ("U.L.G.") Complaint in the Underlying Lawsuit, *U.L.G., Inc. v. Leon Guerrero*,

---

by Evanston. (ECF No. 22 at 1-2 ("Defendant Accepts the facts set forth in the moving party's concise statement[.]").)

[3] Along with its Cross-MSJ, Evanston filed a Concise Statement of Undisputed Material Facts (ECF No. 45), which Plaintiffs responded to stating their acceptance of those facts (ECF No. 49). Plaintiffs nevertheless oppose Evanston's cross-MSJ (ECF No. 47), to which Evanston replied (ECF No. 51).

Civil Case No. CV0776-2020 filed in the Superior Court of Guam on October 19, 2020, where Plaintiffs in this action seek an order directing Evanston to finance their defense; (2) the Professional Liability Insurance Policy issued by Evanston to PATICO and at issue in this case; and (3) the Declaration of Bill R. Mann (ECF No. 15) and attached exhibits 1 through 8. (ECF No. 45 at 18-19.) All three documents were previously filed in support of Plaintiffs' MSJ. (ECF Nos. 15 (Decl. Mann); 15-1 (U.L.G. Compl.); 20 (Policy).) Evanston's request is unopposed, and Plaintiffs accepted the facts set forth in Evanston's Concise Statement of Undisputed Material Facts ("CSUMF"), which includes an iteration of the Policy's provisions. (*See* Opp'n, ECF No. 47; Def.'s CSUMF, ECF No. 45; Pls.' CSUMF, ECF No. 49 (accepting Defendant's CSUMF).)

Based on the non-opposition to the facts identified in Evanston's CSUMF, the Court will take judicial notice of all three documents pursuant to Federal Rule of Evidence 201, which requires judicial notice of facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. As to the U.L.G. Complaint, the Court does not make findings on the veracity of the allegations; rather, the Court will reference the U.L.G. Complaint's allegations as just that—allegations. *See Smith v. K9 Games AZ LLC*, No. CV-20-00797, 2020 WL 6585587, at *1 (D. Ariz. Nov. 10, 2020) ("Therefore, while courts may take notice of records in another case to determine, for instance, what issues were actually litigated in the past, courts may not take notice of the truth of the facts recited in those records[.]" (citations omitted)). Furthermore, the Policy has been attached to the Notice of Removal (ECF No. 1 at 10-77) and Plaintiffs' Complaint for Declaratory Judgment in this case necessarily relies on the Policy. *See Hints v. Am. Family Life Assurance Co. of Columbus*, No. 4:19-cv-03764, 2020 WL 2512234, at *1 n.1 (N.D. Cal. May 15, 2020) (granting request for judicial notice

- 3 -

because the insurance policy was submitted with complaint) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). Finally, Mr. Mann's declaration and exhibits may be judicially noticed because the declaration simply proffers the existence of documents that were originally submitted by Plaintiffs. (Def.'s CSUMF 104-105.) *Cf. Aurora Corp. of Am. v. Michlin Prosperity Co., Ltd*., No. CV 13-03516, 2015 WL 5768340, at *3 (C.D. Cal. Sept. 2015) (taking judicial notice of the existence of an affidavit but declining to take judicial notice of any facts or statements).

With these documents judicially noticed, the Court now turns to the allegations in the U.L.G. Complaint, which must be reviewed in order to determine whether Evanston's duty to defend Plaintiffs in the Underlying Lawsuit is triggered.

## B.  Origin of Tumon Property and U.L.G., Inc.

Pedro Leon Guerrero ("Pedro") owned a one-third interest in three valuable real properties located in Tumon Bay, Guam ("Tumon Property"). (U.L.G. Compl. ¶ 24.) He had four children with his wife who he intended would share equally in the income generated by the Tumon Property. (*Id*. ¶ 25.) In 1993, a year before Pedro and his wife died, title to the Tumon Property was assigned to U.L.G., Inc. ("U.L.G."), an entity formed by Gregory, Pedro's son. (*Id*. ¶ 26.) Gregory transferred ownership of the Tumon Property to U.L.G. on February 8, 1993, by a quitclaim deed recorded at the Guam Department of Land Management. (*Id*. ¶ 30.) "Despite the expressed intent of Pedro and [his wife] Vicenta as to how the income from the [Tumon Property] would be divided among their children, after their death, Gregory, through U.L.G. retained for himself the rental income from the Properties from 1994 until his death in 2014."[4] (*Id*. ¶ 31.) The vast majority of shares in U.L.G. (and therefore ownership of the Tumon Property)

---

[4] The U.L.G. Complaint earlier alleges that Gregory died in 2013. (U.L.G. Compl. ¶ 23.)

- 4 -

was issued to Gregory, with one additional share each to Pamela and Anthony, first cousins of Gregory. (*Id.* ¶ 27.) Gregory's three siblings were not aware that U.L.G.'s articles of incorporation did not include them as shareholders. (*Id.* ¶¶ 29, 31.)

After Gregory's death, Gregory's surviving wife Mary S.N. Leon Guerrero ("Mary") told the siblings that she wanted to make things right by including them in U.L.G.'s affairs. (*Id.* ¶ 32.) To that end, in October 2018, Mary, her son Collin (*id.* ¶ 22), Gregory's siblings, and Pamela and Anthony executed a series of documents equally dividing U.L.G.'s 1,500 shares among Mary and the three siblings. (*Id.* ¶ 33.) Peter, one of Gregory's siblings, was elected U.L.G.'s President and Treasurer, and Mary as its Secretary. (*Id.* ¶ 34(f).)

The three siblings then allege that a year later, in November 2019, Mary signed and filed a 2019 annual report falsely identifying herself as the President and Treasurer of U.L.G., her son Collin as its Secretary, and that the shares were owned by herself, her son, and the cousins—but not the siblings. (*Id.* ¶ 39.) The three siblings did not consent to transferring their collective 75% of the shares of U.L.G. stock nor did they elect Mary as U.L.G.'s President and Treasurer. (*Id.* ¶ 40.)

## C.  Sale of Tumon Property

Two weeks after she filed the false 2019 annual report, on December 13, 2019, Mary, purporting to act as U.L.G.'s President and Treasurer, executed a warranty deed transferring title of U.L.G.'s interest in the Tumon Property to Columbus Development Corp. (*Id.* ¶ 41.) The three siblings did not consent to this transfer. (*Id.* ¶ 43.)

The signatures on the warranty deed were notarized by Lourdes San Nicolas, an employee of PATICO, the escrow company charged with handling the land transaction. (*Id.* ¶ 46.) The buyer Columbus paid approximately $2,000,000 for U.L.G.'s interest in the Tumon

Property, and Mary kept all the money for herself. (*Id*. ¶ 47.)

**D. Procedural Background of Underlying Superior Court Lawsuit**

U.L.G. and the three siblings initiated a civil action on October 19, 2020, in the Superior Court of Guam against Mary, PATICO, San Nicolas, and others asserting five causes of action. (U.L.G. Compl. 1.) The two causes of action against PATICO and San Nicolas are 1) aiding and abetting breach of fiduciary duty and 2) civil conspiracy. U.L.G. and the siblings allege that Mary breached her fiduciary duty to U.L.G. as a director and officer by transferring legal title of the Tumon Property to Columbus for the benefit of U.L.G. "while actually keeping all of the purchase price for herself." (*Id*. ¶ 58.) U.L.G. and the siblings also allege that PATICO and San Nicolas, among other defendants, knowingly assisted and encouraged Mary to breach her fiduciary duties. (*Id*. ¶ 70.) In particular, San Nicolas notarized the signatures of Mary and the buyer's agents on the warranty deed, when PATICO and San Nicolas "knew that Mary did not have authority to execute the warranty deed on behalf of [U.L.G.], but nonetheless conspired with Mary and the other Defendants in their attempt to transfer the [Tumon Property] to Columbus through Mary's unauthorized actions." (*Id*. ¶ 46.) Additionally, PATICO "acting through its representative San Nicolas . . . also knew that Mary did not have the authority to transfer the Properties to Columbus on behalf of U.L.G. but likewise assisted and encouraged her to breach her fiduciary duties to U.L.G." (*Id*. ¶ 67.)

**E. Professional Liability Insurance Coverage Policy**

At the time U.L.G. and the siblings filed suit against PATICO and San Nicolas, PATICO was insured under the Professional Liability Insurance Coverage Policy through Evanston. The Policy contains a duty to defend provision, stating: "With respect to coverage hereunder, [Evanston] will have the right and duty to defend the Insured and to investigate any Claim . . .

to which coverage under this Coverage Part applies . . . ." (Policy 28 (Section VII(A)).) The Policy requires Evanston to pay damages and claim expenses incurred due to a "Wrongful Act" committed by PATICO while providing "Professional Services." (*Id*. at 18 (Section II(A)).) "Claim" is defined by the Policy as a "written demand for damages[.]" (*Id*. at 22 (Section III (C)(1)).) "Wrongful Act" is defined as "a negligent act, error or omission in Professional Services rendered[.]" (*Id*. at 25 (Section III(FF)).) "Professional Services" is defined to include services rendered "as escrow agent pursuant to written escrow instructions accepted in writing by the Insured." (*Id*. at 57 (Section III(V)(3)).)

The Policy also contained several exclusions from coverage. Specifically, the Policy provides that "this Coverage Part does not apply to any Claim . . . [b]ased upon or arising out of . . . [a]ny conversion, misappropriation, commingling, defalcation, theft … in the amount of escrow funds, monies, monetary proceeds, funds or property, or any other assets … or thing of value." (*Id*. at 26, 57 (Section IV(B)(7)).) In addition, the Policy prohibits coverage for claims arising out of conversion "irrespective of which individual, party, or organization actually or allegedly committed or caused in whole or in part the conversion." (*Id*. at 57.) Coverage will likewise not apply to intentional conduct except "this exclusion will not apply to [t]he strictly vicarious liability of any insured for the intentional . . . conduct of another Insured[.]" (*Id*. at 27 (Section IV(C)(1)(a)).)

**F.  PATICO and San Nicolas's Initiation of Instant Declaratory Judgment Action**

Evanston was provided a copy of the U.L.G. Complaint soon after PATICO and San Nicolas were served with it in February 2021. (*See* Pls.' Concise Statement of Material Facts ("CS") ¶ 1, ECF No. 13; ECF No. 22 (Defendant accepted Plaintiffs' Concise Statement)).) By a letter dated February 15, 2021, PATICO and San Nicolas demanded that Evanston provide them

- 7 -

a defense in the Underlying Lawsuit based on the Policy. (*See* Pls.' CS ¶ 3; ECF No. 22 (accepted); ECF No. 15-4.) Nevertheless, Evanston denied coverage including defense costs because the U.L.G. Complaint did not assert a claim for negligent conduct, but instead asserted that PATICO and San Nicolas knowingly aided and abetted Mary's breach of fiduciary duties. (*See* Pls.' CS ¶ 4; ECF No. 22 (accepted); ECF No. 20 at 74.) Evanston further averred that the exclusionary clauses prohibit coverage of claims arising out of conversion and misappropriation. (ECF No. 20 at 80.)

PATICO and San Nicolas unsuccessfully requested Evanston to reconsider its position after the Superior Court denied their motion for summary judgment in the Underlying Lawsuit. (ECF No. 15-7 (PATICO letter); ECF No. 15-8 (Evanston denial); *see* Pl.'s CS ¶ 6; ECF No. 22 (admitted).) PATICO and San Nicolas then initiated their own lawsuit for a declaratory judgment against Evanston in the Superior Court of Guam in July 2022, a copy of which is included in Evanston's Notice of Removal. (Notice of Removal 80, ECF No. 1.) Evanston subsequently removed PATICO and San Nicolas's complaint for declaratory judgment to this Court. (*Id.* at 1.) In this suit, PATICO and San Nicolas seek:

(1) A declaratory judgment construing the provisions of the Policy and determining the rights and liabilities of the parties;
(2) A court order against Evanston to defend PATICO and San Nicolas against the Underlying Lawsuit and to pay any judgment rendered against them;
(3) A court order against Evanston to reimburse PATICO and San Nicolas litigation expenses, including attorney's fees, in defending the Underlying Lawsuit plus an addition 12% of the amount owing; and
(4) A court order against Evanston to reimburse PATICO and San Nicolas's reasonable attorney's fees, court costs, and litigation expenses in filing this action.

(*Id.* at 83.) PATICO and San Nicolas are Guam residents and citizens, whereas Evanston is a citizen of the State of Illinois. (*Id.* at 4.) According to Evanston, PATICO and San Nicolas claim they have expended $59,245.22 for litigation fees and expect more than $16,000 in future

- 8 -

litigation expenses. (*Id.* ¶ 21.) Therefore, Evanston has established complete diversity jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and (2).

## II.    LEGAL STANDARD

### A.  Summary Judgment

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattret*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary judgment who does bear the burden of proof at trial must produce evidence that would entitle him to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make this showing, the moving party

- 9 -

is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). "If a genuine dispute of material fact exists, a court must deny both motions." *Fed. Trade Comm'n v. Am. eVoice, Ltd.*, 242 F. Supp. 3d 1119, 1121 (D. Mont. 2017) (citation omitted). However, if there is no dispute of material fact and only one party is entitled to judgment as a matter of law, a court may grant summary judgment as to that party only. *E.g.*, *Johnson v. Diaz*, 339 F. Supp. 60, 65 (C.D. Cal. 1971) (granting one party's motion for summary judgment and denying other party's motion).

## B. Interpreting Insurance Policies

"[I]nterpretation of an insurance policy is a question of law, subject to the ordinary rules of contractual interpretation." *Axis Reinsurance Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 847 (9th Cir. 2020). In general, "summary judgment is appropriate only if the contract or the contract provision in question is unambiguous." *Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 920 (9th Cir. 1998) (citation omitted). The rationale for this rule is that "ambiguity in a contract raises a question of intent, which is a question of fact precluding summary judgment." *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1981). "The usual statement of the rule, however, assumes that there is at least some evidentiary support for competing interpretations of the contract's language." *Id*. When there is no evidentiary support for the interpretation urged by a party, summary judgment against that party is appropriate, even if the contract is ambiguous on its face. *Id*. "Policy language must be interpreted 'in context, with regard to its intended function in the policy,' keeping in mind '[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the

- 10 -

parties.'" *Axis*, 975 F.3d at 847 (citation omitted).

"A policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable." *Id.* If there is ambiguity, "it is generally resolved against the insurer and in favor of coverage." *Id.*

Interpretation of an insurance policy is a question of state law. *See Northfield Ins. Co. v. Sandy's Place, LLC,* 530 F. Supp. 3d 952, 962 (E.D. Cal. 2021); *Nat'l Union Fire Ins., Co. of Pittsburgh, Pa. v. Guam Hous. & Urban Renewal Auth.*, 2003 WL 22497996, 2003 Guam 19 ¶ 13 (Gu. 2003) (hereinafter "*GHURA*"). Where Guam law is unclear, "a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Med. Lab. Mgmt. Consultants v. Am. Broad Cos.*, 306 F.3d 806, 812 (9th Cir. 2002) (citation omitted). This determination is guided by "decisions from other jurisdictions, statutes, treatises, and restatements[.]" *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990). In interpreting Guam insurance policies, "California law may be illuminating, as 'Guam's insurance statutes were adopted from California[.]'" *Guam Indus. Serv. Inc. v. Zurich AM. Ins. Co.*, No. CV 11-00014, 2013 WL 5068873, at *4 (D. Guam Sept. 13, 2013) (quoting *Fajardo ex rel. Fajardo v. Liberty House Guam*, 2000 Guam 4 ¶ 15); *see GHURA*, 2003 Guam 19 ¶ 63 (looking to California law because Guam's insurance statutes mirror California's).

**III. DISCUSSION**

The parties' central dispute is whether Evanston has a duty to defend PATICO and San Nicolas in the Underlying Lawsuit. PATICO and San Nicolas say "yes" because the U.L.G. Complaint could potentially include a claim for negligence. They maintain this duty to defend is grounded in three different bases: (1) the underlying U.L.G. Complaint may be amended to include a negligence claim which the Policy covers, (2) the Superior Court reduced a claim to

- 11 -

negligence in the Underlying Lawsuit, and (3) PATICO can assert coverage based on a vicarious liability exception to an exclusionary clause in the Policy. Conversely, Evanston says there is no duty to defend, because there are no facts in the U.L.G. Complaint that allege negligence, and even if there were, the Policy precludes coverage for claims "arising out of" Mary's alleged conversion of the Tumon Property. PATICO and San Nicolas respond that the conversion happened after PATICO and San Nicolas's involvement, i.e. after the close of escrow when PATICO no longer had control of the funds.

Ultimately, the Court finds that Evanston does not have a duty to defend in this case because the U.L.G. Complaint in the Underlying Lawsuit does not assert any facts to demonstrate negligence. Rather, the U.L.G. Complaint solely relies on the intentional conduct of PATICO and San Nicolas to assert the claims of aiding and abetting breach of fiduciary duty as well as civil conspiracy. Even if the Court were to rely on the Superior Court's decision and order denying PATICO and San Nicolas's motion for summary judgment, this Court finds that the disputed fact presented by the U.L.G. Plaintiffs to overcome the motion support a legal theory of intentional wrongdoing rather than negligence. Furthermore, the Superior Court merely discussed negligence as one of the elements in its analysis of a potential legal theory of whether there was liability for the count of aiding and abetting breach of fiduciary duty. Furthermore, even if Evanston's duty to defend were triggered by a potential negligence claim asserted by the U.L.G. Plaintiffs, there is an exclusionary clause that precludes coverage for conduct arising out of conversion and/or misappropriation, which is the allegation against PATICO and San Nicolas. Finally, the Court finds that PATICO cannot avail itself of the vicarious liability exception to any exclusion because there is no coverage in the first instance. Summary judgment must therefore be granted in favor of Evanston.

- 12 -

**A. The Policy expressly includes a duty to defend when coverage applies.**

In interpreting insurance policies, "a court must first determine whether the insurer had a duty to defend under the policy." *GHURA*, 2003 Guam 19 ¶ 15. It is a contractual duty, requiring courts to examine the insurance policy itself. *Id.* ¶ 16. Here, the Policy plainly states that Evanston has a duty to defend when coverage applies: "With respect to coverage hereunder, [Evanston] will have the right and duty to defend the Insured and to investigate any Claim and Disciplinary Proceeding to which coverage under this Coverage Part applies[.]" (Policy 28 (Section VII(A)).) Evanston does not dispute this.

**B. The duty to defend is not triggered because coverage does not apply.**

Evanston maintains that because the U.L.G. Complaint does not allege any negligent conduct, its duty to defend is not triggered. (Cross-MSJ 20-21, ECF No. 44.) The Underlying Lawsuit "is well beyond the pleading stage as the parties have engaged in extensive and voluminous discovery, and discovery is now complete. Even after discovery closed, the U.L.G. Plaintiffs chose not to amend the U.L.G. Complaint to allege that PATICO and San Nicolas were negligent." (*Id.* at 21.) Therefore, Evanston contends that PATICO and San Nicolas cannot argue that the U.L.G. Complaint could be amended to include a negligence claim. (*Id.*) PATICO, by contrast, argues that "it is of no moment that the U.L.G. Complaint has not been amended to date since the duty to defend is determined at the time of the tender of the defense." (MSJ 12.) That is, if the complaint could be amended to include a claim because there are facts supporting it, then the duty to defend is triggered. In arguing that negligence is a potential claim, PATICO and San Nicolas rely on the Superior Court's decision finding potential liability based on the elements of negligence in the Underlying Lawsuit. (Opp'n to Cross-MSJ 4.)

"An insurer must defend its insured against claims that create a *potential* for indemnity

- 13 -

under the policy." *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (Cal. 2005); *see Aerojet-Gen.l Corp. v. Transport Indem. Co*., 17 Cal. 4th 38, 59 (Cal. 1997) (noting that the duty to defend "extends beyond claims that are actually covered to those that are merely potentially so, but no further"). "In determining whether the duty to defend . . . is triggered, the focus is on the *facts* in the complaint and those known to the insurer 'regardless of the technical legal cause of action pleaded by the third party.'" *GHURA*, 2003 Guam 19 ¶ 22 (emphasis added) (quoting *Cort v. St. Paul Fire & Marine Ins. Co.*, 311 F.3d 979, 983 (9th Cir. 2002)). The duty to defend is not excluded if the facts of a complaint "reasonably inferable, or otherwise known" could be amended to state a claim. *Scottsdale*, 36 Cal. 4th at 654; *Aerojet*, 17 Cal. 4th at 59 ("[I]n an action wherein all the claims are at least potentially covered because they may possibly embrace some triggering harm of the specified sort within the policy period . . . the insured has a duty to defend."). "The defense duty arises upon tender of a potentially covered claim and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage." *Scottsdale*, 36 Cal. 4th at 655. Importantly, however, "[t]here is no duty to defend or obligation to pay defense costs 'if a third party complaint can by no conceivable theory raise a single issue which would bring it within policy coverage." *Id*. Thus, a duty to defend only arises "if the *facts* alleged or known could support a claim" other than those already asserted in the complaint. *Los Angeles Lakers v. Fed. Ins. Co*., 869 F.3d 795, 806 (9th Cir. 2017) (emphasis added).

The Court agrees with Evanston: nowhere in the U.L.G. Complaint is it *factually* supported that PATICO or San Nicolas acted negligently. Rather, the U.L.G. Complaint is replete with facts alleging that PATICO and San Nicolas (along with other defendants) acted intentionally. The U.L.G. Complaint specifically alleges, *inter alia*, Plaintiffs: "had actual

- 14 -

*knowledge* of Mary's breaches of her fiduciary duties that she owed to U.L.G." (U.L.G. Compl. ¶ 64 (emphasis added)); "substantially assisted or *encouraged* Mary to breach the fiduciary duties she owed to U.L.G." (*id*. ¶ 65 (emphasis added)); "*knew* that Mary did not have the authority to transfer the Properties to Columbus on behalf of U.L.G. but likewise assisted and *encouraged* her to breach her fiduciary duties to U.L.G." (*id*. ¶ 67 (emphasis added)); and committed tortious actions "*knowingly* assisting and encouraging Mary to breach her fiduciary duties [which] were malicious and fraudulent" (*id*. ¶ 70 (emphasis added)). Furthermore, "[t]he signatures of Mary, Schrage, and Kim on the warranty deed were notarized by San Nicolas, who is employed by [PATICO], which, together with San Nicolas, *knew* that Mary did not have the authority to execute the warranty deed on behalf of U.L.G., but nonetheless conspired with Mary and the other Defendants in their attempt to transfer the Properties to Columbus through Mary's unauthorized actions." (*Id*. ¶ 46 (emphasis added).) In its Concise Statement of Undisputed Material Facts, Evanston identifies that the U.L.G. Complaint only alleges intentional or fraudulent conduct (Def.'s CSUMF 3), a fact that PATICO and San Nicolas accepted (Pls.' CSUMF 1). None of these facts suggest negligent conduct.

While PATICO and San Nicolas would have the Court focus on potential *theories* of liability (such as negligence), the Court must not misconstrue the principle of potential liability under an insurance policy. *See Lakers*, 869 F.3d at 806 (a duty to defend only arises "if the facts alleged or known could support a claim" other than those already asserted in the complaint). Rather, the Court must look to the alleged *facts* that would show a potential for coverage, and here, there are no facts to show a potential finding of a negligent act. *See Hurley Const. Co. v. State Farm Fire and Casualty Co.*, 10 Cal. App. 4th 533, 538 (Cal. Ct. App. 1992) ("The Fireman's Fund complaint, on its face, alleged no *facts* showing a potential for coverage."

- 15 -

(emphasis added)). Furthermore, if Evanston's representations are accurate that discovery has closed in the Underlying Lawsuit since the Court held its hearing on PATICO and San Nicolas' motion for summary judgment and there is still no amended complaint, then the Court finds that as further evidence that there are no factual allegations to establish coverage.

PATICO and San Nicolas assert that the Superior Court of Guam reduced the Underlying Lawsuit's claim of the common law tort of aiding and abetting breach of fiduciary duty to a mere negligence case: "there is not just a possibility that PATICO will face a negligence claim at trial, but a probability." (MSJ 15.) This is a fundamental misunderstanding of the Superior Court's decision. The Superior Court addressed the two specific intent tort causes of action against Plaintiffs—neither of which was negligence. (*See* Decision & Order 9-12, ECF No. 15-6.) In its analysis of the claim aiding and abetting breach of fiduciary duty, the Superior Court listed the four elements of this common law tort. (*Id*. at 9.) It then discussed the several theories under which the first element of duty may be satisfied. (*Id.* at 10.) In discussing the second theory to establishing duty, it found that the claim requires that the aider and abettor owe a fiduciary duty to the victim, and that the aider and abettor provide substantial assistance to the person breaching his or her fiduciary duty. (*Id*. at 11.) The Superior Court then discussed San Nicolas's duty as an escrow agent. (*Id.*) It is in this context that the reference to negligence is mentioned: "It is also the duty of an escrow holder to exercise reasonable skill and ordinary diligence in its employment, and if the escrow holder acts negligently, it is ordinarily liable for any loss occasioned by its breach of duty." (*Id.*) On this issue, PATICO and San Nicolas alleged the U.L.G. Plaintiffs could not prove San Nicolas had any knowledge about the ownership dispute. The U.L.G. Plaintiffs responded by presenting the testimony of Mary's real estate broker Ramona, who told San Nicolas about the ownership dispute. With these disputed facts as to the

first element, the Superior Court ended its analysis and concluded summary judgment was improper. (*Id*. at 12.) The Superior Court's legal conclusion did not result in an alteration of the factual allegations and legal claims in the Underlying Lawsuit's complaint, and without any subsequent amendment, the Court will not read new facts or legal claims into the complaint.

Even if the Court were to consider the Superior Court's findings of undisputed facts as extrinsic evidence known to the insurer Evanston, those facts do not support a finding of negligent conduct by PATICO or San Nicolas.[5] (*Id*. at 3-8.) According to the facts determined by the Superior Court, it is undisputed that escrow was opened at PATICO for the purchase of the Tumon Property on November 15, 2019. (*Id*. at 6 ¶ 27.) PATICO was hired by Columbus, the buyer, to arrange for a title insurance policy insuring Columbus against various possible defects in title. (*Id*.) The professionals at PATICO conducted an investigation on title and reviewed the corporate records provided by Mary. (*Id*.) PATICO subsequently made written requests for U.L.G.'s particular corporate documents. (*Id*. at 6 ¶ 29.) The corporate documents filed at the Department of Revenue and Taxation in October 2018, including U.L.G.'s Corporate Annual Report for 2018, show that Mary and the three plaintiffs in the Underlying Lawsuit owned equal percentages of U.L.G. shares and that Peter was U.L.G.'s President and Treasurer. (*Id*. at 2 ¶ 12.) Mary and her real estate broker Ramona knew about these filed documents. (*Id*. at 5 ¶ 19.) Mary never provided PATICO the requested corporate documents, but instead filed U.L.G.'s Corporate Annual Report for 2019, which showed that she was the President and that the siblings were not shareholders. (*Id*. at 6 ¶ 31.) There is no evidence on the record that

---

[5] In their motion for summary judgment, Plaintiffs do not appear to dispute most of the facts as iterated by the Superior Court. Instead, Plaintiffs in a footnote identify just one fact that is "strongly contested," namely that Plaintiffs were informed that there were issues with ownership over the Tumon Property. (*See* MSJ 14 n.3 (citing to Decision & Order 4.))

- 17 -

PATICO ever issued a title report. The Guam Superior Court found a genuine issue of material fact was established by the U.L.G. Plaintiffs when they submitted the deposition testimony of Ramona Siblang, who "specifically and repeatedly testified that she told [San Nicolas] before closing that there were "issues with the ownership" of U.L.G. documents filed with DRT." (*Id.* at 10.) Despite being informed of those issues, San Nicolas knowingly told Ramona just to send what she had, that is, the superseded Articles of Incorporation and Bylaws of U.L.G. that did not show its change of ownership, so that the transaction could be closed anyway. (*Id.*) Mary then signed the warranty deed for the transaction the following week, and closing occurred the week after. (*Id.* at 6 ¶¶ 32-33.) Mary subsequently instructed PATICO to wire the net sale proceeds in the amount of $2,321,003.74 to her personal account. (*Id.* at 6 ¶ 34.) All of this conduct, as the facts elucidated by the Superior Court shows, reveals allegations of intentional wrongdoing—not negligence.

In fact, the Superior Court's Decision and Order, which PATICO and San Nicolas rely on, contains the undisputed facts that Mary and Ramona went to DRT to examine U.L.G.'s filings just two days before escrow was opened, during which time Ramona informed Mary that they could not go through with the transaction. (*Id.* at 5-6 ¶ 26-27.)

In determining whether a potential claim is covered, the Court is also to consider whether the insurer has a duty to defend an action "where extrinsic facts known to the insurer suggest that the claim may be covered." *Lakers*, 869 F.3d at 806 (quoting *Scottsdale*, 36 Cal. 4th at 466). However, "[a]n insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date[;]" therefore, "an insured may not 'manufacture coverage.'" *Id.* (quoting *Gunderson v. Fire Ins. Exch.*, 37 Cal. Rptr. 2d 272, 277-78 (Cal. Ct. App. 1995)). Based

- 18 -

on all the facts alleged in the U.L.G. Complaint, and the extrinsic evidence known to the insurer, Evanston, this Court concludes that there are no facts to support a finding that there is potential coverage. Accordingly, the Court DENIES PATICO and San Nicolas's MSJ, and instead GRANTS Evanston's Cross-MSJ to declare that the factual allegations in the U.L.G. Complaint of the Underlying Lawsuit do not trigger Evanston's duty to defend under the Policy because the duty to defend only arises when coverage applies.

**C. Even if the duty to defend were triggered, the Policy's exclusionary clause precludes coverage.**

Evanston asserts that there is an exclusionary clause in the Policy that precludes coverage for claims "based on" or "arising out of" conversion or misappropriation. (*See* Cross-MSJ 22.) The Policy provides as follows:

> C. Based upon, arising out of, or in any way involving:
>
> **1.** Any conduct of the **Insured** or at the **Insured's** direction that is intentional, willful, dishonest, fraudulent or that constitutes a willful violation of any law, statute or regulation; however, this exclusion will not apply to:
> > **a.** The strictly vicarious liability of any **Insured** for the intentional, willful, dishonest or fraudulent conduct of another **Insured** or for the conduct of another **Insured** that constitutes a willful violation of any statute or regulation; or
> > **b. Claim Expenses** incurred until an allegation is determined through final and non-appealable adjudication.
> **2.** The gaining by any **Insured** of any profit, remuneration or advantage to which such **Insured** was not legally entitled, provided, however any fact pertaining to any **Insured** will not be imputed to any other **Insured** under this Coverage Part for the purpose of determining the applicability of this exclusion . . .

(Policy 27.)

PATICO and San Nicolas argue that whether the exclusionary clause prohibits coverage for claims based on or arising out of conversion and misappropriation depends, in their view, on *when* the alleged conversion occurred. (Opp'n to Cross-MSJ 6.) They assert that the exclusionary

- 19 -

clause is inapplicable because the alleged conversion occurred after the funds were disbursed by escrow to Mary and contend that "<u>when</u> the conversion took place makes all the difference in the world." (*Id.*) PATICO and San Nicolas reason that they have no control over what happens after the money is disbursed from escrow and holding them liable for conduct they have no control over would be unfair: "An escrow agent obviously does not guarantee that funds it disburses in a real estate closing will be forever more handled properly. After closing and disbursement, the escrow agent no longer has control of the funds or what the recipients do with the funds, and cannot possibly be liable for post-disbursement wrongdoing." (*Id.*) Evanston maintains that "[t]his argument makes no difference and has no impact on the application of" the exclusionary clause, suggesting that its broad language precludes coverage regardless of when the alleged conversion occurred. (*See* Reply to Opp'n of Cross-MSJ 10, ECF No. 51.) "Even if the sale proceeds from the sale of the [Tumon Property] are what was converted . . . this Exclusion still bars coverage for the Underlying Lawsuit because it is a conversion of monetary proceeds." (*Id.* at 10-11.)

Guam courts have construed "arising out of" broadly in different contexts. "Courts in several jurisdictions, which have interpreted a similar clause to the present one, have construed the 'arising out of' and 'relating to' language broadly." *Brown v. Dillingham Const. Pac. Basin, Ltd.*, 2003 Guam 2 ¶ 17 (Guam 2003) (collecting cases and finding that the clause in arbitration contracts is afforded broad interpretation). "Courts typically hold that 'generic' alternative dispute resolution clauses—i.e., those triggered by disputes 'arising out of' or 'related to' an operating agreement—shall be construed broadly in favor of alternative dispute resolution." *Perez v. Monkeypod Ent., LLC*, 2022 Guam 12 ¶ 15 (Guam 2022) (collecting cases). This is consistent with Ninth Circuit precedent interpreting California law. "[W]hen an exclusionary

clause is relied upon to deny coverage, the burden rests upon the insurance company to demonstrate that the allegations of the complaint can be interpreted only to exclude coverage." *GHURA*, 2003 Guam 19 ¶ 23. Such exclusionary clauses, however, are to be interpreted narrowly against the insurer. *Lakers*, 869 F.3d at 801. In *Lakers*, the Ninth Circuit addressed the scope of a policy excluding coverage "based upon, arising from, or in consequence of . . . invasion of privacy." 869 F.3d at 801. Interpreting insurance policies in view of California and federal law, the court noted "California courts and our court have consistently given a broad interpretation to the clause 'arising from' in an insurance contract." *Id*. It described that "'arising out of' encompasses 'originating from, having its origin in, growing out of, . . . flowing from, . . . incident to, or having connection with.'" *Id*. The court concluded that the "clause broadly excludes from coverage claims with 'a minimal causal connection or incidental relationship' to invasion of privacy." *Id*. Further analyzing what constitutes "invasion of privacy," the court determined that the exclusionary clause was triggered. *Id*.

Given the consistency in interpreting "arising out of" broadly, the Court also applies this broad reading to the exclusionary clause at bar. Considering the Insurance Policy as a whole, and in light of caselaw, the meaning of the term "arising out of" is not ambiguous. While courts are instructed to construe exclusionary clauses narrowly against the insurer, this exclusionary clause is particularly broad because it precludes *any* claim *arising out* of *any* conversion or misappropriation *irrespective* of the individual who caused the conversion. (Policy 57.) This Court does not interpret the conversion exclusion to impose a temporal limit.

Furthermore, the Court disagrees that conversion did not occur until after the sale proceeds of the Tumon Property were disbursed and escrow closed. Rather, the facts in the U.L.G. Complaint expressly allege that PATICO and San Nicolas "knew that Mary did not have

- 21 -

authority to execute the warranty deed on behalf of [U.L.G.], but nonetheless conspired with Mary and the other Defendants in their attempt to transfer the [Tumon Property] to Columbus through Mary's unauthorized actions." (U.L.G. Compl. ¶ 46.) Upon information and belief, the U.L.G. Plaintiffs alleged the buyer paid approximately $2,000,000 for U.L.G.'s interest in the Tumon Property, "but Mary kept all of the money for herself." (*Id.* ¶ 47.) The Guam Superior Court subsequently found that "Mary instructed PATICO to wire the net sale proceeds in the amount of $2,321,003.74 to her account." (Decision & Order 35.) This allegedly intentional conduct, which forms the basis of the claim against PATICO and San Nicolas, is "based on" and "arose out of" Mary's conversion of the sale proceeds that San Nicolas knowingly gave her for a transaction of real property owned by U.L.G. Inc. The transfer of the deed as well as the remittance of the sale proceeds to Mary's personal account instead of U.L.G.'s account, were substantial steps towards the conversion of the sale proceeds, and therefore, conversion allegedly occurred both before and after escrow closed.

Broadly applying the arising out of language in the exclusionary clause and finding unpersuasive Plaintiffs' argument that conversion happened after the disbursement of funds, the Court finds that the facts alleged demonstrate that the claim is "based upon or arose out of" conversion. Accordingly, Evanston has met its burden to show that the exclusion is triggered, and the Court GRANTS summary judgment in favor of Evanston on this basis as well.

**D. Vicarious liability does not exist because there is no coverage.**

Finally, PATICO argues that there is coverage against vicarious liability resulting from the intentional wrongdoing of another insured, here, San Nicolas. (MSJ 12.) Although PATICO concedes that the duty to indemnify cannot be determined prior to the outcome of trial, "the possibility of indemnification clearly triggers Evanston's duty to provide a defense to PATICO."

- 22 -

(*Id*. at 13.) Evanston opposes, arguing that "[a]n exclusion cannot act as an additional grant or extension of coverage." (Opp'n to MSJ 21, ECF No. 19.) "The exception to the exclusion merely 'serves to reinstate coverage where it would not exist.'" (*Id*. (quoting *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1192 (Cal. 1998)).) Evanston later states "[a]n exception to an exclusion, which is a 'carve back' within an exclusionary provision, merely restores already-existing coverage. Here, coverage does not exist in the first instance." (Reply to Opp'n to Cross-MSJ 12.)

The Court has already determined that coverage does not apply. Where there are exclusions to coverage, there may also exist exceptions to those exclusions. "[O]nce the insurer carries its burden of proving the exclusion applies, the insured bears the burden of proving the exception." *Aydin Corp.*, 18 Cal. 4th at 1186. Any such exception must be construed broadly in favor of the insured. *Id*. at 1196.

The exception to exclusion analysis begins "by considering whether the policy's insuring agreements create coverage for the disputed claim." *Sony Comput. Entm't Am. Inc. v. Am. Home Assurance Co.*, 532 F.3d 1007, 1017 (9th Cir. 2008). "If coverage exists, *then* the court considers whether any exclusions apply." *Id*. (emphasis added). However, "[i]f coverage does not exist, the *inquiry ends*. The exclusions are no longer part of the analysis because 'they cannot expand the basic coverage granted in the insuring agreement.'" *Id*. (emphasis added). This applies to exceptions to exclusions as well. "A 'carve back' within an exclusionary provision merely restores already existing coverage." *Id*.

As previously established under *Lakers*, there is no coverage in the first instance here because the U.L.G. Complaint does not allege facts that would bring the claim into coverage, i.e., it does not allege negligent acts to support a negligence claim but rather only intentional

- 23 -

acts. Moreover, the duty to defend was not triggered through extraneous facts regarding potential liability by the insured. PATICO may not avail of the vicarious liability exception and there is neither a duty to defend nor indemnify.

## IV.     CONCLUSION

Plaintiffs PATICO and San Nicolas moved for summary judgment to have the Court find and declare that their insurer Evanston has a duty to defend them in the Underlying Lawsuit pursuant to its Policy. Evanston filed its own cross-motion for summary judgment asserting there is no duty to defend PATICO and San Nicolas under the Policy. The Court finds that there is no coverage in the first instance because the U.L.G. Complaint does not allege facts that would bring the claim into coverage.

For the foregoing reasons, the Court hereby DENIES Plaintiffs' motion for summary judgment (ECF Nos. 11, 12) and GRANTS Defendant's cross-motion for summary judgment (ECF No. 44). Accordingly, the Clerk shall enter judgment in favor of Defendant. The case is hereby closed, and all pending motions are terminated.

IT IS SO ORDERED this 31st day of March 2025.


RAMONA V. MANGLONA
Designated Judge